407.423.9900
Fax 407.841.2779
Toll Free 855-MYDEPOS

MILESTONE I REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

1    UNITED STATES DISTRICT COURT

2    MIDDLE DISTRICT DIVISION

3    TAMPA DIVISION

4    CASE NO.:  8:23-CV-02548-KKM-JSS

5

6    SCARLETT LOPEZ,

7    Plaintiff

8

9    V.

10

11   CITY OF TAMPA,

12   Defendant

13

14   DEPONENT:  DANNI JORGENSON *VOL I*

15   DATE:      MAY 23, 2024

16   REPORTER:  ISABELLA GARBUTT

17

18

19

20

21

22

23

24

25

400 North Ashley Drive, Suite 2600        100 East Pine Street, Suite 308        4651 Salisbury Road, 4th Floor
TAMPA, FL 33602                           ORLANDO, FL 32801                      JACKSONVILLE, FL 32256
                                          CORPORATE

APPEARANCES

ON BEHALF OF THE PLAINTIFF, SCARLETT LOPEZ:
Daniela S. Carrion, Esquire
Linesch & Carrion, LLC
700 Bee Pond Road
Palm Harbor, Florida 34683
Telephone No.: (727) 786-0000
E-mail: daniela.carrion@lineschfirm.com

ON BEHALF OF THE DEFENDANT, CITY OF TAMPA:
Christopher M. Bentley, Esquire
Maddi H. McLeland, Esquire
Johnson Jackson, PLLC
100 North Tampa Street
Suite 1800
Tampa, Florida 33602
Telephone No.: (813) 580-8400
E-mail: cbentley@johnsonjackson.com
mmcleland@johnsonjackson.com

ON BEHALF OF THE WITNESS, DANNI JORGENSON:
Sarah A. Naccache, Esquire
Sass Law Firm
601 West Dr. Martin Luther King, Jr. Boulevard
Tampa, Florida 33603
Telephone No.: (813) 251-5599
E-mail: snaccache@sasslawfirm.com

Also Present: Scarlett Lopez, Plaintiff; Koranis Garcia,
Linesch & Carrion, LLC Paralegal; Rebecca Carr, City of
Tampa



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

1                          INDEX
                                                    Page
2    PROCEEDINGS                                     5
     TESTIMONY OF DANNI JORGENSON
3    DIRECT EXAMINATION BY MS. CARRION               5
     CROSS-EXAMINATION BY MR. BENTLEY                117
4
                          EXHIBITS
5    Exhibit                                         Page
       1 - Text Message Thread with Scarlett
6          Lopez                                     38
       2 - Text Message Thread with Jean Duncan      43
7      3 - Work Release Form Correspondence          59
       4 - March 3, 2022 E-mail from Kimberly
8          Sullivan                                  62
       5 - March 15th, 2022 E-mail to Jean Duncan
9          and Bertha Mitchell                       63
       6 - City of Tampa Letter from Jean Duncan
10         to Scarlett Lopez                         93
       7 - Performance Evaluation from City of
11         Tampa                                     102
       8 - August 3, 2022 E-mail from Jean
12         Duncan                                    107
       9 - City of Tampa Civil Service Log           135
13    10 - January 3, 2022 Copy of E-mail
           from Jean Duncan                          150
14    11 - March 8, 2022 E-mail from Mike Swine
           to Employee Relations                     165
15    12 - April 20, 2022 Grievance Letter
           from Scarlett Lopez                       168
16

17

18

19

20

21

22

23

24

25



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

1                    STIPULATION

2

3  The deposition of DANNI JORGENSON was taken at JOHNSON

4  JACKSON, PLLC, 100 NORTH TAMPA STREET, SUITE 1800,

5  TAMPA, FLORIDA 33602, on THURSDAY the 23RD day of MAY

6  2024 at 9:06 a.m. (ET); said deposition was taken

7  pursuant to the FLORIDA Rules of Civil Procedure.

8

9  It is agreed that ISABELLA GARBUTT, being a Notary

10  Public and Court Reporter for the State of FLORIDA, may

11  swear the witness and that the reading and signing of

12  the completed transcript by the witness is not waived.

13

14

15

16

17

18

19

20

21

22

23

24

25



MILESTONE **|** REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
 1              PROCEEDINGS
 2          THE REPORTER:  And we are now on record.
 3          Ms. Jorgenson, if you could please raise your
 4      right hand. Do you solemnly swear or affirm that the
 5      testimony you're about to give be the truth, the
 6      whole truth, and nothing but the truth?
 7          THE WITNESS:  I do.
 8          THE REPORTER:  All right.
 9          And you may begin.
10              DIRECT EXAMINATION
11          BY MS. CARRION:
12      Q.   Good morning, Ms. Jorgenson. Could you please
13   state your full name and spell it for the court
14   reporter, please?
15      A.   Sure.  It's Danni, D-A-N-N-I, Hirsch, H-I-R-S-
16   C-H, Jorgenson, J-O-R-G-E-N-S-O-N.
17      Q.   And have you ever used any other names?
18      A.   Just Danni Hirsch before I was married.
19      Q.   Okay.  And could you please tell us your date
20   of birth?
21      A.   XX-XX-XXXX.
22      Q.   And how old are you currently?
23      A.   39.
24      Q.   It's okay.  I deny it, too.
25          Could you please tell us your current address,
```

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

 1  city and state?

 2      A.    4519 West Dale Avenue, Tampa, Florida 33609.

 3      Q.    And when did you start residing there?

 4      A.    In October 2013.  I think we bought the house

 5  on Halloween.

 6      Q.    Perfect.

 7            2013, you said?

 8      A.    Uh-huh.

 9      Q.    Okay.  Thank you.

10            Do you know why you're here today?

11      A.    Yes.

12      Q.    Okay.  Do you understand that you're currently

13  under oath, and that means that you're sworn to tell the

14  truth?

15      A.    Yes.

16      Q.    Have you ever had any depositions taken in the

17  past?

18      A.    No.

19      Q.    Now, you are aware I have the right to ask you

20  any questions about this matter.  However, it's so

21  important that you understand all my questions.  So I

22  would just ask if for whatever reason you don't

23  understand any question, or it's confusing, that you

24  please ask me to repeat.

25            Can we agree to that?



**MILESTONE | REPORTING  COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          *Toll Free 855-MYDEPOS*

1      A.   Yes.

2      Q.   Perfect.

3           Besides your counsel and I, have you spoken to

4  anybody else about this matter?

5      A.   I mean, just, like, family members.

6      Q.   Okay.  Besides your spouse, any family members

7  that you've spoken to this case about?

8      A.   No.

9      Q.   Okay.  Do you understand who my client is?

10     A.   Yes.

11     Q.   Okay.  And do you know her?

12     A.   Yeah.

13     Q.   Okay.  When you were coming in for depositions

14 today, how did you prepare?

15     A.   I watched a video about depositions.

16          MS. NACCACHE:  Object to privilege.

17          THE WITNESS:  Okay.  Yeah.

18          BY MS. CARRION:

19     Q.   If your counsel objects to privilege, she may

20 also ask you whether you can answer the question or not.

21 And so I'll defer to her whenever she makes the

22 objection, okay?

23          MS. NACCACHE:  Yeah.

24          THE WITNESS:  Okay.

25          BY MS. CARRION:

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    Q.   Okay.  Besides speaking with your counsel, did

2  you review any documents in order to prepare for today's

3  deposition?

4    A.   No.

5    Q.   Besides speaking with your counsel, did you

6  speak to anybody else about preparing for this

7  deposition?

8    A.   No.

9    Q.   Have you spoken or signed any affidavits or

10  sworn statements in regards to this case?

11    A.   I'm not sure.

12    Q.   Okay.  Have you ever signed anything that

13  talked about any facts in relations to Ms. Lopez and

14  this litigation matter?

15    A.   Have I ever signed anything?  Can you say the

16  question again?

17    Q.   Yeah.  Have you ever written any statement in

18  regards to any allegation that Ms. Lopez may have made?

19    A.   In any document?

20    Q.   In any document?

21    A.   Yes.

22    Q.   Okay.  Have you ever signed any kind of

23  statement that you wrote down in regards to Ms. Lopez's

24  matter?

25    A.   I don't know.

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    Q.    Okay.  And are you currently employed by the

2  City of Tampa?

3    A.    No.

4    Q.    When did you start working for them?

5    A.    I started working at the City in May 2013.

6    Q.    Okay.

7    A.    2014. No. That's not right. I don't remember.

8  2017. 2018.

9    Q.    That's okay.

10   A.    May 2018.

11   Q.    Okay. And do you recall when you stopped

12  working for the City?

13   A.    June 2nd of last year.

14   Q.    Okay.  And are you currently employed?

15   A.    Yes.

16   Q.    Okay. Outside of the City of Tampa?

17   A.    Yes.

18   Q.    Okay. And from May 2018, what was your

19  position?

20   A.    From 2018 until when?

21   Q.    What was your first position?

22   A.    I was the Chief Planning Engineer --

23   Q.    Okay.

24   A.    -- at the City, and I had that position for a

25  few years.

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    Q.   Do you recall when you stopped working as

2 Chief Transportation Planning Engineer?

3    A.   When I was approached about the promotion to

4 become the manager of the team.

5    Q.   Who approached you?

6    A.   Vik.

7    Q.   And what was the position he approached you

8 about?

9    A.   To replace the person who was currently acting

10 as the manager.

11   Q.   Okay.  And what was that position called?

12   A.   The Transportation Manager.

13   Q.   Is that the Transportation Engineer Manager?

14   A.   It's like a chief engineer, but most people

15 call it Transportation Manager.

16   Q.   Okay.  And do you recall when you started

17 working for that position?

18   A.   Officially, it was January 2022, but I had

19 already taken on other responsibilities in the months

20 before.

21   Q.   Okay.  And when Vik approached you for this

22 position, did you understand whether this position was a

23 classified or unclassified position?

24   A.   I understood that it served at the pleasure of

25 the mayor.

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1     Q.    Okay.  And do you understand the difference

2  between a classified and unclassified position?

3     A.    I don't think I do entirely.

4     Q.    Okay.  And did you have to apply for the

5  Transportation Engineering Manager position?

6     A.    I believe I did.

7     Q.    Do you know whether you applied after Vik

8  approached you?

9     A.    Yes.

10    Q.    Okay.  When Vik approached you to take on the

11 Transportation Engineer Manager position, did it seem

12 like they were pretty certain that they wanted you for

13 that position?

14    A.    Uh-huh.

15    Q.    Okay.  And do you know whether they

16 interviewed other applicants for that position?

17    A.    No other interviews.

18    Q.    Was that an external or internal posting for

19 that position?

20    A.    The position had already been awarded to me,

21 and at that point, they did an internal-only three-day.

22 And then I applied, and there was no interview.

23    Q.    When you say the position was already awarded

24 to you, what do you mean by that?

25    A.    Certain levels you can appoint people.  You

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  don't have to go through the traditional interview

2  process.

3      Q.   Okay.

4      A.   And so he appointed the position to me.

5      Q.   Okay.  And how long were you in that position

6  for?

7      A.   A year-and-a-half, I think.

8      Q.   Do you recall when you left the City?

9      A.   Yeah.  June 2, 2023.

10     Q.   And who did you report to?

11     A.   Vik Bhide.

12     Q.   And what is his position?

13     A.   Director of Mobility.

14     Q.   And who did he report to?

15     A.   Jean Duncan.

16     Q.   And what is her position?

17     A.   Administrator for Mobility and basically

18  public works.

19     Q.   Okay.  And who does she report to?

20     A.   The mayor.

21     Q.   Since you've left, do you know who's currently

22  in the Transportation Engineer Manager position?

23     A.   Yes.  They moved someone who was overseeing

24  the Smart Mobility Division.  So he kind of oversaw,

25  like, traffic signals and stuff like that, and they

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  moved him into my role.

2       Q.   Okay.  Do you know his name?

3       A.   Brandon Campbell.

4       Q.   Okay.  Was he hired after you left the City?

5       A.   He was an employee while I was at the City,

6  and then they moved him laterally into my position.

7       Q.   Okay.  At the time you transferred from Chief

8  Transportation Planning Engineer to manager, did anybody

9  make you aware whether that position that you were

10 transferring into was classified or unclassified?

11      A.   (No verbal response.)

12      Q.   Did anybody from HR ever reach out --

13           MS. NACCACHE:  Can we -- for the record, can

14      you just verbalize --

15           THE WITNESS:  Oh.

16           MS. NACCACHE:  -- your response instead of --

17           THE WITNESS:  Yeah.

18           MS. NACCACHE:  And then no uh-huh.  Thank you.

19           THE WITNESS:  Okay.  Yes.

20           MS. CARRION:  Thanks.

21           THE WITNESS:  No.

22           MS. NACCACHE:  Sorry.

23            BY MS. CARRION:

24      Q.   I'm looking at you, so I saw you nod.  I

25 apologize.

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**     **www.MILESTONEREPORTING.com**     **Toll Free 855-MYDEPOS**

1     A.    Yeah.  No one made me aware of what the

2 difference was.

3     Q.    Had HR ever explained to you during your time

4 there from 2018 up until 2023 what any of the classified

5 versus unclassified meant?

6     A.    No.

7     Q.    And at all times when you were there as a

8 Chief Transportation Planning or manager, did you always

9 report to Vik?

10     A.    No.

11     Q.    When you were Planning Engineer, who did you

12 report to?

13     A.    Milton Martinez.

14     Q.    And is he --

15         MR. BENTLEY:  I'm sorry.  I missed the first

16     name.

17         THE WITNESS:  Milton.

18         MR. BENTLEY:  Milton.

19         BY MS. CARRION:

20     Q.    And do you know whether he's still with the

21 City?

22     A.    He's not.

23     Q.    And do you know what his position was?

24     A.    He was the Transportation Manager.

25     Q.    And do you know when he left?

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    A.   He left -- officially, his last day was in

2  January, which was officially when I became the manager.

3  But unofficially, he had taken the last maybe month or

4  so off of work.

5         And then since Vik approached me, it was the

6  summer before.  It was probably June or July.  That's

7  when we started the transition plan with Milton for me

8  to take over his role.

9    Q.   Perfect.  And so it took about a few months in

10 order for you to transition into the role?

11   A.   Uh-huh.

12   Q.   Okay.  And at all times while you were

13 Engineering Manager, did you always report to Vik?

14   A.   Yes.

15   Q.   Okay.  Tell me a little bit about your

16 position.  What were some of the things that you had to

17 do?  What were your duties?

18   A.   As a manager?

19   Q.   Yes.

20   A.   So my duties were understanding the team, the

21 needs of the team, and the direction of where we need to

22 go, our core responsibilities, and then helping the team

23 to achieve those.  The core groups, the core

24 responsibilities in the team included planning.

25         We had some geospatial design, like GIS and

MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  graphics capabilities.  We had design, transportation

2  engineering design, capital projects management.  So

3  whether it's the West River build project or the

4  Complete Streets project on Columbus, those were within

5  our team.

6          We also had a survey team.  I think that's --

7  that pretty much covers it.

8      Q.  At the time that you were employed, who did

9  you oversee in your team?  What positions?

10     A.  I directly managed three people.  Alana

11 Brasier, who was the Chief Planner; Lara Bouck, who was

12 the Chief Production Manager; and then Cal Hardie, who

13 was the Chief Design Engineer.

14     Q.  At the time that you started working in the

15 manager position, did you have a Utility Administrative

16 Support Technician role?

17     A.  No.

18     Q.  Okay.  When you took on the manager position,

19 do you know who would handle any kind of employee

20 complaint, what department?

21     A.  If an employee had a complaint, it would be

22 Human Resources.

23     Q.  Would that include complaints of

24 discrimination?

25     A.  (No verbal response.)



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

1          MR. BENTLEY:  Can you verbalize your answer?

2          THE WITNESS:  Yes.

3          BY MS. CARRION:

4     Q.   Do you know what the process is for an

5  employee to file a grievance?

6     A.   Yes.

7     Q.   Can you tell me a little bit about your

8  thought of what that process is?

9     A.   You write a letter to Human Resources

10  indicating your grievance.  I think they take time, and

11  they review it.  And then there's several rounds up to a

12  point, where maybe after round three of going back and

13  forth between Human Resources and the staff person.

14          Then at that point, there would be, like, an

15  in-person hearing where the person who, I guess, has

16  been grieved has the opportunity to say what they think.

17  And then some panel of people reflect on that, and then

18  they issue a decision.

19     Q.   Okay.  And in your experience as manager, if

20  the complaint is against your direct supervisor, is it

21  appropriate for you to approach them with that

22  grievance, or is it appropriate to then go directly to

23  Human Resources?

24     A.   It's appropriate to go to Human Resources.

25     Q.   Did you ever speak to Human Resources in

MILESTONE **|** REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  regards to going directly to them?

2      A.   With?

3      Q.   For any kind of employee complaint that had to

4  deal with their supervisor?

5      A.   Did I --

6      Q.   Strike that.  Let me rephrase the question.

7           Did Human Resources ever explain to you the

8  process of filing a complaint from an employee?

9      A.   No.

10     Q.   Earlier, you said that you did know Scarlett

11 Lopez?

12     A.   Yes.

13     Q.   And you're aware she's my client?

14     A.   Yeah.

15     Q.   Okay.  And did you work with her?

16     A.   Uh-huh.

17     Q.   How long did you work with her?

18     A.   I worked with Scarlett from January 2022 to

19 June-ish 2022, about that.

20          Did I get those years right?

21     Q.   I think so.

22          MR. BENTLEY:  Who's testifying?

23          THE WITNESS:  It's hard to remember.

24          MS. CARRION:  Is that an objection, Counsel?

25          MR. BENTLEY:  Yeah.  It is.  I'll just object



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    to form.

2         THE WITNESS:  I don't remember.

3         MR. BENTLEY:  It's okay, though.

4         THE WITNESS:  Yeah.

5         BY MS. CARRION:

6    Q.   From what you recall, was it a few months that

7    you worked with Scarlett?

8    A.   Uh-huh.  Six months.

9    Q.   About that?  Okay.

10        In the time that you worked with her, would

11   you say that she's an honest and truthful person?

12   A.   Yes.

13   Q.   How would you describe Scarlet's character?

14   A.   She is -- in the time I worked with her, she

15   was just, like, a soft, sweet person, very approachable.

16   She worked hard.  She was organized.

17        But we were just getting to know each other, I

18   felt like, and she also -- you know, she wasn't -- she

19   had other circumstances, so she wasn't in the office the

20   entire six months.  But it was good.  A good experience.

21   Q.   Was she respectful to you?

22   A.   Yeah.

23   Q.   And you earlier mentioned that the Utility

24   Administrative Support Technician position wasn't always

25   there.  When did it -- when was it created?



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1      A.    Some point before I had started at the City,

2   there was an idea to consolidate administrative support

3   from every team and move it to one place where they were

4   housed together.  And so when that happened, they took

5   over some functions, but a lot of the functions that

6   maybe we relied on, people were lost.

7           So we became a big enough group with a lot

8   going on where we really needed someone like Scarlett,

9   and so I was happy to have her come on board.

10     Q.    Okay.  Do you recall who came up with the idea

11  of the Utility Administrative Support Technician role?

12     A.    In general or for this -- my team?

13     Q.    Specifically for your team?

14     A.    It came from a call from Vik just before --

15  just around the Christmas holiday.  And he said, we are

16  going to temporarily reassign Scarlett to your team.

17     Q.    Do you recall around when in late December

18  that call happened?

19     A.    No.

20     Q.    Do you recall maybe if it was before Christmas

21  holiday or after?

22     A.    I don't recall.

23     Q.    Okay.  During that call with Vik, was anybody

24  else on that phone call?

25     A.    I -- not that I knew of.

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1      Q.   Did you ask him any questions?

2      A.   It was -- I remember he called me at a time

3  when I was with my family, like on a vacation, when I

4  picked up.  So I didn't really have time to delve into

5  it.  I just figured we could figure it out when we get

6  back to the office after break.

7      Q.   Were you glad that they were finally assigning

8  someone to help you on this role?

9      A.   Yeah.  I was.

10     Q.   Had the role of Utility Administrative Support

11 Technician ever been discussed with Vik prior to that

12 late December phone call?

13     A.   No.

14     Q.   Was that role ever discussed with anybody else

15 and you?

16     A.   No.

17     Q.   Okay.  Do you believe Vik came up with the

18 title of Utility Administrative Support Technician?

19          MR. BENTLEY:  Object to the form.

20          BY MS. CARRION:

21     Q.   You can go ahead and answer.

22     A.   Do what -- like do I believe it was his idea?

23     Q.   To specifically create that position?

24     A.   No.  I -- I assume it was Jean that came up

25 with the idea.



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          *Toll Free 855-MYDEPOS*

1    Q.   Okay.  And what made -- what gives you that

2  assumption?

3    A.   Something she did a lot, in my experience, was

4  kind of moving people around and changing titles. That's

5  just one of the ways she led, so.

6    Q.   Okay.  And can you give me any other examples

7  of employees that she moved around?

8    A.   I think when we had employees that weren't

9  performing, she would move them to different roles.  So,

10  like, there was someone named Ben Money who was hired at

11  the City.  He wasn't performing.  He frankly just didn't

12  do anything.

13      MR. BENTLEY:  I'm so sorry.  I missed the name.

14    I could not hear you.

15      THE WITNESS:  Ben Money.

16      MR. BENTLEY:  Sorry about that.

17      THE WITNESS:  So he wasn't doing anything, so

18    Jean demoted him.  He still continued to do nothing,

19    collecting $100,000 a year.

20      And then when I became manager, I sat down with

21    him, and I'm like, what are you passionate about?

22    Like, what drives you?  Because I don't get the

23    sense that this is it.

24      And he thought about it, and he decided to

25    leave, which was a good decision.  But I think

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900      www.MILESTONEREPORTING.com      Toll Free 855-MYDEPOS

1    there's a lot of that where it's, like, you kind of

2    just move problems around.

3         BY MS. CARRION:

4    Q.   Okay.  Is that part of the team dynamic?  Not

5    specifically your team, but the department?

6    A.   I think that there are some people in

7    leadership who use that tactic.

8    Q.   Would Jean Duncan use that tactic?

9    A.   Yes.

10   Q.   What was Ben's position prior to transferring?

11   A.   I think he was either a manager -- he had a

12   very high-up position.  He was either the manager or

13   Chief Design Engineer.  He was very under-qualified to

14   do it, and then he just didn't do his job.

15   Q.   And do you recall what Jean's position --

16   where did she demote him to?

17   A.   Same team, lesser role, project manager.

18   Q.   Do you know any other employees that Jean has

19   demoted?

20   A.   Yeah.  I'd have to think about that.  I don't

21   know off the top of my head.

22   Q.   Okay.  We can come back to that question.

23        After you spoke to Vik about having fill in

24   the Utility Administrative Support Technician position,

25   were you ever presented with what those duties for that

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

1 position would be?

2     A.    Bertha Mitchell, who was on -- technically on

3 Bryan Rodger's team.  He was a different manager. Bertha

4 reported to him. And so Bertha called me to talk about

5 how she could kind of help train Scarlett in this new

6 role. And I said, okay, well, here is a list of things

7 that I think would be very beneficial if someone were

8 coming in, to be able to do these things.  And it's

9 tracking inventory, you know, making sure that our --

10 stay up-to-date, like, just, like, the behind-the-scenes

11 stuff that are easier to forget, the low-level but still

12 important things.  Like, that was great. And then just

13 bringing the team together more with, like, socializing.

14 And so those -- that -- I explained the things we were

15 looking for.

16     Q.    What was Bertha's title?

17     A.    I don't know.

18     Q.    What was her role?

19     A.    She led the customer service team for the

20 Mobility Department.

21     Q.    Okay.  And she reported to who?

22     A.    To Bryan Rodger, who was another manager.

23     Q.    Okay. And explain to me the dynamic that you

24 understand between her role and the Utility

25 Administrative Support Technician. Would her training



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  for someone in your team happen often? Did she reach

2  out?

3          MS. NACCACHE:  Object to form.

4           BY MS. CARRION:

5      Q.   Go ahead and answer.

6          MS. NACCACHE:  You can answer.

7          THE WITNESS:  Yeah.  The intent was that

8      Scarlett would go there a couple days a week and

9      learn from what they're doing and figure out what

10     elements she could kind of peel off and bring back

11     to our team.

12         Maybe there had been some functions that they'd

13     been doing that would make sense that we had our own

14     dedicated resource.  So it had started, but.

15          BY MS. CARRION:

16     Q.   Had Bertha reached out to help out with any

17  other position?

18     A.   Had Bertha reached out?

19     Q.   Yeah.

20     A.   No.

21     Q.   Did you work with Bertha at all?

22     A.   Yes.

23     Q.   What were some of the things that you and

24  Bertha collaborated on?

25     A.   A lot of the more politically sensitive items



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1  that came across our desks, whether it's customer

2  complaints or -- Jean really used Bertha as a direct

3  resource.

4          And so sometimes I would help the two of them

5  prepare things, prepare presentations, memos.

6      Q.   Okay.  And prior to Scarlett coming on under

7  the Utility Administrative Support role, had you ever

8  had any dealings with her?

9      A.   Yes.

10     Q.   Did you work on projects together?

11     A.   No.  It wasn't like that.  It's -- like, if we

12 needed to work through a legal assignment with City

13 attorneys, we would work with Bertha to kind of

14 facilitate that relationship, traveling, getting

15 approvals from the City.  We worked with them for that

16 in such a variety of ways.

17     Q.   Okay.  And when Vik approached you in regards

18 to Scarlett taking over this position, did he have

19 anything to say about her taking over the position?

20     A.   No.

21     Q.   After you had that conversation with him in

22 December, did you ever have any follow-up conversations

23 in regards to what temporary assignment meant?

24     A.   Yes.

25     Q.   Do you recall around when was your first

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1 conversation?

2      A.   It was just after the holiday.  I think I

3 talked to Jean, Vik, and Bertha, maybe together, maybe

4 separately.  But I talked to all of them about where I

5 saw the needs and, you know, just wanting to make sure

6 that we can match her strengths with, you know, those

7 outcomes.  And so that was my perspective of it.  And

8 then they shared a little bit more about why they wanted

9 to relocate her, like the backstory.

10      Q.   Could you tell me what they shared with you

11 and who specifically?

12      A.   Sure.  So Jean and Vik shared that Scarlett

13 had said she had really bad back problems, and so she

14 couldn't come into work, and so she'd been working from

15 home. And at that point, Jean felt like she wasn't

16 getting the level of service she needed from Scarlett.

17 So she made the decision that when she came back, she

18 was going to relocate her and find someone new.

19      Q.   I know this is really hard, but that

20 conversation is really important.  And so, can you try

21 to tell me who said what?  And so, what exactly did Vik

22 say, as best as you can recall, and what did Jean say,

23 as best as you can recall?

24          MR. BENTLEY:  Object to the form of the

25      question.



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

1          BY MS. CARRION:

2     Q.   You can go -- every time Counsel objects, and

3  I apologize for not explaining it to you before, unless

4  your counsel specifically instructs you not to answer,

5  there's a variety of objections they can make that later

6  on that they can try to get the evidence kicked out.

7          But for purposes of this deposition, any time

8  of objection, you just need to go ahead and answer --

9     A.   Okay.

10    Q.   -- to the best of your abilities and

11 truthfully.

12    A.   Sure.

13    Q.   I'll go ahead and rephrase that question.

14         Can you tell me specifically what Vik said as

15 best as you can recall during that meeting?

16         MR. BENTLEY:  Object to the form.

17         THE WITNESS:  I can't remember exactly what Vik

18    said.  Jean said that Scarlett had -- it was -- it

19    was like a bigger discussion, but she said she --

20    she said that she had hurt her back moving, and Jean

21    kept bringing up Scarlett's boyfriend about the

22    matter and, like, that he's the cause of the

23    problems.  And when he entered the picture, she

24    became, like, a less devoted employee. And so she

25    was home resting her back, and Jean felt like she

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

1        needed someone physically there.  So at that point,

2        it wasn't a match for Jean.  And so that's when she

3        said, well, let's try her out and see how she does

4        on your team.

5             BY MS. CARRION:

6        Q.   Okay.  Was this an in-person meeting?

7        A.   Yeah.

8        Q.   And the people in that meeting was Jean, Vik,

9   and Bertha?

10       A.   I don't know if Bertha was there, but Jean,

11  Vik, and me.

12       Q.   Okay.  And do you recall whether Jean said

13  anything in regards to believing whether Ms. Lopez had a

14  back problem?

15            MR. BENTLEY:  Object to the form of the

16       question.

17            THE WITNESS:  I don't think she -- I think she

18       believed that Scarlett had a back problem.

19            BY MS. CARRION:

20       Q.   When you had this discussion, had you already

21  met with Scarlett to start for the position?

22       A.   I don't know that answer.

23       Q.   Do you recall whether this meeting happened

24  immediately after New Year's?

25       A.   Yeah.  It happened early on when we returned



MILESTONE **|** REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

1  from the holiday.

2      Q.   Do you recall when Scarlett started working in

3  that position?

4      A.   No.

5      Q.   Do you recall when you met Scarlett to start?

6      A.   It was --

7          MR. BENTLEY:  Object to the form.

8          Sorry.  Go ahead.

9          THE WITNESS: I met Scarlett because I would go

10     to see Jean a lot, and we had a pretty good

11     relationship at that time. And Scarlett was always

12     sitting outside the desk and greeting people, and

13     she was really helpful. So yeah. I really liked

14     seeing Scarlett, but. Yeah. So it had been months

15     before. But I didn't really work closely with

16     Scarlett.

17         BY MS. CARRION:

18     Q.   Okay.  And after conversation with Vik and

19  Jean, did you speak to anybody else about the transition

20  of Scarlett to your team?

21     A.   Yeah.  I talked to Michael Capotrio, who was

22  on my team, since we were in the process of

23  reconfiguring our team and realigning some of the

24  disciplines with, you know, people -- we were just

25  trying to make it a more strategic framework. I talked



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  to him, and I asked if he would consider supervising --

2  unofficially supervising Scarlett.  And so he helped

3  with that.  Like, he helped show her around and, you

4  know, get her acclimated, make sure she had everything

5  she needed. And then I still kept the part of the role

6  where we would talk about, like, her schedule.  So if

7  she was going to be out or if something happened, she

8  would let me know.

9       Q.   Okay.  And when you first approached him, did

10 he make any remarks in regards to her work ethic?

11      A.   No.

12           MR. BENTLEY:  Object to the form of the

13      question.

14           BY MS. CARRION:

15      Q.   Did Michael make any remarks in regards to her

16 character?

17      A.   No.

18      Q.   Do you know whether they knew each other?

19      A.   No.

20      Q.   And when was -- do you recall when he was

21 brought on to help her?

22           MR. BENTLEY:  Object to the form of the

23      question.

24           THE WITNESS:  As soon as she started, as soon

25      as she reported to my floor, Michael was the one

MILESTONE **|** REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    helping her, showing her around, teaching her how we

2    do things.

3         BY MS. CARRION:

4    Q.   Do you recall when she started in the role of

5    Utility Tech Support?

6    A.   She started in a temporary position that was

7    still her own.  And then I don't know if that was -- I

8    don't know if it was transitioned, or I don't know when

9    it happened.

10   Q.   When did you specifically start working with

11   Scarlett?

12   A.   After the holidays in January.

13   Q.   Do you recall the date?

14   A.   Nope.

15   Q.   And what was your understanding at that time

16   of who she would be reporting to?

17   A.   Me.  My team.

18   Q.   And did Vik or Jean or anybody at the City of

19   Tampa explain to you that she would be reporting to you?

20   A.   Vik and Jean.

21   Q.   When did they do that?

22   A.   Right after the holidays during that first

23   sit-down.

24   Q.   Was this during the meeting that we discussed

25   earlier?



**MILESTONE** | **REPORTING  COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          *Toll Free 855-MYDEPOS*

1      A.   Yes.

2      Q.   And prior to Scarlett starting the position,

3  did anybody send you Scarlett's resume?

4      A.   No.

5          MR. BENTLEY:  Object to the form.

6          BY MS. CARRION:

7      Q.   Prior to starting her position, did you review

8  her employee personnel file?

9      A.   No.

10     Q.   Prior to starting her position, did Jean

11 Duncan share any documents with you in regards to

12 Scarlett's performance?

13     A.   No.

14     Q.   What made you believe that Scarlett was

15 qualified to do that position?

16         MR. BENTLEY:  Object to the form.

17         MS. NACCACHE:  Object to the form.

18         THE WITNESS:  Do I still answer?

19          BY MS. CARRION:

20     Q.   Yes.

21         MS. NACCACHE:  You can.

22         THE WITNESS:  I believe Scarlett had, for

23     probably a year, been doing a higher level of

24     function as an executive aide.  Supporting an

25     administrator is a really hard job.  It's a big job,

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1       and it's multifaceted. It's -- there's political

2       pieces in nature. You're preparing them for

3       counsel, for the media. It's -- it's a big job.

4            And so I had just thought, if she can do that

5       job, which she had been doing before she had gone

6       out for back problems, and Jean said great things

7       about her, that we would be lucky to have someone

8       like that on our team.

9            BY MS. CARRION:

10      Q.   When did Jean say that you'd be lucky to have

11   someone like that on your team?

12           MR. BENTLEY: Object to the form.

13           THE WITNESS: I thought that -- I thought that

14      we would be lucky to have her. But Jean had said

15      very positive things about her, you know, in the

16      beginning.

17           BY MS. CARRION:

18      Q.   Was the Utility Administrative Support

19   Technician a lower-level role?

20      A.   Yes. It was. And the salary ranges were

21   significantly different.

22      Q.   Would someone going from a Senior Executive

23   Assistant position to a Utility Administrative Support

24   Technician role be considered a demotion?

25           MR. BENTLEY: Object to the form of the



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    question.

2          THE WITNESS:  Yes.

3          BY MS. CARRION:

4     Q.   In your experience, would someone willingly go

5  from the executive assistant role to the administrative

6  support role?

7          MR. BENTLEY:  Object to the form of the

8     question.

9          MS. NACCACHE:  Object to form.

10          THE WITNESS:  In my experience, have I seen

11     that?  No.

12          BY MS. CARRION:

13     Q.   Were you excited for Scarlett to come on

14  board?

15     A.   Yeah.

16     Q.   When she first came on board, did she share

17  with you anything in regards to her back problem?

18     A.   Uh-huh.

19     Q.   What did she share with you?

20     A.   She shared that she had been in an immense

21  amount of pain, and she was trying to figure out what to

22  do about it.  And she -- I think, eventually, she found

23  a place that she felt comfortable.  Am I allowed to

24  share -- share this?

25     Q.   Yes.

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          *Toll Free 855-MYDEPOS*

1     A.    Okay.  But she found a place where they could,

2  like, inject her spine with something.  And so that was

3  the day where she knew she wanted to do it because she'd

4  been in so much pain, but that she also found out she

5  was pregnant because they did a pregnancy test.

6     Q.    And she shared that with you?

7     A.    She did.

8     Q.    And did you believe her?

9     A.    Yeah.

10     Q.    And what did she share with you about her

11  pregnancy?

12     A.    I mean, I think she was just so surprised

13  because it wasn't something she anticipated happening.

14  And we hugged, and we cried a little because this is

15  beautiful.

16          And I think she -- she was just scared.  Like,

17  how could she do this all?  And, you know, being

18  pregnant is a challenge.  It's hard to be pregnant.  And

19  so I think she was thinking through that.  And we talked

20  about that.

21     Q.    Do you recall whether this conversation

22  happened in-person?

23     A.    It was in-person in my office with the door

24  closed, and I didn't share it.

25     Q.    Okay.  And do you recall whether this happened



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

1   in January?

2          MR. BENTLEY:  Object to the form.

3          THE WITNESS:  I don't remember what day or

4       month it happened.

5          BY MS. CARRION:

6       Q.   Did she share with you how early in her

7   pregnancy she was?

8       A.   She said it was very early because she didn't

9   even know.

10      Q.   Did it seem like she had just found out?

11      A.   Yeah.

12      Q.   Do you recall whether Scarlett met with Bertha

13  to go over her duties?

14         MR. BENTLEY:  Object to the form.

15         THE WITNESS:  She did meet with -- Bertha and

16      Scarlett met together to go through some training

17      and understand how we could transition certain

18      aspects of the role back to our division.

19         BY MS. CARRION:

20      Q.   Do you recall when that meeting happened?

21      A.   No.

22      Q.   Was this prior or before her starting the

23  role?

24      A.   I don't -- I don't remember the timeline.

25         MS. CARRION:  I'm going to go ahead and enter



MILESTONE **|** REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          *Toll Free 855-MYDEPOS*

1      as Exhibit 1.

2             (EXHIBIT 1 MARKED FOR IDENTIFICATION)

3          MS. GARCIA:  Can I have your --

4          MS. CARRION:  Right next to the other one.

5      Thank you.

6          MS. GARCIA:  Thank you.

7           BY MS. CARRION:

8      Q.   Can I have you look at 990 through 996?

9          MR. BENTLEY:  I'm sorry.  Ms. Carrion, can you

10     say that again?

11         MS. CARRION:  990 through 996.

12          BY MS. CARRION:

13     Q.   Are these your text messages with Scarlett?

14     A.   Looks like it.

15     Q.   Do these text messages look accurate?

16     A.   I think so.

17     Q.   Did Scarlett tell you whenever she was

18  admitted into the hospital?

19     A.   (No verbal response.)

20     Q.   Do you recall her being admitted to the

21  hospital multiple times?

22     A.   Yeah.

23         MR. BENTLEY:  Object to the form.

24          BY MS. CARRION:

25     Q.   On Exhibit 1, 500990, Scarlett relates to you



**MILESTONE | REPORTING  COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

1  at 2:35 a.m. that she's on her way to the ER.  Did you

2  believe that she was on the way to the ER?

3      A.   Yeah.

4      Q.   On January 13th on Exhibit 1, 500991, at 6:28

5  p.m., she sends you a letter stating that she was able

6  to be released to go back to work.

7          Did you believe that letter came from a nurse?

8      A.   Yes.  But when I shared it, I think Jean or

9  Human Resources wanted more information, like, it on

10  letterhead or something like that.  But I -- I don't

11  have the ability to verify a doctor's note.

12      Q.   Was it Jean's duty to request that this be on

13  letterhead?

14          MR. BENTLEY:  Object to the form of the

15      question.

16          MS. NACCACHE:  Yeah.

17          BY MS. CARRION:

18      Q.   Would you like me to say the question again?

19      A.   Okay.

20      Q.   Was it Jean's role -- and I'll just --

21          MS. CARRION:  Court Reporter, can I have you

22      read the question again, please?

23          THE REPORTER:  Yes.  Would you like it played

24      back or read?

25          MS. CARRION:  You can read it back.  I can ask

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1      it another way if it's easier.

2           THE REPORTER:  I can play it back if that's

3      easier.

4           MS. CARRION:  No, I think that's fine.

5           BY MS. CARRION:

6      Q.   You mentioned that Jean asked you for the

7  letter to be on letterhead?

8      A.   Uh-huh.

9           MR. BENTLEY:  Object to the form of the

10     question.

11          BY MS. CARRION:

12     Q.   I'm sorry, yes or no?

13     A.   Yes.

14     Q.   Is it normal for anybody to question whether a

15 doctor's note needs to be on letterhead?

16          MR. BENTLEY:  Object to the form of the

17     question.

18          THE WITNESS:  This was my first time dealing

19     with an FMLA situation or someone needing medical

20     support, so I -- I don't know if it's normal.

21          BY MS. CARRION:

22     Q.   Okay.  Why was she requesting to see the form?

23     A.   She was still technically Scarlett's

24  supervisor.

25     Q.   How was that?

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    A.   Scarlett had been temporarily reassigned to

2  me, but she still was an executive aide.  She was being

3  paid at her executive aide level.  So she was performing

4  the function of being on my team, but there was no

5  position for her to move into.

6    Q.   And what do you mean by, there was no position

7  for her to move into?

8    A.   We would've had to create a new position, and

9  the City doesn't choose to operate that way, so she was

10  in a temporary position.  The idea was she would be in a

11  temporary position so that Jean could hire Scarlett's

12  replacement.

13        And then Jean had somehow arranged to get FTE

14  -- a full-time employee from another division and

15  reallocate that resource to my team.

16    Q.   And what was the goal in order to reallocate

17  that resource to your team?

18        MR. BENTLEY:  Object to the form.

19        THE WITNESS:  The goal was to be able to have

20     an administrative support person on my team.

21        BY MS. CARRION:

22    Q.   Was there ever discussions in regards to

23  making this position permanent?

24    A.   Yes.

25    Q.   When did those discussions start?

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          *Toll Free 855-MYDEPOS*

1      A.    From the first meeting that I had with them.

2      Q.    And did anybody mention that they wanted

3 Scarlett to take on that role?

4      A.    Initially, they did.

5      Q.    Who?

6      A.    Jean.  They -- initially, they wanted

7 Scarlett.  They wanted us to go through a quick process,

8 and then she would take on a full-time role there.

9      Q.    Where did the funds for that position come

10 from?

11     A.    I think the Parking Division.

12     Q.    Do you know when those funds were allocated

13 for that position?

14     A.    No.

15     Q.    Where did the --

16          MR. BENTLEY:  I'm sorry.  Did she verbalize? I

17     didn't hear any response.

18          THE WITNESS: I verbalized. I have a soft voice.

19          MR. BENTLEY: I know. I apologize. I wasn't --

20          THE WITNESS:  I can try to speak up.

21          MR. BENTLEY:  I was looking down.  I'm so

22     sorry, Mr. Jorgenson.

23          THE WITNESS:  I'll try to speak up.

24          MR. BENTLEY:  No.  Yeah.  I just made sure for

25     the record.  I didn't --

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1        THE WITNESS:  Okay.

2        MR. BENTLEY:  I'm so sorry about that.

3        THE WITNESS:  No.  You're good.

4        BY MS. CARRION:

5    Q.   Did anybody explain to you where the funds to

6  pay for Scarlett's temporary position would come from?

7    A.   I think the assumption from Jean was that the

8  funds were going to come from the Parking Division.  For

9  some reason, it didn't work out.  And I think that there

10 weren't enough funds in Jean's fund source, as the

11 administrator, to fund both positions.

12        So I don't know what the resolution was or how

13 they figured it out, but I just -- that wasn't -- that

14 wasn't my role in this.

15        MS. CARRION:  I'm going to go ahead and enter

16    this into the record as Exhibit 2.

17        (EXHIBIT 2 MARKED FOR IDENTIFICATION)

18        BY MS. CARRION:

19   Q.   I'm going to have you look, if you don't mind.

20        Are these texts between you and who?

21   A.   I'm going to guess it's me and Jean, but I

22 need to read it more.

23   Q.   Do you recognize the phone number at the top?

24   A.   Oh, yeah.  That's me.

25   Q.   And on 1-6-22, "Hi, Danni.  Please give me a



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  call when convenient.  Thanks." "I'll call right back or

2  maybe you can pop up here." "I'll pop up.  Thanks."

3      A.   That's Jean.

4      Q.   Do you recall having a meeting with Jean on

5  January 6th?

6      A.   I don't remember.  I met with Jean a lot.  I

7  don't remember a January 6th meeting.

8      Q.   Do you recall anything about meeting with her

9  early in December to discuss Scarlett?

10         MR. BENTLEY:  Object to the form.

11         THE WITNESS:  I don't think it was in December.

12     I don't remember.

13         BY MS. CARRION:

14     Q.   January?

15     A.   I think it was in January.

16     Q.   Okay.  Can I have you read it above where we

17  just were?  And there's a blacked-out area.

18     A.   Okay.

19     Q.   Do you recall what you may have said?

20     A.   I'm gray, right?

21     Q.   Uh-huh.

22     A.   So read the gray part?

23     Q.   There's a blacked-out area for January 10,

24  2022, and then there's a blacked-out area where it looks

25  like it's Jean's response. Do you recall what that

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1 conversation was about?

2      A.   Can you say your question again, please?

3      Q.   Yes.  On January 10th, it seems like you had a

4 conversation with Jean where she says, "Please let

5 Scarlett know that she can't eliminate any support to me

6 from her workload." Do you recall what you may have

7 texted her at 9:46:41?

8      A.   No.

9      Q.   Do you understand what is Jean referring to

10 when she sends that text in regards to her workload?

11      A.   No.

12      Q.   Was this the first week that Scarlett had

13 started working with you?

14      A.   I think so.  I'm not 100 percent sure.

15      Q.   Did Jean ever ask you -- strike that.

16           Did Scarlett ever relay to you that she was

17 still working on duties for Jean?

18      A.   Yeah.  Sometimes.  But she said in the

19 beginning that she was still monitoring Jean's e-mails

20 for her, which was something she had been doing.  And I

21 think the phone service was still going to her. And then

22 just we communicated together as a group, and I think

23 they decided to reassign those activities.

24      Q.   When you say they decided to reassign the

25 activities, what do you mean?



MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          *Toll Free 855-MYDEPOS*

1      A.   It probably went to Bertha temporarily.  And

2  then once Jean hired the new aide, Sheila, it went to

3  Sheila.

4      Q.   And for the Utility Service Technician

5  position, did Scarlett receive a laptop or a phone -- a

6  work laptop or a phone?

7      A.   Yeah.  You had a work computer.  I don't know

8  if it was a laptop.  I know you -- you gave back the

9  laptop and phone that you got when you were with Jean,

10  and I think you replaced it with a laptop.  She had a

11  computer.  I just don't know what kind.

12      Q.   Okay.  Why is there different laptops for

13  different roles?

14          MR. BENTLEY:  Object to the form of the

15      question.

16          THE WITNESS: There are -- in the tech, or --

17      there are computers by function and by position. So

18      there's executive laptops that are meant for, like,

19      Jean and directors. They have nicer screens. Then

20      there's, like, kind of, like, a more middle-of-the-

21      road, just a couple options there. And then there's

22      special options for police, you know, where they

23      come with, like, this sturdy case. I think that's

24      it.

25          BY MS. CARRION:



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1      Q.    Would lower-level positions have lesser-

2  quality laptops?

3      A.    Yeah.

4           MR. BENTLEY:  Object to the form of the

5      question.

6           BY MS. CARRION:

7      Q.    When you transferred from one position to

8  another, did you receive a different work cell phone?

9      A.    I did.

10     Q.    Are you aware of needing different cell phones

11 in order to transfer positions?

12     A.    Sometimes.

13     Q.    Do you know why?

14     A.    I mean, the City still uses flip phones.  So

15 if you go from being in a flip phone and not having to

16 take Teams meetings on the road, and suddenly you're in

17 a role where you have to meet through a Teams meeting

18 remotely, then you're going to need a different phone or

19 an iPad or -- so I think the intent is the tool should

20 match the job requirements.

21     Q.    Did employees communicate through their

22 personal phones a lot?

23     A.    Uh-huh.

24           MR. BENTLEY:  Object to the form of the

25      question.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1           BY MS. CARRION:

2      Q.   Did you communicate in your -- through your

3 personal phone a lot?

4      A.   I tried not to, but it happened.

5      Q.   You and Scarlett communicated through personal

6 phones?

7           MR. BENTLEY:  Object to the form of the

8      question.

9           THE WITNESS:  Yeah.  Yeah.  And a lot of times,

10      I felt like the stuff we were talking about was

11      more, like, just personal.  You know, she was

12      sharing she was going through a really terrible

13      time.  It felt appropriate.

14           BY MS. CARRION:

15      Q.   Did you ever communicate with Jean through

16 your personal phone?

17      A.   Sometimes.  Jean wouldn't -- she -- it was

18 just, you know, either/or.  I just always had to keep

19 both on me because I never knew what she was going to

20 use.

21      Q.   In your team, do majority of your colleagues

22 keep both phones on them?

23      A.   Yeah.

24      Q.   In your team, do majority of your colleagues

25 work on both phones to communicate with each other?



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    A.   Yeah.  It's -- there's a gray line.  Like, if

2 we're going out to a group happy hour or something

3 after, that was personal phone.  If we're talking about

4 a project or something related to our core business, it

5 was a business -- I'm sorry, work cell phone.

6    Q.   Now, when Scarlett first started working for

7 you, she didn't work very many days?

8        MR. BENTLEY:  Object to the form of the

9   question.  Sorry.

10       MS. NACCACHE:  Object to form.  Sorry.

11       BY MS. CARRION:

12    Q.   In the -- her first month of employment, about

13 how many days would you say she worked?

14    A.   I don't remember the number, but it was --

15 there were absences because she was in a lot of pain.

16    Q.   And what was her pain?  What -- strike that.

17       Did she explain to you why she was having

18 pain?

19    A.   She did.  She said she had terrible back

20 pains, debilitating.  And she had a plan for going to a

21 doctor to try to get some kind of shot that would help,

22 at least temporarily, relieve the pain so that she could

23 be productive at work.  But she struggled.

24    Q.   Who approved Scarlett's leave while she was

25 reporting to you in her role?

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

1     A.   I think I went through the process with her

2   with the help of Human Resources, and then I relayed

3   that information to Bertha, Jean, and Human Resources,

4   and then they -- Human Resources approved the leave.

5     Q.   Why did you have to send that to Bertha and

6   Jean?

7     A.   Jean was still her official supervisor.  And

8   then Bertha just kind of, like, didn't -- she was, like,

9   a catchall for Jean -- for Jean because that was her

10  unofficial role.

11       MR. BENTLEY:  Can you both speak up just a

12     little louder?  It's hard hearing.  There's a white

13     noise thing, and I can't -- if you guys could --

14     just both of you.  I'm so sorry.  Just so low-

15     spoken.

16       THE WITNESS:  I will project.

17       MR. BENTLEY:  I know.  I'm saying it's for both

18     sides.  It is -- I know I must be getting old in my

19     hearing, so I apologize.

20       BY MS. CARRION:

21     Q.   Who made you aware that Jean was still her

22   direct supervisor?

23       MR. BENTLEY:  Object to the form of the

24     question.

25       THE WITNESS:  I knew I was not her supervisor



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    because one of my roles as manager was to monitor

2    time sheets every week for the team, and so

3    Scarlett's name was not listed under me.  When you

4    looked at the org chart, which you could do through

5    just looking at Outlook, you know, it still showed

6    that Scarlett reported to Jean.

7        So on paper, all the processes, Scarlett

8    reported to Jean.  But Scarlett was on my team, and

9    I felt like we were on the team.  And so that's why

10   I tried to take some of those supervisory

11   responsibilities and share them up with Bertha and

12   Jean so that they could have the same communication

13   I was getting.

14       BY MS. CARRION:

15   Q.   Did you ever ask why in the system it showed?

16   A.   It was because Jean's plan of taking a

17   position from Parking and moving it to my division

18   wasn't as easy or seamless as she thought it would be.

19   And so it just took time to move Scarlett into a

20   temporary position.

21   Q.   When you say take a job from Parking to move

22   it, what do you mean?

23       MR. BENTLEY:  Object to the form.

24       THE WITNESS:  There's a full-time employee just

25   assigned to the Parking Division.  And so that's,



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1     like, basically one of their people assets.  And

2     then Jean took that person and moved that position

3     to my team.  It's really difficult in the City to

4     get new positions created.

5          BY MS. CARRION:

6     Q.   When you say Parking, do you mean the

7   Transportation Mobility Department?

8     A.   Yeah.  It's within the same department, just a

9   different division.

10    Q.   Okay.  And what position in Parking are you

11  talking about?

12    A.   An administrative position.

13    Q.   So the Utility Administrative position was a

14  position in the Parking Division that got transferred to

15  your division?

16    A.   I don't know what it was called when they

17  identified it as what would be transferred over.  I just

18  knew what they wanted to call it when it was moved.

19    Q.   Okay.  Do both positions get the same funding

20  from the same source?

21    A.   No.

22    Q.   Who gets to decide where the funding comes

23  from for those positions?

24          MR. BENTLEY:  Object to the form.

25          THE WITNESS:  If it's a Parking-funded



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    position, it comes from the Parking enterprise

2    funds. If it's from Transportation Engineering

3    Mobility, which is mine, we were funded in a variety

4    of ways.  Partially gas tax funds, salaries,

5    partially general funds.  But, you know, Parking

6    makes enough money that they can pay for their own

7    staff resources.

8        BY MS. CARRION:

9     Q.   Thank you.

10       Does Jean make the decision in regards to

11 transfer of positions?

12       MR. BENTLEY:  Object to the form of the

13    question.

14       THE WITNESS:  I think that she -- I think that

15    she has a lot of weight, but the ultimate decision

16    is probably with someone in Human Resources as to

17    whether a position can be moved.

18        BY MS. CARRION:

19     Q.   Do you know whether the mayor has to approve

20 any of these position changes?

21     A.   I don't think the mayor does.  I think it's

22 probably someone in Human Resources that has to -- has

23 to make that decision.

24     Q.   Okay.  Do you recall whether Scarlett applied

25 for FMLA?



**MILESTONE | REPORTING  COMPANY**

TOMORROW'S TECHNOLOGY TODAY

1    A.   I think she did.

2    Q.   Do you recall whether the FMLA was approved?

3    A.   I think it was.

4    Q.   Do you recall what was the reason for her

5  applying to FMLA?

6    A.   While she was with me, I think it was the very

7  serious -- not morning sickness because it happened all

8  day.  I don't know what you call it.  All-day sickness

9  from being pregnant and just the dehydration.  And so I

10 think that was what the FMLA was tied to.

11   Q.   Did you ever speak to Jean in regards to

12 Scarlett's FMLA?

13   A.   Sure.

14   Q.   Do you recall any conversations with Jean in

15 regards to Scarlett's FMLA?

16   A.   Like what?

17   Q.   Any conversations in regards to her

18 application?

19        MR. BENTLEY:  Object to the form.

20        THE WITNESS:  No.  I don't think, about the

21    application itself.

22        BY MS. CARRION:

23   Q.   Did you have any conversations with Jean in

24 regards to Scarlett's taking time off?

25        MR. BENTLEY:  Object to the form.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**        **www.MILESTONEREPORTING.com**        *Toll Free 855-MYDEPOS*

1        THE WITNESS:  Yes.

2            BY MS. CARRION:

3    Q.   What conversation did you have with Jean?

4        MR. BENTLEY:  Same objection.

5        THE WITNESS:  I think that Jean, by that point,

6    was very frustrated because she expressed that

7    Scarlett had just taken time away for her back, and

8    now she's pregnant.  I think Jean just doubted if

9    she was actually pregnant and -- so.

10           BY MS. CARRION:

11    Q.   Did Jean tell you she doubted that Scarlett

12 was pregnant?

13    A.   Yeah.

14    Q.   What did Jean say?

15    A.   She said, I don't even know if she's pregnant.

16 And, you know, she said, like, that doctor's note

17 doesn't even look real.

18    Q.   Was she referring to the doctor's note on the

19 exhibit?

20    A.   (No verbal response.)

21    Q.   Was that an in-person meeting?

22    A.   (No verbal response.)

23        MR. BENTLEY:  I didn't -- you've got to

24    verbalize.

25        THE WITNESS:  Yes.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1      MR. BENTLEY:  I didn't hear that.  I didn't

2   hear what it was.

3      MS. NACCACHE:  Let the record reflect she

4   nodded her head yes.

5      MR. BENTLEY:  For both questions?  For both

6   questions?

7      MS. NACCACHE:  Well, I didn't hear -- I didn't

8   see it for the first --

9      MR. BENTLEY:  Because you had two questions. I

10   didn't hear words.  So I'm just -- I just wanted to

11   make it -- for the record, if you want to go back.

12   I didn't hear anything she said.

13      MS. CARRION:  Counsel, I can get louder, but I

14   would appreciate if you allow me to ask --

15      MR. BENTLEY:  She didn't respond to the one

16   question, and then you asked another question, and

17   then she shook her head again.  So I wanted the back

18   -- I want to make sure I heard a verbal response

19   because I didn't hear anything.

20      MS. CARRION:  She did.

21      MR. BENTLEY:  Well, I have a white noise thing

22   coming from this computer, and I can't hear it.

23   From whatever this computer -- your assistant's

24   computer, I can't hear.  It is a white noise

25   machine.



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1          MS. CARRION:  Like I said, Counsel, I can get

2     louder to make sure that you can hear the questions.

3     And if you need the question repeated or the answer,

4     please state so.  I don't --

5          MR. BENTLEY:  I did.  That's what I did, Ms.

6     Carrion.  I said, I didn't hear it.  I don't think

7     her counsel even heard the answer to the first

8     question. And then I made a thing.

9          So when we both can't hear it, I want make sure

10    for the record that her response is captured.

11    Sometimes during a deposition, people nod their

12    head, and we don't get it captured.  That's my only

13    complaint. So I don't know what you're objecting.

14    I'm just making sure I can hear it and the court

15    reporter can hear it.

16          MS. CARRION:  I appreciate your lengthy

17    objection, Counsel.

18          MR. BENTLEY:  It wasn't an objection.  It was a

19    statement.

20          MS. CARRION:  Thank you for clearing the

21    record.  Would you like the court reporter to read

22    back the questions?

23          MR. BENTLEY:  All I want to know is, did she

24    verbalize a yes for both of the questions that you

25    just previously asked?



**MILESTONE** | **REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          *Toll Free 855-MYDEPOS*

1          BY MS. CARRION:

2      Q.   Danni, did Jean state that she believed or did

3   not believe that Scarlett was pregnant?

4          MR. BENTLEY:  Object to the form of the

5      question.

6          THE WITNESS:  Yes.  Jean said that she doubted

7      Scarlett was pregnant.

8          BY MS. CARRION:

9      Q.   Did you have a conversation with Jean in

10  regards to a letter from a nurse?

11     A.   Yes.

12         MR. BENTLEY:  Object to the form of the

13     question.

14         BY MS. CARRION:

15     Q.   Was this an in-person meeting?

16     A.   Yes.

17     Q.   What comment, if any, did Jean make in regards

18  to the doctor's letter?

19         MR. BENTLEY:  Object to the form.

20         THE WITNESS:  She said, that doesn't even look

21     like a doctor's letter.  I don't think a doctor

22     signed. It's not on letterhead.  And she suggested

23     that Human Resources needed to push back and ask for

24     a different letter.

25         BY MS. CARRION:



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**        **www.MILESTONEREPORTING.com**        **Toll Free 855-MYDEPOS**

1          Q.   And the letter you're referring to is the

2     letter on the exhibit?

3               MR. BENTLEY:  What exhibit, Counsel?

4               THE WITNESS:  On 991?

5               MS. NACCACHE:  Exhibit 1?

6               MS. CARRION:  Sorry.  I'll go ahead and mark

7          Exhibit 3.

8               (EXHIBIT 3 MARKED FOR IDENTIFICATION)

9               MS. CARRION:  Counsel, your comments got me all

10         exacerbated over here.

11              MR. BENTLEY:  I apologize.  I was just making

12         sure I know what exhibit you're referring to.

13              MS. CARRION:  Thank you.

14              MS. GARCIA:  I think that's it.  Yeah.

15              MS. NACCACHE:  And can we take a break either

16         after this line or --

17              MS. CARRION:  Yes.  Yeah.  Let me finish this

18         line.

19              MS. NACCACHE:  Okay.

20              MS. CARRION:  Thanks.  And I appreciate the

21         break because I need it as well.

22              MS. NACCACHE:  Yeah.  I thought maybe it would

23         be a good time for you, too.

24              MS. CARRION:  Thank you.

25              MS. NACCACHE:  It's going --

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1          BY MS. CARRION:

2      Q.   Danni, do you see page number 501081?

3          THE WITNESS:  Sorry.

4          MS. NACCACHE:  Uh-huh.

5          BY MS. CARRION:

6      Q.   There's a work release form here.

7          At the top, can you read Jean's response?

8      A.   "This nurse has no letterhead or details.  We

9  also don't retrofit FMLA time, annual time.  Something

10 seems amiss.  Jean."

11     Q.   And she also made a remark to you in regards

12 to this letter?

13     A.   Yes.

14     Q.   And what was that remark?

15     A.   That she didn't think it was real.  She just

16 didn't trust Scarlett.

17     Q.   Did she believe Scarlett was pregnant?

18         MR. BENTLEY:  Object to the form.

19         THE WITNESS:  No.

20         BY MS. CARRION:

21     Q.   Did you ever tell Jean that Scarlett was

22 pregnant?

23     A.   Yes.

24     Q.   Can you tell me about that conversation?

25     A.   I think I told her that Scarlett found out



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  she's pregnant, and she was excited, but nervous.  She

2  talked about her last pregnancy and that experience for

3  her.  And so -- so it was just a big mix of emotions. So

4  I shared that with Jean.

5          And I said, so she might, you know, need to be

6  out a little bit, but we'll work around her schedule. So

7  that was the kind of information I shared with Jean.

8      Q.   Did Jean have a response?

9      A.   I think she just started to doubt.  You know,

10 how do we really know she's pregnant?  Did she just say

11 it?

12         Well, she said she's pregnant.

13     Q.   About how many times did she question -- let

14 me rephrase.  About how many times did Jean state that

15 she doubted Ms. Scarlett being pregnant?

16         MR. BENTLEY:  Object to the form of the

17     question.

18         THE WITNESS:  Several.

19         BY MS. CARRION:

20     Q.   Did HR ever request another doctor's letter on

21 letterhead?

22     A.   I don't know.

23     Q.   The letter on the exhibit on 501801, did you

24 ever request Ms. Scarlett to give you that letter on

25 letterhead?



MILESTONE **|** REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1      A.    I don't -- I don't know.  I don't think so.

2           MS. CARRION:  I think we can take a break.

3           THE REPORTER:  And we're off record.

4            (OFF THE RECORD)

5           THE REPORTER:  We are back on record.

6           MS. CARRION:  Thank you.

7            BY MS. CARRION:

8      Q.    Danni, do you recall when Scarlett came back

9  from FMLA leave?

10     A.    No.

11          MS. CARRION:  I'll go ahead and introduce

12     Exhibit 4.

13              (EXHIBIT 4 MARKED FOR IDENTIFICATION)

14           BY MS. CARRION:

15     Q.    Is that an e-mail you received from Kimberley

16  Sullivan on March 3rd?

17     A.    It looks like it.

18     Q.    Okay.  The e-mail from Kimberley Sullivan says

19  that they've received a medical note clearing Scarlett

20  to return to work tomorrow.  She would let Jean Duncan

21  know.

22          Would it be fair to say that she returned --

23  she was cleared to go back to work after March 3rd?

24          MR. BENTLEY:  Object to the form of the

25     question.

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900      www.MILESTONEREPORTING.com      Toll Free 855-MYDEPOS

1       THE WITNESS:  Based on this e-mail, it seems

2   like that is what is being implied.

3       BY MS. CARRION:

4   Q.   Perfect.  And I saw that you forwarded that to

5 Vik Bhide.

6   A.   Yes.

7   Q.   Do you recall why you forwarded that to him?

8   A.   He was my supervisor.

9   Q.   Did you forward that e-mail to Jean Duncan or

10 Bertha?

11   A.   I don't know.

12       MS. CARRION: Go ahead and introduce Exhibit 5.

13       (EXHIBIT 5 MARKED FOR IDENTIFICATION)

14       MS. NACCACHE:  Thank you.

15       BY MS. CARRION:

16   Q.   Can I have you -- sorry.  Let me just go back

17 for a second.

18       Can I have you look at Exhibit 2, Page 501482?

19   A.   Is this 2?

20   Q.   It's this one.

21       MS. NACCACHE:  Yeah.  They're not marked.

22       MS. GARCIA:  It's that one.

23       MS. NACCACHE:  Okay.

24       BY MS. CARRION:

25   Q.   Yes. That right there. On March 4th, there's a



**MILESTONE** | **REPORTING  COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**     **www.MILESTONEREPORTING.com**     **Toll Free 855-MYDEPOS**

1  conversation between you and Jean where Jean says,

2  "Danni, please send any recent text messages from

3  Scarlett to Kimberley Sullivan." Oh, sorry. Excuse me.

4  "Danni put a 10:00 a.m. meeting on our calendars.

5  Topic: SL, Scarlett Lopez." Do you recall having a

6  meeting on March 4th with Jean?

7      A.   I remember having several meetings.  I don't

8  remember the specific meeting.

9      Q.   Do you recall having meetings around the time

10 that Scarlett was coming back from FMLA with Jean?

11     A.   Yes.

12     Q.   What were those meetings about?

13     A.   I think we started talking about the interview

14 process, but I -- I'm not sure of the timeline of

15 everything.

16     Q.   When you say the interview process, what do

17 you mean?

18     A.   To find someone for the permanent position.

19     Q.   And when you say permanent position, what do

20 you mean?

21     A.   If she had been moved into a temporary

22 position, we would've had conversations about

23 interviewing and finding someone for a permanent

24 position.

25     Q.   When you say, "permanent position," do you



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  mean the Utility Service Technician?

2      A.   Yes.

3      Q.   Do you recall any specific conversation with

4  Jean in regards to the permanent position?

5          MR. BENTLEY:  Object to the form of the

6      question.

7          THE WITNESS:  Yes.  I recall specific

8      conversations.

9          BY MS. CARRION:

10     Q.   Can you tell me what was said during those

11 conversations?

12     A.   It depends on the chronology.  There were

13 multiple conversations, and they had different

14 discussions.

15     Q.   Any discussion early on once Scarlett was

16 coming back from FMLA leave that you recall?

17     A.   I don't remember.

18     Q.   You said there was multiple discussions. Which

19 ones do you recall?

20     A.   There were multiple.  So there were

21 discussions before and after Scarlett was on leave.  And

22 then at some point, Jean completed a performance

23 evaluation for Scarlett.  There were meetings after

24 that.

25     Q.   Prior to her performance evaluation, was there



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

 1  any meetings in regards to Scarlett's FMLA leave?

 2      A.   I don't remember.

 3          MS. CARRION:  Did we do Exhibit 5?  Yeah.

 4          BY MS. CARRION:

 5      Q.   On Exhibit 5, there's an e-mail from you,

 6  March 15th, to Jean and Bertha.  And it says, "Since I'm

 7  not officially Scarlett's supervisor, please find FMLA

 8  information."

 9          Is that your e-mail?

10      A.   Uh-huh.

11      Q.   Do you recall that e-mail?

12      A.   Not really, but it sounds like -- it seems

13  like something I would've sent, but I don't recall this

14  specific e-mail.

15      Q.   Did HR ever instruct you to forward FMLA

16  information to Jean and Bertha?

17      A.   Yes.

18      Q.   Who specifically from HR?

19      A.   It probably happened in the -- the earlier

20  conversations when we were talking about the logistics

21  of everything, and it was probably Becca who worked with

22  us throughout this process.

23      Q.   When you say Becca, you mean Rebecca Carr?

24      A.   Yes.

25      Q.   Okay.  When you say, "earlier conversations on



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  logistics," were these conversations before or after

2  Scarlett started working for the position?

3          MR. BENTLEY:  Object to the form.

4          THE WITNESS:  It's probably -- it was just

5      early on.  I don't know if it was before or if it's

6      just when she started, but I was given the

7      instruction that anything that came to me would need

8      to go up to them because they -- she was the

9      supervisor.

10          BY MS. CARRION:

11      Q.   Okay.  And can you see the e-mail right above

12  it from Jean to you?

13      A.   Yes.

14      Q.   Can you tell me what she means by reassigning

15  Scarlett to Kronos to Danni?

16      A.   Sure.  Kronos is the City of Tampa's software

17  function that tracks time and staff -- staff hours. It's

18  like how we do our time sheets.  And so if you switched

19  Scarlett to me as a supervisor, that would've made it

20  the official step.

21      Q.   And so after Scarlett was reassigned, was

22  Scarlett reassigned in Kronos to you?

23      A.   I don't remember.

24      Q.   By reassigning an employee in Kronos to you,

25  does that make you officially their supervisor?



**MILESTONE** | **REPORTING  COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1          MR. BENTLEY:  Object to the form.

2          THE WITNESS: I think so. I think if you asked

3     Human Resources, they would say there are some other

4     steps that need to be taken for it to be official,

5     but.

6          BY MS. CARRION:

7     Q.   Do you approve employees' time sheets on

8  Kronos?

9     A.   Yes.

10    Q.   Do you employ -- do you approve your

11  subordinates' time sheets on Kronos?

12    A.   Yes.

13    Q.   What does she mean by, "Now that she's in a

14  temp position, that should not be a problem as it was

15  before"?

16    A.   I think it was the -- as I described earlier,

17  where Jean had wanted to take a position from another

18  team to put in my team.  And that Scarlett would be in

19  that position temporarily.  Because until that point,

20  she had still be -- she had still been functioning as

21  executive aide.

22    Q.   What do you mean by functioning as executive

23  aide?

24    A.   That was her title, and her job duties, I

25  guess, followed it.  So she was really being asked to do


MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

1  a job that wasn't necessarily aligned with her job

2  title.

3      Q.   At that time, she was already performing job

4  duties under the Utility Tech position?

5      A.   Yes.

6      Q.   But her job title was still Senior Executive

7  Administrative Assistant?

8          MR. BENTLEY:  Object to the form.

9          THE WITNESS:  I believe so.

10          BY MS. CARRION:

11      Q.   By reassigning her title in Kronos, does it

12  change it throughout the system?  Do you know?

13      A.   I think so.  I don't remember the mechanics of

14  it.  It's been too long for me.

15      Q.   Do you recall anything that triggered this

16  change?

17          MR. BENTLEY:  Object to form.

18          BY MS. CARRION:

19      Q.   That triggered the change in Kronos?

20      A.   No, I don't remember.

21      Q.   Do you remember anything that triggered Jean's

22  e-mail to want to move Scarlett from the Kronos under

23  her versus under you?

24      A.   Can you say that question again, please?

25      Q.   Do you recall whether anything triggered Jean



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1 to want to change Scarlet's position to Kronos under

2 you?

3     A.   Yes.  Jean had begun her, I think, interview

4 process.  And so she really wanted to bring someone new

5 on board, and she couldn't do that if Scarlett was still

6 in that role.  So she had picked someone else.

7     Q.   When you say, "had picked someone else," what

8 do you mean?

9     A.   I think she identified the candidate that she

10 wanted with Sheila.

11     Q.   And how do you know that?

12     A.   Because Jean told me at some point.

13     Q.   And Sheila, what is her last name?

14     A.   Del Castillo.

15     Q.   Okay.  And was she already a City employee?

16     A.   I don't know.

17     Q.   Do you recall when Jean told you that she had

18 identified her for the job?

19     A.   No.

20     Q.   Do you recall when Scarlett told you she had a

21 miscarriage?

22     A.   Yes.

23     Q.   Do you know around what date that was?

24     A.   I read through the document, but I know it was

25 text, and then I was very surprised that she came in the



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**        www.MILESTONEREPORTING.com        *Toll Free 855-MYDEPOS*

 1  next day.  It was -- it was devastating.

 2       Q.   When she told you about her miscarriage, did

 3  you believe her?

 4       A.   Yeah.

 5       Q.   Did you share that she had had a miscarriage

 6  with anybody?

 7       A.   Yeah.

 8       Q.   Who did you share it with?

 9       A.   Jean and Bertha.

10       Q.   Was this in an in-person meeting or over the

11  phone?

12       A.   I think it was in-person I told Jean.

13       Q.   Were they both in the same meeting together or

14  two separate meetings?

15       A.   I don't know.

16       Q.   It's okay.

17            Do you recall anything that Jean said in

18  regards to Scarlett's miscarriage?

19       A.   I -- I don't -- I don't think -- she didn't

20  express sympathy.  It was more like she doubted if she

21  was pregnant.

22       Q.   Do you recall what was said during that

23  meeting?

24       A.   No.

25       Q.   Do you recall what you told Jean?

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1      A.   I said, Scarlett approached me and shared

2  that, after a difficult pregnancy, she's lost the baby.

3      Q.   Did Bertha make any remarks?

4      A.   No.

5      Q.   Did they offer to send her flowers?

6      A.   No.

7           MR. BENTLEY:   Object to the form of the

8      question.

9           BY MS. CARRION:

10     Q.   Did they offer any sympathies at all?

11          MR. BENTLEY:   Object to the form of question.

12          THE WITNESS:   No.

13          BY MS. CARRION:

14     Q.   What was Jean's demeanor during that meeting?

15     A.   Cold.

16     Q.   What was Bertha's demeanor during that

17  meeting?

18     A.   Cold.

19     Q.   Did you tell anybody else about Scarlett's

20  miscarriage?

21     A.   Probably not.  Probably would've -- not a

22  secret -- not my secret to share.

23     Q.   Would it be accurate to state that about two

24  weeks after she came back on March 3rd, she had her

25  miscarriage?

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    A.   I don't remember the timelines.

2    Q.   During the weeks that she was working in

3 March, do you recall of Scarlett making any mistakes in

4 her job?

5    A.   No mistakes.

6    Q.   During the two weeks that she was at work in

7 March, do you recall her working on anything with

8 Duncan?

9    A.   No.  I don't think so.

10   Q.   During the month of March, do you recall

11 anybody speaking in regards to Ms. Lopez's performance?

12   A.   No.

13   Q.   Do you recall how many days after her

14 miscarriage did she come back to work?

15   A.   I remember being very surprised at how fast it

16 was.  And I talked to her, and I said, come in my

17 office.  And I said, should -- you know, this is more

18 important.  Like, don't you think you should take time

19 at home to recover?

20        And she said she just didn't have the time,

21 and she needed to be at work.

22   Q.   Did she say anything else during that meeting?

23   A.   I don't know.  I think I gave her a hug.  It's

24 really sad.

25   Q.   What was her demeanor during that meeting?



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1      A.   Sad.  Defeated.

2      Q.   Do you recall any projects that Scarlett was

3  working on at this time?

4      A.   I think around this time, we had the Bloomberg

5  Associates team coming in, and Scarlett had been

6  organizing the logistics for their visit and helping

7  with planning the tour.  And it was just -- there were a

8  lot of logistics because we planned out an extensive

9  tour for them.  So she helped a lot with that and just

10  made our lives much easier.

11      Q.   Did she make any mistakes when it came to that

12  project?

13      A.   No.

14          MR. BENTLEY:  Object to the form of the

15      question.

16          BY MS. CARRION:

17      Q.   Did she make any mistakes during the month of

18  March when she was working?

19      A.   No mistakes.

20      Q.   Did you notice any performance deficiencies in

21  the weeks of March that she was working?

22      A.   I don't know -- I wouldn't say deficiencies.

23  No.

24      Q.   Do you have an idea about how many weeks

25  Scarlett worked with you prior to coming back in March?



MILESTONE **|** REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

 1      A.   I -- I don't know that now.

 2      Q.   Would you say it's less than two weeks?

 3      A.   I can't guess.  I don't know.

 4      Q.   Do you recall her being out on continuous

 5 leave?

 6      A.   After the miscarriage, I think she was in the

 7 office for the rest of the time.

 8      Q.   And when you mean the rest of the time, you

 9 mean from March 3rd up until her termination?

10           MS. NACCACHE:  Here.

11           THE WITNESS:  Yes.

12           MS. CARRION:  Thank you.

13           THE WITNESS:  Thanks.

14           BY MS. CARRION:

15      Q.   What were some of the projects she was working

16 on from March up until her termination?

17      A.   We were trying to get the office -- it -- it

18 had been a place with a lot of forgotten piles of things

19 all around, which really bothered me.  I just wanted to

20 get everything well organized so we could establish a

21 clean start priority.  So Scarlett was really helpful in

22 just getting the office set up in a way that could make

23 our team more efficient. And we had also started a new

24 community Vision Zero program.  So Scarlett was helping

25 a lot with that, getting materials ordered and kind of

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1  getting those put away in a nice way.  And I think those

2  were the two big things we were working on. And then

3  whenever we had -- whether it was Bloomberg or we had, I

4  think, the undersecretary from FHWA come, you know, we

5  relied a lot on Scarlett to help get those events set

6  up, which was a lot of work.

7      Q.   Was she helpful during this time?

8      A.   Yes.

9      Q.   Did you do -- did you ever become aware that

10  Scarlett filed a grievance?

11     A.   Yes.

12     Q.   Do you recall when you became aware that she

13  filed a grievance?

14     A.   Jean forwarded it to me.

15     Q.   Do you recall around what month?

16     A.   No.

17     Q.   Do you recall around when Scarlett received an

18  evaluation?

19     A.   It had to be somewhere halfway when we -- in

20  March, I don't really remember.

21     Q.   That's okay.  When Jean forwarded you the

22  grievance -- strike that.

23          Why did Jean forward you the grievance?

24          MR. BENTLEY:  Object to the form of the

25      question.



MILESTONE **|** REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1            THE WITNESS:  I don't know.

2            BY MS. CARRION:

3      Q.    Did you have a conversation with her in

4   regards to the grievance?

5      A.    Not at that time.

6      Q.    Did you do anything with that e-mail?

7      A.    I read it.

8      Q.    What was in that e-mail besides her grievance?

9            MR. BENTLEY:  Object to the form of the

10      question.

11           THE WITNESS:  It was just a forward from Jean,

12      I think, with the grievance.

13           BY MS. CARRION:

14     Q.    Did Jean say anything in that e-mail as you

15   can recall?

16     A.    Nothing I can recall.

17     Q.    Do you recall anybody else CC'd on that e-

18   mail?

19     A.    I don't remember.

20     Q.    What was your understanding of the grievance

21   when you read it?

22     A.    My understanding was that Jean's previous

23   performance evaluation of Scarlett from the last time

24   she had to do one, she had given her all perfect remarks

25   in every category, all fives.

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1          And then following the next one where Scarlett

2   had been temporarily reassigned to my team, so she had

3   been with me for a couple months maybe at that point,

4   Jean, without talking to me about the performance

5   evaluation, completed it, and it was the opposite.  It

6   was all ones.

7          It was -- and so I remember reading in that

8   letter in the grievance something like, you know, how

9   can my institutional knowledge go from five to one?  So

10  it was -- you know, so that's what I saw.

11      Q.   Were you surprised to see that an evaluation

12  was made during the time that she reported to you?

13          MR. BENTLEY:  Object to the form of the

14      question.

15          MS. CARRION:  Counsel, what's your specific

16      objection?

17          MR. BENTLEY:  Calls for absolute speculation.

18          THE WITNESS:  But I still answer?

19          BY MS. CARRION:

20      Q.   Yes, please.

21          MR. BENTLEY:  And I get why we could -- just

22      please try not to watch Ms. Lopez.  I know she's --

23      in the conversation, sometimes she'll nod her head.

24      I just want to make sure -- that conversation is

25      happening -- it is happening, and I've been watching



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    it, and so I'm making sure --

2         MS. CARRION:  Counsel --

3         MR. BENTLEY:  If we want to really go -- and

4    I'm going to keep watching it.  If I see nods and

5    head shakes, yes.  I'm going to bring it up on the

6    record.

7         MS. CARRION:  Counsel, you can bring it up on

8    the record.  You may do so respectfully.

9         But at the same time, Counsel, I would ask that

10   you please keep your speaking objections to the

11   minimal over the past --

12        MR. BENTLEY:  You just asked me what my

13   objection --

14        MS. CARRION:  -- two hours.

15        MR. BENTLEY:  -- you just asked me what my

16   objection was.  I clarified that.  I thought it was

17   a good point in time because if she keeps looking at

18   Ms. Lopez -- to bring up that point.  I didn't know

19   how else to do it in a private -- I was trying to

20   find the time to do it.

21        MS. CARRION:  I understand, Counsel, but who do

22   they look at during depositions --

23        MR. BENTLEY:  Have a conversation with you, Ms.

24   Carrion.

25        MS. CARRION:  Can we go off the record for a



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    second, please?

2         THE REPORTER:  Yes.

3         And we're off the record.

4          (OFF THE RECORD)

5         THE REPORTER:  And we're back on the record.

6         MR. BENTLEY:  We had a conversation off the

7    record.  After I noticed that Ms. Lopez was shaking

8    or nodding her head, I explained to Counsel I did

9    not believe it was intentional, but it was

10   occurring.

11        And her counsel, Ms. Carrion, has instructed

12   Ms. Lopez to try to be mindful of it and try not to

13   do it in the future.

14        MS. CARRION:  Thank you, Chris.

15        Can you remind me where we were?

16        THE REPORTER:  Yes.  One moment, please.

17        MS. CARRION:  I think I got it if you want to

18   keep going.  It's okay.

19        THE REPORTER:  Okay.

20        MS. CARRION:  Sorry.  I'm just trying to save

21   some time.

22         BY MS. CARRION:

23    Q.   Danni, we were discussing the grievance.  Did

24 anyone ever reach out to you about preparing Scarlett's

25 yearly evaluation?



MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1      A.    Yes.

2      Q.    Who reached out to you?

3      A.    Human Resources.

4      Q.    And what did they say?

5      A.    They said that because Scarlett had also been

6  on my team for a portion of the year, it would be

7  appropriate for me to complete a performance evaluation.

8      Q.    Do you recall when they approached you?

9      A.    No.

10      Q.    Do you recall who approached you?

11      A.    No.

12      Q.    Prior to HR approaching you in regards to the

13  evaluation, did anybody else speak to you about the

14  evaluation of her grievance?  Strike that.

15          MS. CARRION:  Let me rephrase before you

16      object.

17          MR. BENTLEY:  It was coming.

18          BY MS. CARRION:

19      Q.    The evaluation that you read attached to the

20  grievance, did you have any discussion with any City

21  employee in regards to that?

22      A.    Yes.

23      Q.    Who did you have a discussion with?

24      A.    Jean had called me to talk about it.

25      Q.    And what did she say?

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
407.423.9900      www.MILESTONEREPORTING.com      Toll Free 855-MYDEPOS

1     A.   She was appalled that Scarlett had filed a

2 grievance.  She was really angry.  She was pretty direct

3 with that.

4     Q.   Do you recall any specifics?

5     A.   Yeah.  It was a lot of, like, who does she

6 think she is, kind of comments.

7     Q.   What other comments did she make?

8     A.   It's my right.  She's an at-will employee.  I

9 can do what I want.

10     Q.   Was anybody else there in that meeting?

11     A.   I don't think so.  I think it was just a phone

12 call between the two of us.

13     Q.   Do you recall whether this phone call came

14 soon after you received that e-mail?

15     A.   Yes.

16     Q.   Did she say anything else?

17     A.   Not at that time.

18     Q.   Did she say anything about the actions she

19 would take?

20     A.   Not at that time.

21     Q.   Did you have a response for her?

22     A.   No.

23     Q.   Did Jean talk about terminating Scarlett

24 during that phone call?

25     A.   No.

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    Q.   Did Jean talk to you about her position during

2  that phone call?

3    A.   Can you please rephrase your question?

4    Q.   Did Jean state any specifics in regards to any

5  action she would take against Scarlett?

6         MR. BENTLEY:  Object to the form.

7         THE WITNESS:  No.

8         BY MS. CARRION:

9    Q.   Do you recall what month that was?

10   A.   No.

11   Q.   Was the position for Utility Service Tech

12 posted externally?

13   A.   Yes.

14   Q.   Whose idea was it to post the position

15 externally?

16   A.   Mine.

17   Q.   When did you decide to post the position

18 externally?

19   A.   When I understood that Jean had made the

20 expectation to me that Scarlett was not to get that

21 position.

22   Q.   And what do you mean by that?

23   A.   Jean told me directly, do not hire Scarlett

24 for this position.

25         And I said, okay, then I'm going to do an

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1 external interview so I can find the most qualified

2 candidate.

3      Q.   Could you have just hired Scarlett for that

4 position?

5      A.   Jean told me I could not.

6      Q.   But procedurally, if Jean said you could,

7 could you?

8      A.   Yeah.

9           MR. BENTLEY:   Object to the form of the

10      question.

11           THE WITNESS:   If -- if Jean had supported it,

12      and the interview panel, which I had removed myself

13      from, found that she was the best candidate, then,

14      yes.

15           BY MS. CARRION:

16      Q.   Is there a different kind of posting, an

17 internal posting versus an external?

18      A.   Yes.

19      Q.   Can you explain to me the differences?

20      A.   Sure.   There's -- sometimes the City will do a

21 three-day, internal-only posting.   Those are typically

22 for when the candidate has been identified, and they

23 don't want to go through a lengthy process of looking.

24 They want to just be able to hire that person.

25           And then maybe internal City is they think of

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  there could be more than one good candidate, but it's

2  restricted to the City staff, so smaller pool still.

3          And then the largest pool is external, and

4  then for the number of days, too.  So we did a longer

5  term because by that point we knew -- I was told I could

6  not hire Scarlett.

7      Q.   Were you directed not to hire Scarlett?

8      A.   Yes.

9          MR. BENTLEY:  Object to the form.

10          BY MS. CARRION:

11      Q.   Who directed you not to hire Scarlett?

12      A.   Jean.

13      Q.   Did she do -- how did Jean direct you not to

14  hire Scarlett?

15          MR. BENTLEY:  Object to the form.

16          THE WITNESS:  After we discussed the grievance

17      letter, she said, Scarlett has got to go.  We're not

18      -- we're not keeping Scarlett.

19          BY MS. CARRION:

20      Q.   And this was after you --

21      A.   After we read and discussed the grievance

22  letter.

23      Q.   And this was soon after you received the e-

24  mail with the grievance?

25      A.   Pretty soon.

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    Q.   What was your reaction?

2    A.   I felt like I was in an ethical quandary.

3    Q.   Why did you feel that?

4    A.   Because the right thing to do, that I felt,

5  was not what I was being told to do.

6    Q.   What did you feel the right thing to do was?

7    A.   The right thing to do would have been to give

8  her a fair assessment at an external interview process

9  where we were removing biases from the panel, which is

10  why I took a step back.  Because Jean had had these

11  conversations with me.  So I tried to make it as

12  unbiased as possible.

13    Q.   Do you recall when the position was actually

14  posted?

15    A.   No.

16    Q.   Do you recall who decided to post externally?

17        MR. BENTLEY:  Object to the form.

18        THE WITNESS:  I think I suggested it, but the

19     decision to do something like that would probably

20     fall to Human Resources and need concurrence from

21     the director.

22        BY MS. CARRION:

23    Q.   Are you aware whether Scarlett was qualified

24  for the position?

25    A.   No.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1      Q.   Did you ever review her resume?

2      A.   I don't think so, no.

3      Q.   You mentioned earlier that you removed

4  yourself from the hiring panel.

5           Why did you do that?

6      A.   Because I had been instructed not to hire

7  Scarlett, and I felt like it would be the most impartial

8  way that we could do this.  It was -- it was just a

9  really touchy situation.

10     Q.   Who were the members of the hiring panel?

11     A.   Well, I asked Michael Capotrio, who was on my

12 team, and I find him to be just, like, a very good,

13 trustworthy person.  So he organized it, and he asked

14 two others.  One of whom was Joani, I think, from

15 Stormwater.  And then I don't know the third.  Usually

16 there's three.

17          And they ask the same questions to each

18 candidate.  They sent out a preliminary survey asking

19 for questions to try to narrow it down because they had

20 200 applicants.  And then they narrowed it down to a

21 short list.  They did short-list in-person interviews,

22 and then they made a selection.

23     Q.   Do you know whether Scarlett made the short

24 list?

25     A.   She did.



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    Q.    Did Michael ever make any remarks in regards

2 to potentially hiring Scarlett for that position?

3    A.    He had come to me because Jean called him and

4 told him the same thing: Don't hire Scarlett.

5    Q.    What specifically did Michael tell you during

6 that call?

7    A.    He came to my office, and he said, Jean is

8 calling me saying we need to hurry this up.  She wants

9 Scarlett gone faster and that we can't hire her.

10         And so I told Vik, my boss, and I said, I feel

11 really uncomfortable with this situation.

12         He said, you just have to do what you're told.

13    Q.    And let me just make sure I get this

14 accurately.  Vik told you, you just have to do what

15 you're told?

16    A.    (No verbal response.)

17    Q.    Did he say anything else?

18         MR. BENTLEY:  Can you verbalize, please?

19         MS. CARRION:  Can you -- sorry.  Can you

20     verbalize your answer instead of nodding?

21         THE WITNESS:  Yes.

22         MS. CARRION:  Thank you.

23         THE WITNESS:  Sorry.

24         MS. CARRION:  No, it's okay.

25         BY MS. CARRION:

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1      Q.   How many conversations with Michael did you

2  have in regards to Scarlett's termination?

3      A.   It wasn't in regard to her termination.  It

4  was more about the interview process.  He was very

5  focused on keeping it as by the book and consistent for

6  everyone as he could.  And so I tried to step out of it

7  as much as I could and give him the space to do it.

8      Q.   Was Vik involved in the hiring of the Utility

9  Administrative Support Technician role?

10     A.   He was not on the panel, but Michael shared

11 with me that Vik had called the other two people on the

12 panel and told them the same thing, that they could not

13 hire Scarlett.

14     Q.   Did Michael say anything else in regards to

15 Vik?

16     A.   No.

17     Q.   Did you speak with anybody else on the panel?

18     A.   No.

19     Q.   Did you speak directly with Jean in regards to

20 her comments to the panel?

21     A.   Yes.  She called me frequently and said, why

22 aren't they done yet?  Why is this taking so long?  I

23 want her gone.  I had to ride an elevator with her

24 today.  I want her gone.  That this is taking too long.

25          But I had shared with Vik and Jean that

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

 1 | Scarlett had told me she was applying for another

 2 | position at the City.  And so I was hopeful that we

 3 | could line -- align the timeline so that when she moved

 4 | out of this temporary administrative position, she could

 5 | move into this other one that she had identified, and

 6 | that there would be no gap in -- in her employment.

 7 |      Q.   When you say, "this other one," you mean a

 8 | different role besides the Utility Administrative

 9 | Support Technician?

10 |      A.   Yeah.  She said she was talking to someone in

11 | her former division.

12 |      Q.   Do you know who she was talking to?

13 |      A.   Maybe Payroll.  I don't know.

14 |      Q.   That's okay.  How long did it take between the

15 | posting and the hiring of the Utility Administrative

16 | Support Technician role?

17 |      A.   I don't know.

18 |      Q.   Would you say that it took more than a few

19 | months?

20 |      A.   I don't know.

21 |      Q.   Did you speak to Scarlett in regards to not

22 | getting the position?

23 |      A.   No.  We tried to keep it -- once I knew that

24 | the panel had selected a different candidate, I tried to

25 | keep that confidential so that she could continue, but I



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  still encouraged her to talk to the other group that she

2  was speaking with about transferring to that team.

3       Q.   Did you have any influence whatsoever in

4  regards to who they chose for that role?

5       A.   No.

6       Q.   Who was chosen for that role?

7       A.   Her name is Joeylee.

8       Q.   Can you spell her first name?

9       A.   Joey, J-O-E-Y-L-E-E.

10      Q.   Was this a female or a male?

11      A.   Female.

12      Q.   Female.  Was Joey hired from outside of the

13  City?

14      A.   Yeah.  She was an out-of-state candidate.

15      Q.   Is she still with the City?

16      A.   I believe so.  I haven't seen her in a year.

17      Q.   At the time that you left the City, was she

18  still in the Utility Administrative Support Technician

19  role?

20      A.   Yes.

21      Q.   Once Joeylee was hired for the Utility

22  Administrative Support Technician role, did you speak to

23  Jean in regards to Scarlett's termination?

24      A.   No.

25      Q.   Did you speak to Bertha in regards to



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  Scarlett's termination?

2      A.    No.

3      Q.    Do you recall when Scarlett was terminated?

4      A.    Yes.

5      Q.    Can you tell me the month?

6      A.    I think it was June.  I'm not sure.  We had

7  the Bloomberg Associates team in town, and so I got a

8  call from, I think it was Jean's new executive aide,

9  that I needed to take Scarlett to the fifth-floor

10 conference room, but with no other context.

11          And I showed up, and when we opened the door

12 to the room, I knew what was about to happen, but I had

13 no idea what we were walking into.  And then I waited on

14 the floor, and she came up to get her purse, and I saw

15 that Scarlett had been crying.  And I think Becca had

16 been there waiting to just escort her out of the

17 building.

18     Q.    Who was in that conference room?

19     A.    I think it was Vik, Jean, and Becca, but I

20 can't be sure.

21     Q.    At the time that Scarlett was terminated, was

22 Joey already hired?

23     A.    She'd been selected and probably had gone

24 through the paperwork and was hired, but she hadn't

25 started yet.



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1        MS. CARRION:  Let me go ahead and label Exhibit

2    10 for 6.

3        MS. GARCIA:  10?

4        MS. CARRION:  You grabbed 10, but it's 6.

5        MS. GARCIA:  Yeah.

6        MS. CARRION:  You just have to write on this,

7    Exhibit 6.

8            (EXHIBIT 6 MARKED FOR IDENTIFICATION)

9            BY MS. CARRION:

10    Q.    Have you seen this letter before?

11    A.    I've seen a similar letter, but not this one.

12    Q.    That's okay.  It states on here, "Your last

13 working day in the office today, August 22, 2022.

14 However, your last day of employment will be Friday,

15 September 2, 2022."

16        Do you have any idea why Scarlett's last day

17 was August 22nd, but she was employed until September

18 2nd?

19    A.    No.

20    Q.    Did Jean ever have any conversations with you

21 in regards to Scarlett's termination being quickly?

22        MR. BENTLEY:  Object to the form of the

23    question.

24        BY MS. CARRION:

25    Q.    Let me rephrase.



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1          Did Jean ever make any comments in regards to

2    the date of Scarlett's termination?

3          A.    She wanted it to be done as quickly as

4    possible, and she would call me frequently, saying, when

5    is this going to be done?  Why hasn't this been done?  I

6    want her out of the building.

7          You know, that one day she shared an elevator

8    with Scarlett, I got many calls from Jean saying, why is

9    she still here?

10         Q.    In one -- I just want to make sure I get this

11   accurately.  In one day that Jean shared the elevator

12   with Scarlett, that day you received many calls?

13         A.    Yeah.

14         Q.    And do you recall whether that day was before

15   or after you hired Joey?

16         A.    I don't remember.

17         Q.    You recall around the month?

18         A.    I don't remember.

19         Q.    Do you recall what phone she called you to,

20   personal or work?

21         A.    I don't remember.  I carried both because she

22   would call me on either.

23         Q.    Did you pick up every single phone call?

24         A.    Always with Jean.

25         Q.    And what was every call about?



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1          MR. BENTLEY:  Object to the form.

2          THE WITNESS:  What was every call on that day

3     about?

4          BY MS. CARRION:

5     Q.   Correct.

6     A.   It was all about Scarlett.  She was very

7  distressed that she had to see Scarlett after Scarlett

8  had filed a grievance.

9     Q.   When you say see, what do you mean?

10    A.   Like that they shared a building, that they

11 bump into her.

12    Q.   On that day, did she call you more than two

13 times?

14    A.   Probably.

15    Q.   Would you say she called you more than five

16 times?

17    A.   I don't know.

18    Q.   Are there any comments from Jean that you can

19 recall from those phone calls?

20    A.   Just the comments were, I had to share an

21 elevator.  Like, you know, who does she think she is

22 that she can file a grievance against me?  So I want her

23 gone.  Those were the main things.

24    Q.   Can any employee file a grievance?

25         MR. BENTLEY:  Object to the form.

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

1        THE WITNESS:  I think so.  You'd have to ask

2    Human Resources.

3        MS. CARRION:  Counsel, what's your specific

4    objection?

5        MR. BENTLEY:  I'm scared to give you a specific

6    objection because you're going to -- but it calls --

7    I can -- I'll start listing them for you.

8        MS. CARRION:  You just have to tell me the

9    specific objection.  Sorry.  I didn't hear you.

10        MR. BENTLEY:  Yeah.  It calls for speculation.

11        MS. CARRION:  Okay.  Thank you.  It's not

12    Kora's computer.

13        MR. BENTLEY:  I deal with this every day, and

14    that's why I probably have lost my hearing.

15        MS. NACCACHE:  It gets really loud sometimes.

16    It's in the building down there, and so it's even

17    closer.

18        MR. BENTLEY:  Even on a Zoom call, you have to

19    -- how do you mute yourself?

20        MS. NACCACHE:  It's really -- yeah.

21        THE WITNESS:  Is this the old Trump site?

22    Trying to think -- what's it called now?  Pendry?

23        MS. CARRION:  We're still on the record.

24        THE WITNESS:  Oh, sorry.

25        MS. CARRION:  It's okay.



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1          BY MS. CARRION:

2      Q.   Over the course of the time that Scarlett came

3  back from FMLA up until the time she was terminated,

4  about how many times do you think Jean reached out to

5  you in regards to terminating Scarlett?

6      A.   From the time that she returned from FMLA?

7      Q.   Uh-huh.

8      A.   I don't know that answer.

9      Q.   Was it more than once?

10     A.   I don't know.

11     Q.   Did Jean continuously reach out to you in

12 regards to a status update of Scarlett's termination

13 date?

14     A.   Yes.

15     Q.   How often would Jean check in on you to see

16 when Scarlett's termination date would be?

17     A.   At least daily, sometimes more.

18     Q.   When you say daily, is there a specific month

19 that you're --

20     A.   Whenever the grievance was filed, it started

21 after that.

22     Q.   So after Scarlett filed her grievance, Jean

23 Duncan would ask you daily when Scarlett's last day of

24 employment would be?

25     A.   Yes.



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    Q.   Did anybody else check up on you in regards to

2  the last day of employment for Scarlett?

3    A.   Bertha.

4    Q.   How often would Bertha reach out in regards to

5  Scarlett's last day of employment?

6    A.   Probably daily as well.

7    Q.   Was this over phone?

8    A.   Phone, mostly.

9    Q.   What was -- do you recall any context of the

10 conversations with Bertha in regards to Scarlett's

11 termination date?

12   A.   Yes.

13   Q.   Can you share with me the conversations you

14 had with Bertha in regards to Scarlett's termination

15 date?

16   A.   Yes. I shared with Bertha that I understand,

17 for other reasons, that we were not able to keep

18 Scarlett in this role, but that Scarlett had mentioned

19 to me she was talking to this other department that she

20 had a good relationship with, and she was hoping that it

21 would work out where she could go be hired with that

22 team. And I would like to -- my -- the ideal was to

23 align her departing my team and then immediately being

24 able to join this other team so there was no lapse for

25 her. And then Bertha said, trust me, Scarlett will not

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1 be working anywhere at the City again. Jean has seen to

2 it.

3     Q.   Do you recall when Bertha made this remark?

4     A.   It would have been after we selected the

5 candidate, but --

6     Q.   Did she make this remark once?

7     A.   I -- I talked to Jean also about that, and I

8 said, you know, I'd really like to make it so that

9 Scarlett can have a transition from this current role to

10 the one she's applying for.  It sounds like they really

11 want her, and she wants to work there.  So I would hope

12 that there's a way we can kind of find the time.

13          And Jean said, oh no, that's not happening.  I

14 will see to it.  She will not work at the City.

15     Q.   Do you recall when you had this conversation

16 with Jean, around what time?

17     A.   No.

18     Q.   What was your reaction when she said that to

19 you?

20     A.   I just felt defeated and really sad.

21     Q.   Why did you feel defeated and sad?

22     A.   Because, like, it's one thing for someone to

23 take an issue with one person, but to go to those

24 lengths to try to hurt her, it's just really sad.

25     Q.   And when you say it hurt her --



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    A.    Like --

2    Q.    -- what do you mean?

3    A.    -- just because she spoke up and took issue

4  with how they did their performance evaluations, like

5  that they would try to ruin her career basically.

6  That's --

7    Q.    Would you say that someone denying you --

8  strike that.

9         Would you say that someone assuring that

10 you're no longer employed with the City of Tampa could

11 potentially be damaging to their career?

12        MR. BENTLEY:  Object to the form.

13        BY MS. CARRION:

14   Q.    You can answer, please.

15   A.    Yes.

16   Q.    Had you ever seen Jean do that to anybody

17 else?

18   A.    Not that exact situation, but I had seen her

19 act in similar capacities.

20   Q.    What do you mean by that?

21   A.    Like when she had a -- there were people who,

22 if she didn't like them, if maybe she felt like they had

23 an antagonistic relationship, she would politic in a way

24 to try to get them removed from their position or make

25 it look like they're failing in their role.  Like --

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900         www.MILESTONEREPORTING.com         Toll Free 855-MYDEPOS

1    Q.   Had she ever made a comment in regards to any

2 other employee where she said she wanted to assure that

3 they don't work at the City anymore?

4    A.   I don't know.

5    Q.   Earlier, you testified that you wanted to see

6 Scarlett be employed so that there would be a smooth

7 transition into another City job --

8    A.   Uh-huh.

9    Q.   -- is that accurate?

10    A.   Yeah.

11    Q.   Do you believe Jean uses her position to

12 persuade the termination of employment of employees?

13 Strike that.

14        Do you believe Jean uses the power of her

15 position to influence the termination of employees?

16        MR. BENTLEY:  Object to the form of the

17    question.

18        THE WITNESS:  Yes.

19        BY MS. CARRION:

20    Q.   Do you believe Vik uses his position in order

21 to influence the termination of employees?

22        MR. BENTLEY:  Object to the form of the

23    question.

24        THE WITNESS:  Yes.

25        BY MS. CARRION:



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1      Q.    Did you have to fill out an evaluation for

2  Scarlett?

3      A.    Yes.

4      Q.    Who advised you to do an evaluation for

5  Scarlett?

6      A.    Human Resources.

7      Q.    Do you recall when that was?

8      A.    No.

9      Q.    Do you recall whether this was before or after

10 she was terminated?

11     A.    Before she was terminated.

12     Q.    What did Human Resources say to you?

13     A.    They said that since she'd been reporting to

14 me unofficially since January, Jean's performance

15 evaluation really only reflected half of the year, and

16 so I was to do the other half.

17          And I said that Scarlett had been on FMLA, and

18 I didn't feel comfortable writing an evaluation based

19 on, you know, the limited time I was able to work with

20 her.  And so they advised me how to complete the

21 evaluation.

22          MS. CARRION:  I'm going to go ahead and enter

23      into --

24          MS. GARCIA:  Exhibit 7.

25          MS. CARRION:  Exhibit 7?

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1          MS. GARCIA:  Uh-huh.

2             (EXHIBIT 7 MARKED FOR IDENTIFICATION)

3          MS. NACCACHE:  Oh, thank you.  Sorry.

4          MS. GARCIA:  You're welcome.

5          BY MS. CARRION:

6      Q.   Do you recognize this document?

7      A.   Yes.

8      Q.   If you look at the first Page, 50071, it says

9  the rater is Danni Jorgerson; is that correct?

10     A.   Yeah.  Danni Jorgenson.

11     Q.   Jorgenson. I apologize. The period covered of

12 the evaluation is January 3rd up until April 19, 2022.

13     A.   Uh-huh.

14     Q.   From January 3rd up until April 19, 2022, was

15 Scarlett in the office often?

16     A.   Sometimes.

17     Q.   During that time, was she out on approved FMLA

18 leave?

19     A.   Yes.

20     Q.   When you -- do you recall when you filled this

21 document out?

22     A.   I recall filling it out after I had spoken to

23 Human Resources and said, I don't feel comfortable

24 completing it because I didn't feel like I had enough

25 opportunity to work with her to give her a fair

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1  assessment.

2         So they advised me to do all threes, which I

3  did, all meets expectations.  And then in the comments,

4  they kind of gave me some language to use.  So that's

5  what I did.

6     Q.   Who is they?

7     A.   I think it was Becca or maybe Kimberley.

8     Q.   Okay.  And if I can have you look at Page

9  50076?

10    A.   Uh-huh.

11    Q.   When you say they gave you some language to

12 use, did you use any of that language under the

13 reviewer's comments?

14    A.   Yes.

15    Q.   Okay.  Can you tell me what HR told you to

16 write on reviewer's comments?

17    A.   I think I even gave them the language before I

18 put it in here, and so they approved of it, but --

19    Q.   HR approved the language that you were putting

20 in the evaluation prior to you putting it on the

21 evaluation?

22    A.   Yeah, I went through it with them.

23    Q.   When you say you went through it with them,

24 was it Rebecca Carr?

25    A.   I don't remember.  But I did -- I was nervous



MILESTONE **|** REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  because this is something I hadn't done before.  I'd

2  never encountered anything like this.  I wanted to make

3  sure I was doing it right.  So I went through the

4  language with them. They said, yep, that sounds good.

5  And so I put this in here, and it was a neutral

6  evaluation because I wasn't in a place to adequately

7  perform a performance evaluation.

8        Q.   Is that because -- why did you feel like you

9  weren't in a place to adequately provide a performance

10 evaluation?

11       A.   Because she had only been on my team for a few

12 months.  Of that time, she was out of the office on

13 FMLA.  And even before that, she had been taking sick

14 days and, you know, she's -- she had a tough season, a

15 tough chapter.  And so I didn't get a fair assessment of

16 what she was like to work with, so I didn't feel like I

17 could fill this out.

18       Q.   Is it accurate to say that you didn't get a

19 fair assessment because you didn't have an opportunity

20 to work with her enough days?

21       A.   Yeah.

22       Q.   Do you know why, on the first page, it says

23 that her class title is still Senior Executive Aide for

24 the Infrastructure and Mobility Department?

25       A.   Yeah.  She hadn't been officially moved.  I



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1 still wasn't her official supervisor at this point.

2     Q.    When you say at this point, do you mean during

3 the time of the period covered by the evaluation or at

4 the time that you filled this out?

5     A.    I think it's both.  I don't know if she was

6 ever moved into a temporary position.  Because when they

7 terminated her position, she was at-will, which was a

8 Senior Executive Aide.

9     Q.    Do you know what the classification is for the

10 Utility Administration Support Technician?

11     A.    Not -- oh, God.  It's -- that one is, like,

12 protected.  One serves at the pleasure of the mayor, one

13 doesn't.

14     Q.    Can I have you briefly look at the last page?

15         It says, "Digitally signed on August 2, 2022,"

16 at the top.

17     A.    Uh-huh.

18     Q.    Is that an accurate timeframe when you filled

19 this out?

20     A.    I don't know.  I guess so.  It says it, but I

21 don't know.

22     Q.    The department director signature, whose

23 signature is that?

24     A.    Vik.

25     Q.    Do you know why HR asked you to do an



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1 evaluation for Ms. Lopez after Duncan had already done

2 an evaluation for her?

3      A.   I gathered that because in the grievance,

4 Scarlett had identified that Jean had only been

5 supervising her for a portion of that year, and the rest

6 of the year she was working with me and my team, so a

7 more balanced approach would've been to have both of us

8 do a review.

9           MS. CARRION:  Are we on 7?

10           I'll enter into evidence Exhibit --

11           MS. GARCIA:  8.

12           (EXHIBIT 8 MARKED FOR IDENTIFICATION)

13           BY MS. CARRION:

14      Q.   I'm going to give you a minute to look over

15 this and read the e-mail, if that's okay.

16           Have you seen this e-mail before?

17      A.   Yes.

18      Q.   Why did Jean CC you on this e-mail?  Do you

19 know?

20      A.   No.

21      Q.   What was the purpose of her e-mail?  Do you

22 know?

23      A.   It says it's to object to a partial granting

24 of the grievance.

25      Q.   Do you know what that -- what she meant by

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  that?

2      A.   No.

3      Q.   Do you know what she meant by, she was not

4  consulted at all on this decision?

5      A.   No.  I don't know.

6      Q.   You forwarded this e-mail to Vik?

7      A.   Yes.

8      Q.   Why did you do that?

9      A.   He's my supervisor.

10     Q.   Did you have a conversation with Vik in

11 regards to this e-mail?

12     A.   No, not that I can remember.

13     Q.   Did he respond?

14     A.   I don't think so, but I don't know.

15     Q.   What do you -- how do you interpret Jean's

16 last sentence where it says, "The interviewing and

17 hiring aspect of this position has also been fraught

18 with missteps"?

19     A.   She was impatient with how long it took.  We

20 opened it up externally, and we had nearly 200

21 applicants, so the interview panel decided to do a

22 preliminary -- kind of like a long listing approach

23 where they sent out written questions, and then they had

24 to get the written questions back, review them.  That

25 took time.



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1          And so it was just a lengthier interview

2     process than maybe what's normal, and that was done very

3     intentionally because I think we all knew everything

4     needed to be very by the book.

5          Q.   By the book with the knowledge that Jean

6     specifically said not to hire Scarlett?

7               MR. BENTLEY:  Object to the form of the

8          question.

9               THE WITNESS:  (No verbal response.)

10               BY MS. CARRION:

11          Q.   Okay.  Sorry.  Could you please verbalize your

12     answer?

13          A.   Yes.

14          Q.   Was Jean eager to hire someone for the

15     position or for Scarlett to be terminated?

16               MR. BENTLEY:  Object to the form.

17               THE WITNESS:  Both.

18               BY MS. CARRION:

19          Q.   In her last sentence, she says, "The only

20     action that will improve the evaluation of this employee

21     is for an appropriate effort to be made to do the lower-

22     level job that she's now assigned to do."

23               Is that lower-level job that she's referring

24     to the Utility Administration Support Technician?

25          A.   Yes.

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    Q.   Did you have a conversation with anyone from

2   the City in regards to this e-mail?

3    A.   No.

4    Q.   Did you have any conversations with anyone

5   from the City in regards to Jean's displeasement of the

6   hiring aspects for the position?

7    A.   Potentially, but I can't remember anything

8   specific.

9    Q.   Do you recall any conversation at all with

10   anybody from the City?

11    A.   Related to?

12    Q.   Related to Jean's feelings towards her --

13   well, relating to Jean's displeasement for the hiring

14   aspects of the position?

15    A.   Yes.  I talked to Michael.  She had also been

16   calling Michael frequently, and so I would say, "Jean

17   called me again today.  She wants to know, you know,

18   what's the status of this process?  When do you

19   anticipate selecting a candidate?"  She wanted to go as

20   fast as possible.

21    Q.   And he shared that with you?

22    A.   It was both ways.  She was calling us both.

23   Like, she would call me in my office and then him in his

24   office, and then he would come talk to me, and.

25    Q.   Did he share with you whether, during any of



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1 these phone calls, Jean mentioned Scarlett?

2      A.   Yes.

3      Q.   And what did Jean relate to Michael about

4 Scarlett?

5      A.   She has to go.

6      Q.   Did Michael state this on your phone calls

7 more than once?

8      A.   In-person, in my office he did, and Vik had

9 called the other panelists and told them the same.

10      Q.   Who told you Vik had called the other

11 panelists?

12      A.   Vik told me.

13      Q.   When did Vik tell you that he had called the

14 other panelists?

15      A.   As interviews were getting ready to be started

16 early in the process.

17      Q.   What did he say to you?

18      A.   I said -- I mean, I went to him, and I said,

19 I'm very uncomfortable with this process. Jean is

20 directing Michael to make sure that he doesn't hire

21 Scarlett, even if she's the best candidate, and I'm

22 uncomfortable. And he said, you just have to do it. If

23 Jean says so, you have to do it. And he said, I'm going

24 to take care and call the other two people, and then he

25 did.



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1      Q.    Do you know what he meant by, I'm going to

2  take care and call the other two people?

3      A.    To tell them that they can't hire Scarlett.

4      Q.    Did Vik ever follow up with you in regards to

5  those conversations?

6      A.    Yeah.  We talked about them more because it

7  really bothered me.  So I brought it up more.

8      Q.    Tell me what Vik said.

9      A.    Vik said, I called them, and I explained to

10 them the Jean situation and that Scarlett just isn't the

11 right fit.

12     Q.    Did he say anything else?

13     A.    Not really.

14     Q.    You said that didn't sit well with you?

15     A.    No.

16     Q.    Why not?

17     A.    Because -- just because she had, you know,

18 miscommunication or an unfortunate experience working

19 with one person doesn't mean she shouldn't be able to

20 work anywhere in an organization.  It just seemed overly

21 punitive, and the retaliation was really triggered by

22 the grievance. And there's -- it's supposed to be a safe

23 process where people can talk to Human Resources and

24 say, I'm having this struggle.  I'm having this problem,

25 and then you go from there and, like, hopefully there's



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          *Toll Free 855-MYDEPOS*

1  resolution.

2      Q.   As a manager, do you believe that taking the

3  actions to contact the hiring panel to specifically tell

4  them not to hire an employee is an abuse of power?

5          MR. BENTLEY:  Object to the form of the

6      question.

7          THE WITNESS:  Do I have to answer that one?

8          BY MS. CARRION:

9      Q.   Yes.

10     A.   Yes.

11     Q.   Can I have you look at the performance

12 evaluation, Exhibit 7, please?  The period covered by

13 the evaluation is up until April 19, 2022, right?  Is

14 that correct?

15     A.   That's what it says.

16     Q.   And Scarlett returned to work around March; is

17 that correct?

18     A.   I think so.

19     Q.   And she was terminated in August; is that

20 correct?

21     A.   Correct.

22     Q.   Therefore, this evaluation period didn't cover

23 the time that she was actually in the office working

24 with you?

25     A.   Right.  That's right.


MILESTONE **|** REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          *Toll Free 855-MYDEPOS*

1    Q.   So you wouldn't have had an opportunity to

2  truly assess her capabilities; is that correct?

3    A.   Correct.

4    Q.   Did anybody else from the City make any

5  comments in regards to rushing the termination of

6  Scarlett?

7    A.   No.

8    Q.   What was Vik's demeanor in regards to Jean's

9  need to assure that Scarlett is not employed by the City

10  of Tampa?

11         MR. BENTLEY:  Object to the form.

12         THE WITNESS:  He acknowledged that there are

13     times when we're asked to do things that are morally

14     or ethically or maybe even legally questionable, and

15     we just have to do them.  You just have to do what

16     you're told.

17         BY MS. CARRION:

18    Q.   If you can recall, what specifically did he

19  say to you?

20    A.   I told him, I feel like this is unethical, and

21  this is not right, and I'm not comfortable participating

22  in this.

23         And he said, you just have to do it.  That's

24  part of our job.  Sometimes we have to do things that

25  are -- you know, that don't align with your personal

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900       www.MILESTONEREPORTING.com       Toll Free 855-MYDEPOS

1 morals, ethics.

2        I think I even made a joke, like, well, I know

3 never to go to Human Resources with a complaint.  Saw

4 that -- you know, saw how that went, so --

5    Q.   What was his remark to that?

6    A.   He was just like, yeah.  Don't do that.

7    Q.   Did Vik seem to have any animosity towards

8 Scarlett?

9    A.   No.

10    Q.   After Scarlett was terminated, did Jean make

11 any comments about Scarlet's termination?

12    A.   No.

13    Q.   Did Jean ever speak to you about Scarlett

14 after Scarlett's termination?

15    A.   No.

16    Q.   What about Bertha?

17    A.   No.

18    Q.   Did anybody else from the City speak about

19 Scarlett after her termination?

20    A.   No.

21        MS. CARRION:  I just need a short break if

22     that's okay, just to look and see.

23        THE REPORTER:  We're off the record.

24         (OFF THE RECORD)

25        THE REPORTER:  And we're back on record.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1          MS. CARRION:  Thank you.

2           BY MS. CARRION:

3      Q.   Danni, did anybody else, besides the City

4  employees we've already talked about, make any

5  derogatory comments about Ms. Lopez?

6          MR. BENTLEY:  Object to the form.

7          THE WITNESS:  I don't think so.

8           BY MS. CARRION:

9      Q.   You've spoken to me before, right?

10     A.   Yes.

11     Q.   Besides your testimony today, is there

12  anything else you and I spoke about?

13     A.   I don't remember.

14     Q.   How many times have you and I spoken before?

15     A.   One.

16     Q.   After Scarlett was terminated, did you speak

17  to her again?

18     A.   No.

19     Q.   The one time that you and I spoke, did I ask

20  you about anything besides my client's matter?

21     A.   I don't think so.

22     Q.   Are there any questions that you can recall

23  that I asked during our phone call that I've not asked

24  today?

25     A.   I don't think so.

MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1        MS. CARRION:  I think that's it.  Thank you.

2        THE REPORTER:  And we're off record.

3         (OFF THE RECORD)

4        THE REPORTER:  And we're on the record.

5        MR. BENTLEY:  Thank you.  Prior to asking

6    questions, Ms. Jorgenson, I just wanted to make a

7    stipulation or make a -- talk about an agreement

8    that myself and Ms. Carrion had off the record, and

9    that is that objection to form is going to be

10   proper.

11       And that if anyone wants to make a subsequent

12   challenge through motion practice and then specify

13   the more specific nature of that objection, I am not

14   going to have a problem with that, and I don't think

15   Ms. Carrion would have a problem with that either.

16   Is that correct?

17       MS. CARRION:  That's correct.

18       MR. BENTLEY:  Okay.  And not so many words, but

19   I get it.  I'm sorry it was a little lengthy.

20                 CROSS-EXAMINATION

21       BY MR. BENTLEY:

22   Q.   All right.  Ms. Jorgenson, at the end of the

23  deposition with Ms. Carrion, you talked about meeting

24  with her or having a conversation with her regarding

25  your testimony today.



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1          Do you recall that?

2          MS. CARRION:  Objection.  Form.

3          THE WITNESS:  I met with Ms. Carrion once.

4          BY MR. BENTLEY:

5     Q.   Okay.  When did you meet with Ms. Carrion?

6          MS. CARRION:  Objection.  Form.

7          THE WITNESS:  It was many months ago.  I think.

8     I had -- I don't even think the lawsuit had been

9     filed yet.

10         BY MR. BENTLEY:

11    Q.   Okay.  And when you met with Ms. Carrion, did

12    you -- had you retained the counsel that's sitting with

13    you today?

14    A.   The same law firm.

15    Q.   Same law firm.  You already had retained that

16    law firm?

17    A.   Yes.

18    Q.   Okay.  And was that a meeting you had with Ms.

19    Carrion?

20         MS. CARRION:  Objection.  Form.  And I will

21    just go ahead and object to this line of questioning

22    in regards to the meeting with me.  That way I don't

23    continue objecting to form.

24         MR. BENTLEY:  Okay.  That's fine.

25         THE WITNESS:  Pardon?

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1          BY MR. BENTLEY:

2     Q.   Yeah.  When was that meeting?  Many months

3 ago?  Do you know what month it was?

4     A.   I don't know what month it was.

5     Q.   Was it in-person?

6     A.   No.

7     Q.   Was it over the phone?

8     A.   Yes.

9     Q.   Was your attorney present?

10    A.   Yes.

11         MS. CARRION:  Objection.  Form.

12         BY MR. BENTLEY:

13    Q.   And when I say your attorney, I'm talking

14 about an individual from the Sass Law Firm?

15    A.   Correct.

16    Q.   Okay.  And how long was the meeting?

17    A.   Maybe 30 minutes.

18    Q.   During the meeting, what did you discuss?

19    A.   Since my attorney was on that meeting, isn't

20 that attorney-client --

21         MS. NACCACHE:  No.  You can answer.  Yeah.

22         THE WITNESS:  Okay.  Well, I shared that I

23     worked with Scarlett and that there were probably

24     some conversations that she wasn't a part of that

25     could be helpful to her and that would be helpful to

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1     this case, and so I just shared my honest

2     recollection.

3          BY MR. BENTLEY:

4     Q.   Okay.  And when you had this conversation with

5  Ms. Carrion, had you filed any complaints with the City

6  yourself?

7     A.   I have never filed a complaint with the City.

8  I've only gone through the grievance process with the

9  City.

10     Q.   Okay.  At the time that you had a meeting with

11  Ms. Carrion, had you filed any type of charge of

12  discrimination against the City?

13     A.   I filed a charge through the EEOC.

14     Q.   Okay.  And when did you file that?

15     A.   In, I would say, mid-June.

16     Q.   Okay.  And did you have the conversation with

17  Ms. Carrion prior to mid-June?

18     A.   No.

19     Q.   It was after mid-June?

20     A.   Yes.

21     Q.   Okay.  Were any agreements reached during the

22  meeting you had with Ms. Carrion?

23     A.   No.

24     Q.   Okay.  The charge that you filed against the

25  City, was that against Jean Duncan?

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1        MS. CARRION:  Objection.  Form.

2        THE WITNESS:  I didn't file a charge against

3    the City.

4        BY MR. BENTLEY:

5    Q.   Okay.  The charge of discrimination that you

6    filed with the EEOC, did you have any complaints in that

7    charge regarding Jean Duncan?

8    A.   I don't know.  I'd have to look at it.

9    Q.   Okay.  Did you have any complaints in that

10   charge of discrimination with regards to Vik Bhide?

11   A.   Probably.  I'd have to look at it.  I don't

12   know.

13   Q.   Okay.  Did you have any complaints in your

14   charge of discrimination with the EEOC against Bertha

15   Mitchell?

16   A.   I don't know.  I'd have to look at it.

17   Q.   Okay.  So as you sit here today, did you have

18   any complaints about Jean Duncan's -- do you have any

19   complaints about Jean Duncan?

20       MS. CARRION:  Objection.  Form.

21       THE WITNESS:  In what -- in what respect?

22       BY MR. BENTLEY:

23   Q.   With regards to your employment?

24   A.   Yes.

25   Q.   Okay.  What specifically?  What's your



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1   complaints against Jean Duncan?

2          MS. CARRION:  Objection.  Form.

3          THE WITNESS:  What's my complaint about Jean

4      Duncan?

5          BY MR. BENTLEY:

6      Q.   Yes.  As it pertains to your employment or

7   pertained to your employment.

8          MS. CARRION:  Objection.  Form.  I'll go ahead

9      and object to form to all questions in regards to

10     any complaints made by Danni Jorgenson in regards to

11     Jean Duncan.

12         THE WITNESS:  The complaints were just that she

13     participated in my termination, but at no point had

14     she or Vik provided me with any kind of feedback or

15     reasoning why they terminated me, and I just was

16     very disappointed in her.

17         BY MR. BENTLEY:

18     Q.   Okay.  And when were you let go from the City

19  of Tampa?

20     A.   June 2nd last year.

21     Q.   So that's June 2, 2023?

22     A.   (No verbal response.)

23     Q.   Okay.  Do you have any motivation to get back

24  at Jean Duncan by your testimony today?

25         MS. CARRION:  Objection.  Form.

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1          THE WITNESS:  No, I don't.

2           BY MR. BENTLEY:

3     Q.   Do you have any biases towards Jean Duncan?

4          MS. CARRION:  Objection.  Form.

5          THE WITNESS:  No.

6           BY MR. BENTLEY:

7     Q.   I'm sorry?

8     A.   No.

9     Q.   Do you have any biases towards Vik Bhide?  Or

10   Bhide, I'm sorry.

11         MS. CARRION:  Objection.  Form.

12         THE WITNESS:  What do you mean by bias?

13          BY MR. BENTLEY:

14    Q.   Do you wish any ill towards Vik?

15    A.   No.

16         MS. CARRION:  Objection.  Form.

17          BY MR. BENTLEY:

18    Q.   Since that conversation you had -- gosh, my --

19   since that conversation you had with Ms. Carrion, have

20   you had any conversations with Ms. Lopez?

21         MS. CARRION:  Objection.  Form.

22         THE WITNESS:  No.

23          BY MR. BENTLEY:

24    Q.   Have you texted Ms. Lopez?

25         MS. CARRION:  Objection.  Form.



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1        THE WITNESS:  No.

2            BY MR. BENTLEY:

3    Q.   How would you describe your relationship with

4  Ms. Lopez?

5    A.   We worked together for a few months.  I

6  thought she was lovely.  I was sad when she left, and

7  then I did not reach out to her after because I knew the

8  expectation was for me not to talk to her.

9    Q.   Who set that expectation?

10   A.   Vik and Jean.

11   Q.   Okay.  Did Vik and Jean specifically tell you

12 not to reach out to Ms. Lopez?

13   A.   Yes.

14   Q.   When did they tell you that?

15   A.   After.

16   Q.   Okay.  When?

17   A.   I don't know.

18   Q.   How far -- earlier, you talked about Ms. Lopez

19 being terminated on or about August 22, 2022.  When did

20 Ms. Duncan have a conversation with you that you shall

21 not reach out to Scarlett Lopez?

22       MS. CARRION:  Objection.  Form.

23       THE WITNESS:  I don't know an exact date or

24    time.  During that -- when -- the day she was fired,

25    we had a visiting team consultant in, so I was very

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1       busy and focused on that.  After they left is

2       probably when I talked to Jean, and she had probably

3       just said something simply, don't talk to Scarlett

4       anymore.

5            BY MR. BENTLEY:

6       Q.   Where did this conversation take place?

7       A.   Where or when?

8       Q.   Where?

9       A.   Always in her office.

10      Q.   On the eighth floor?

11      A.   Yep.

12      Q.   How long did the conversation last?

13      A.    It depends.  Conversations with her could

14   range from five minutes to two hours.

15      Q.   How long did the conversation last when she

16   told you not to speak to Scarlett Lopez?

17      A.   I don't know.

18      Q.    Did anybody else besides Jean tell you that

19   you should not speak to Scarlett Lopez after her

20   termination on or about August 22, 2022?

21      A.   I don't think so.

22      Q.   When did you first meet Scarlett Lopez?

23      A.   When she became Jean's executive aide.

24      Q.   Okay.  And in your position -- and your

25   position, please remind me.  I'm going to botch it. What

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**       **www.MILESTONEREPORTING.com**       *Toll Free 855-MYDEPOS*

1  is -- Transportation Manager?

2        A.   Yeah.

3        Q.   Is there any other -- am I missing any terms

4  in there?

5        A.   I think you caught that.

6        Q.   Okay.  Because I know sometimes you guys have

7  three or four names in the --

8        A.   No.  You're good.

9        Q.   -- okay.  Okay.  And when did you become the

10 Transportation Manager?

11       A.   Officially --

12            MS. CARRION:  Objection.  Form.

13            THE WITNESS:  -- January --

14            MR. BENTLEY:  I'm sorry, what's the objection,

15     so I can correct it?

16            MS. CARRION:  Asked and answered.

17            MR. BENTLEY:  Okay.

18             BY MR. BENTLEY:

19       Q.   Go ahead.

20       A.   January 2022.

21       Q.   Okay.  January 2022?

22       A.   Yeah.

23       Q.   And when did -- to your knowledge, when did

24 Scarlett Lopez become Jean's executive aide?

25            MS. CARRION:  Objection.  Form.


MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1          THE WITNESS:  I don't know. Months before that.

2             BY MR. BENTLEY:

3      Q.   Okay.  Was it prior to -- was it -- so you're

4   January 2022, right?

5      A.   Yeah.

6      Q.   Okay.  Okay.  When you first came on as a

7   transportation engineer, had you heard how Scarlett

8   Lopez was performing in her job?

9          MS. CARRION:  Objection.  Form.

10          THE WITNESS:  When I first -- can you repeat

11      the question, please?

12          MR. BENTLEY:  Yeah.

13             BY MR. BENTLEY:

14      Q.   When you first started as a Transportation

15   Manager, did you receive any indication from Jean Duncan

16   on how she was performing in her job?

17      A.   In January of 2022?

18      Q.   Yep.

19      A.   I think it was about that time that Vik

20   contacted me and said that Scarlett was going to be

21   moved to my team.

22      Q.   Okay.  Prior to January 2022, had you had any

23   conversations with anyone in the City regarding Scarlett

24   Lopez's work performance?

25          MS. CARRION:  Objection.  Form.

MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY
CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**
**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

1          THE WITNESS:  No.

2              BY MR. BENTLEY:

3      Q.    Earlier, you testified that you -- was over

4   the holidays, you learned that Scarlett Lopez was going

5   to be getting transferred to your position; is that

6   correct?

7      A.    Yeah.

8      Q.    Okay.  And when was that?

9      A.    Right before January.

10         MS. CARRION:  Objection.  Form.

11             BY MR. BENTLEY:

12     Q.    January of what?  2022?

13     A.    Uh-huh.

14     Q.    Okay.  And so when you started your position,

15   why were you already getting -- having conversations

16   during the holidays if you hadn't started in your new

17   role as Transportation Manager until January 2022?

18         MS. CARRION:  Objection.  Form.

19         THE WITNESS:  I had started in my role.  Just,

20      officially, Milton Martinez's last day was in

21      January, but he had been absent since Thanksgiving,

22      and so I had assumed the role, but I didn't formally

23      become manager until January.

24             BY MR. BENTLEY:

25     Q.    Okay.  When did you assume the role that



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          www.MILESTONEREPORTING.com          *Toll Free 855-MYDEPOS*

1  Milton held before you?

2      A.   Pretty much after Halloween.

3      Q.   Okay.  And Milton, what's his sex?

4      A.   I think he identifies as male.

5      Q.   Okay.  And I heard you testify earlier that

6  Vik, he recommended you for this position?

7      A.   Yes.

8      Q.   Okay.  And he had to seek Jean Duncan's

9  approval for the position?

10     A.   Yeah.

11     Q.   So in December, when you heard of this move,

12 tell me what was presented to you by Vik regarding why

13 Scarlett Lopez would be moving into your department.

14         MS. CARRION:  Objection.  Form.

15         THE WITNESS: He said something along the lines

16     of, it's not working out with Jean and Scarlett, and

17     we feel this would be a better position for her, and

18     they really sold it to me as a position we had been

19     needing on the team for a long time, and so I was

20     just focused on being happy to get a new team

21     member.

22         BY MR. BENTLEY:

23     Q.   Okay.  Was there any discussion about her

24 boyfriend when you were meeting with Vik and Jean?

25     A.   Not at that time.



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1      Q.   When was there a discussion about the

2  boyfriend?

3      A.   There were discussions when we met in her

4  office, and I think Becca was there, and -- so by this

5  point -- maybe it was after she filed the grievance, but

6  by this point, Jean was upset. She just wanted to

7  terminate Scarlett. And she kept saying, it's because of

8  the boyfriend. This all started when the boyfriend came

9  around.

10         And then Becca would say, you can't say that.

11     Q.   Why can't she say that?

12     A.   I don't know.  I'm not in HR.

13     Q.   Okay.  And so when she said it was all about

14  the boyfriend, what was she talking about?

15         MS. CARRION:  Objection.  Form.

16         THE WITNESS:  She's saying that Scarlett's

17      performance, in her mind or her expectations, were

18      linked to when the boyfriend -- she and her

19      boyfriend started being serious.

20         BY MR. BENTLEY:

21     Q.   When did -- to your knowledge, when did Ms.

22  Lopez and her boyfriend -- start becoming serious with

23  her boyfriend?

24     A.   I have no idea.

25     Q.   Okay.  Did you ever have a conversation with



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1   Ms. Lopez, asked when she started dating her boyfriend?

2       A.   Nope.

3       Q.   What's her boyfriend's name?

4       A.   I don't know.

5       Q.   Okay.  So even though you're hearing Ms.

6   Duncan bring about her boyfriend, you didn't think you

7   should go and talk to Ms. Lopez about it?

8           MS. CARRION:  Objection.  Form.

9           THE WITNESS:  No.

10          BY MR. BENTLEY:

11      Q.   Okay.  As you sit here today, you have no idea

12  when they started dating?

13      A.   Nope.

14      Q.   Did you discuss that during the meeting with

15  you and Ms. Carrion?

16      A.   No.

17          MS. CARRION:  Objection.  Form.

18          BY MR. BENTLEY:

19      Q.   And when she said it was all going down with

20  the boyfriend, did she give you any examples?

21      A.   No.  She just didn't like -- she felt like --

22  the way Jean described it was that Scarlett wasn't

23  giving Jean her full attention, and Jean said it's

24  because of her boyfriend.

25      Q.   Did anybody else besides Jean talk about Ms.

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  Lopez's boyfriend?

2       A.   I don't think so.

3       Q.   Okay.  Did Vik ever bring up the fact that he

4  shared a similar sentiment as Jean regarding Ms. Lopez's

5  boyfriend?

6            MS. CARRION:  Objection.  Form.

7            THE WITNESS:  No.

8             BY MR. BENTLEY:

9       Q.   Did Bertha Mitchell ever bring up the fact

10  that she attributed some things to Ms. Lopez's

11  boyfriend?

12            MS. CARRION:  Objection.  Form.

13            THE WITNESS:  I don't think so.

14             BY MR. BENTLEY:

15       Q.   So when you learned -- was it -- I think you

16  said December that they were moving -- going to move Ms.

17  Lopez?

18       A.   Yeah.

19       Q.   Okay.  And did you understand at the time that

20  Ms. Lopez held an unclassified position?

21            MS. CARRION:  Objection.  Form.

22            THE WITNESS:  I knew that she was at-will and

23      served at the pleasure of the mayor.

24             BY MR. BENTLEY:

25       Q.   Okay.  But you didn't know whether classified



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1  versus unclassified?

2      A.   (No verbal response.)

3      Q.   You yourself held an unclassified position,

4  did you not?

5          MS. CARRION:  Objection.  Form.

6          THE WITNESS:  Apparently, I did.

7          BY MR. BENTLEY:

8      Q.   Okay.  And at no point in time when you were

9  holding that position, did you look at the civil service

10 rules?

11         MS. CARRION:  Objection.  Form.

12         THE WITNESS:  I looked through the personnel

13     manual, but it's not -- I didn't find it easy to

14     find the answer out, and to me, at the time, it

15     didn't seem important.

16         BY MR. BENTLEY:

17     Q.   Okay.  And when Ms. Lopez was getting

18 reassigned over to your department, did you know whether

19 or not she was being put into another unclassified

20 position?

21         MS. CARRION:  Objection.  Form.

22         THE WITNESS:  I knew that --

23         MR. BENTLEY:  I'm sorry.  What's the objection?

24     I'll try to correct here some of these things.

25         MS. CARRION:  Assume facts not in evidence.



MILESTONE **|** REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

1          MR. BENTLEY:  Okay.

2          THE WITNESS:  She was supposed to be moved into

3      a temporary position.  That was what I was told. And

4      then from there, there was going to be a full-time,

5      I assume, classified position, but does not serve at

6      the pleasure of the mayor, just similar to the

7      people who work for Bertha's team.

8          MR. BENTLEY:  Okay.  Dany, do you want me to go

9      -- I'm sorry, two Danys.  Ms. Carrion, do you want

10     me to go -- just keep labeling after you, or do you

11     want me to make them separate?  It's your

12     preference.  I don't care.

13         MS. CARRION:  You can label them after, if

14     that's okay.

15         MR. BENTLEY:  Yeah.  I'm happy with that.

16         MS. CARRION:  Yeah, that's perfect.

17         MR. BENTLEY:  We stopped at Exhibit 8, I

18     believe.

19         THE REPORTER:  Yes.  We're on 9 now.

20         MR. BENTLEY:  9?  Okay.  Just wanted to make

21     sure.

22         MS. GARCIA:  1 through 9, then this one was 8.

23         MR. BENTLEY:  9?  Okay.

24         MS. GARCIA:  9.  Yeah.

25         MR. BENTLEY:  Yep.  That's what I got.


MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1          Guys, I'm so sorry.  I just brought three.  I'm

2     not -- I wasn't thinking.  I'm sorry.

3          Sarah, do you want me to get you other copies,

4     or do you -- afterwards?

5          MS. NACCACHE:  I can look with her.

6          MR. BENTLEY:  Okay.  All right.

7          What I marked as Exhibit 9 is the City of Tampa

8     civil service law.

9          (EXHIBIT 9 MARKED FOR IDENTIFICATION)

10          BY MR. BENTLEY:

11     Q.   Do you see that, Ms. Jorgenson?

12     A.   Sure.

13     Q.   Have you ever reviewed this before?

14     A.   I don't know.

15     Q.   And if you haven't, it's okay.  I just want to

16     make sure.  Do you know, as you sit here today, whether

17     you've ever looked at what has been marked as Exhibit 9?

18     A.   Yeah.  This doesn't look familiar.

19     Q.   Okay.  If you could just point to -- go to

20     500438 for me.

21     A.   I was there already.

22     Q.   You were already there.  Okay.  You read my

23     mind.  And if you look at the very bottom on number 5,

24     it says, "All positions as may be found and fulfilled by

25     the competitive examination" -- or, I'm sorry, "non-

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  competitive examinations."

2          Then if you go to the next page -- and I read

3  the wrong one.  I'm sorry.  500439.  And you see number

4  7, that says, "temporary positions."

5          Did you understand a temporary position to be

6  an unclassified position?

7      A.   No.

8          MS. CARRION:  Objection to form.

9          BY MR. BENTLEY:

10     Q.   Did you ever have any conversations with Mike

11  Swain about how the temporary position that Ms. Lopez

12  held -- how that was an unclassified position?

13         MS. CARRION:  Objection.  Form.

14         MS. NACCACHE:  Objection.  Form.

15         BY MR. BENTLEY:

16     Q.   Do you know who Mike Swain is?

17     A.   Yes.

18     Q.   Okay.  Who is Mike Swain?

19     A.   He is a manager for Employment Services, like,

20  hiring side, I think.  I don't know.

21     Q.   Okay.  And do you know whether or not -- well,

22  let me ask you this:  Had you ever talked to Mike Swain

23  regarding any positions that were under your purview in

24  your department?

25     A.    Yes.

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1      Q.   Okay.  And what types of conversations would

2  you have with Mike?

3      A.   I think it was mostly about reclassifications,

4  kind of sharing the vision of what we were trying to

5  achieve with the reorganization of the team, and then

6  making sure that we could advertise the positions in the

7  right way to fill that strategic vision.

8      Q.   Okay.  Would you need Mike to sign off on

9  those positions?

10     A.   Yeah.

11     Q.   Okay.  And that was his role?  He would be

12  signing off, whether you were doing the reclassification

13  or not?

14     A.   Yeah.  But Vik really handled most of the

15  communication with Mike.

16     Q.   Okay.  So it was really on -- it was on Vik's

17  plate to handle, not yours?

18     A.   Yes.  I had limited interactions, but mostly

19  Vik.

20     Q.   Did you ever have any conversations, then,

21  with Vik about the fact that the temporary position that

22  was created for Ms. Lopez was an unclassified position?

23          MS. CARRION:  Objection.  Form.

24          THE WITNESS:  No.

25          BY MR. BENTLEY:

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    Q.   When you -- earlier, you talked about -- well,

2   when you heard of the plan in December of 2021 that they

3   were moving Ms. Lopez, did you get any indication during

4   that conversation that she was not going back in her

5   role as a Senior Executive Aide to Ms. Duncan?

6    A.   Yes.

7    Q.   Okay.  When did that -- well, tell me about

8   what you heard or what you learned?

9    A.   Can you say your question again?

10    Q.   Yeah.

11         So what I heard you say is in December of

12   2021, you learned that Ms. Lopez was not going to go

13   back into her senior executive position to service,

14   specifically, Ms. Duncan, correct?

15    A.   Right.

16    Q.   Okay.  And I just want to know more about the

17   conversation.  What was told to you?

18    A.   That there would be a temporary position

19   created as kind of, like, a holding spot for Scarlett

20   while we advertised this new position that we were

21   taking from the Parking Division and moving it to

22   Transportation Engineering Division, and that Scarlett

23   was encouraged to apply for that job.

24    Q.   Okay.  And when you say advertised that

25   position, was it made clear that this was going to be an

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1   external posting?

2        A.   Based on the conversations I had had with

3   Jean, I requested that it should be external.

4        Q.   Okay.  And when did you make that request?

5        A.   From the beginning.

6        Q.   Okay.  So in that December 2021?

7        A.   Probably later.

8        Q.   Okay.

9        A.   Probably in January.

10       Q.   In January?

11       A.   And I think Becca was there for that too.  I

12   remember that was a meeting in Jean's office.

13       Q.   Okay.  And why did you say -- at that time,

14   why did you recommend an external posting?

15            MS. CARRION:  Objection.  Form.

16            THE WITNESS:  Because I knew the expectation

17       was going to be for me to make it so that Scarlett

18       could not come back.

19            BY MR. BENTLEY:

20       Q.   In January of 2022?

21       A.   Yeah.

22       Q.   Why did you have that -- why was that

23   expectation there?

24       A.   Because I could tell.  I -- I was reading

25   between the lines, and I knew that that was an



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  expectation of Jean's.  She hadn't said it outright

2  then, but I knew through an external search, we would be

3  able to have options.

4       Q.   Well, I'm confused.  And please help me out

5  with this.  So you served on an unclassified position,

6  correct?

7            MS. CARRION:  Objection to form.

8            THE WITNESS:  Yes.

9            BY MR. BENTLEY:

10      Q.   Okay.  Were you given the option to move into

11 a temporary position?

12      A.   No.

13      Q.   Okay.  Did you ever ask, when you were

14 leaving, why they weren't moving you to a temporary

15 position?

16      A.   No.

17      Q.   Okay.  And so if Ms. Duncan wanted to get rid

18 of Ms. Lopez, as you're suggesting, why did they move

19 her to a temporary position?

20      A.   I don't know.

21      Q.   Okay.  Did you ever think to ask that

22 question, since you believed that's the way it was

23 going?

24      A.   I didn't have that kind of relationship where

25 I could ask questions like that.

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    Q.   Okay.  And did you ever ask Vik, then, since

2  he was your direct report, saying, why are we even

3  moving her to a temporary position?

4    A.   No.  I was hopeful that we could work things

5  out, that Scarlett would work out, and that she could

6  stay on the team.

7    Q.   Why are you hopeful?  You didn't know Scarlett

8  Lopez until you -- right when you started.

9    A.   I did know her.

10       MS. CARRION:  Objection.  Form.

11       BY MR. BENTLEY:

12   Q.   Okay.  So when did you meet her?

13   A.   I met her when she became Jean's aide.

14   Q.   Jean's aide.  Okay.

15   A.   Yeah.

16   Q.   All right.  So you knew her right when she

17  started in Jean's aide?

18   A.   Yeah.  She was really nice, helpful.

19   Q.   Okay.

20   A.   I mean, I didn't know her well, but.

21   Q.   When Ms. Lopez first started, do you know if

22  we were under COVID lockdowns when she started as Jean's

23  aide?

24       MS. CARRION:  Objection.  Form.

25       THE WITNESS:  I don't know.



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900       www.MILESTONEREPORTING.com       Toll Free 855-MYDEPOS

1          BY MR. BENTLEY:

2      Q.   You don't know?  That was a crazy year for

3   your department too, I'm assuming, right?

4          MS. CARRION:  Objection.  Form.

5          THE WITNESS:  Yes.

6          BY MR. BENTLEY:

7      Q.   Okay.

8          MS. CARRION:  I know.

9          MR. BENTLEY:  No.  I understand.  You guys -- I

10     don't -- we're a little late, though.  I'm not going

11     to --

12         MS. CARRION:  I'll be kinder.

13         MR. BENTLEY:  Oh, you don't have to be kind.

14     You do what you need to do.

15         BY MR. BENTLEY:

16     Q.   Okay.  When you were in lockdowns, the work

17   duties that you had to perform, did that get reduced?

18     A.   Well, since I was focused at that time in my

19   role as Chief Planning Engineer, it was really planning.

20   That did slow down just because that became not a

21   priority during the lockdown.  And I helped in other

22   ways that were outside of my responsibilities.

23     Q.   Okay.  And did other people within your

24   department also -- their responsibilities kind of slow

25   down while we were in lockdown?

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1      A.    Some people slowed down, and some people sped

2  up.  It just depends.

3      Q.    Which ones sped up?  Just curiosity.

4      A.    People with any kind of communications

5  responsibilities.

6      Q.    Okay.

7      A.    And I supported, at the time, the Marketing

8  and Communications Director often.

9      Q.    Okay.  In your role as the transportation --

10  oh, wait.  At that time, you weren't Transportation

11  Manager.  What were you?

12      A.    Chief Planning Engineer.

13      Q.    Chief Planning Engineer.

14          And as a Chief Planning Engineer, did you --

15  were you responsible for preparing Ms. Duncan for any

16  meetings with counsel?

17      A.    I don't remember.

18      Q.    You don't remember if you had to assist Ms.

19  Duncan in -- or prepare Ms. Duncan for those meetings?

20      A.    I don't remember.

21      Q.    Okay.  When you were the Chief Planning

22  Engineer, would you have to go visit Ms. Duncan on the

23  8th Floor when you returned from the COVID lockdown?

24      A.    Yeah.

25      Q.    Okay.  And from that, when you were returning,

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1 where would you see Ms. Lopez, if at all?

2      A.   In the beginning, Ms. Lopez sat outside of

3 Jean's office.  That's where the executive aide sat. And

4 then at some point, they eliminated one professional

5 office and split it into two so that the executive aides

6 could be behind a door.

7      Q.   Okay.  Were you part of any discussions on

8 that renovation or that construction?

9      A.   No.

10     Q.   Were you any part of the discussions on why

11 Ms. Lopez initially was out in the hallway area?

12     A.   No.

13     Q.   Okay.  When you would visit Ms. Lopez, would

14 she be on her cell phone?

15     A.   I don't think so.

16     Q.   Okay.  Did you ever have anybody complain

17 about the use of Ms. Lopez -- I mean complain about Ms.

18 Lopez using her cell phone while at work?

19     A.   I know Jean did complain, but probably not at

20 the time.  It was probably after the fact.

21     Q.   Okay.  Why do you say that?

22     A.   Because we only started talking about Ms.

23 Lopez after she was assigned to the team.  And then

24 there was the performance review, so I started being

25 brought into conversations at that point.  But before



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

1  then, there was no need to have me in those

2  conversations.

3      Q.   Okay.  And when you were having those

4  conversations, what was Ms. Duncan saying about the use

5  of Ms. Lopez's cell phone?

6      A.   She said she was on her personal cell phone a

7  lot.

8      Q.   Okay.  Did you get the impression from Ms.

9  Duncan that she was bothered by that?

10     A.   Yes.

11     Q.   Had you talked to anybody else on the eighth

12 floor about Ms. Lopez's use of the cell phone?

13     A.   No.

14     Q.   When she was working in your department, did

15 you see her using the cell phone?

16     A.   Not really.

17     Q.   Okay.  Where was your office in location to

18 hers?

19     A.   It was pretty much, I had a -- a walled

20 office, and then there's a row of cubicles right

21 outside, and then she was kind of on the far side of

22 that row.

23     Q.   Okay.

24     A.   So I walked by her desk anytime I needed to go

25 to the copier or the restroom or just go talk to people.



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

1      Q.   Okay.  How many times a day would you walk by
2  her desk approximately?
3      A.   Like, six, eight.
4      Q.   Okay.  Okay.  So going back.  So the -- prior
5  to January of 2022, had you had any conversations with
6  Jean Duncan regarding Ms. Lopez's work performance?
7           MS. CARRION:  Object to form.
8           THE WITNESS:  Before January '22?
9           BY MR. BENTLEY:
10     Q.   Yeah.
11     A.   No.
12     Q.   Okay.  The only thing I know we had -- and
13  maybe I'm saying it wrong, but the only thing I know is
14  in December -- towards the end of December 2021, you had
15  a conversation with them that they're going to move her
16  to your department?
17     A.   Right.
18     Q.   Okay.  And let me say that prior to that
19  conversation, had you had any conversations with Jean
20  Duncan about Ms. Lopez's work performance?
21     A.   No.
22     Q.   Same question.  Prior to the meeting in
23  December, had you had any conversations with Bertha
24  Mitchell regarding Ms. Lopez's work performance?
25     A.   No.

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1      Q.    And last one.  Prior to the meeting in

2    December, had you had any conversations with Vik Bhide

3    regarding Ms. Lopez's work performance?

4      A.    He did share with me some more background.

5      Q.    Okay.  What did he share?

6      A.    He shared that Scarlett had been home because

7    she hadn't been feeling well.  She wasn't responsive,

8    and that Jean was having to do all of her administrative

9    tasks on her own.

10     Q.    Okay.  Anything else?

11     A.    No.

12     Q.    Did Vik or anybody inform you that Bertha

13   Mitchell had been providing her with any type of

14   training?

15         MS. CARRION:  Objection.  Form.

16         THE WITNESS:  No.

17          BY MR. BENTLEY:

18     Q.    Okay.  Did you ever have any conversations

19   with Ms. Lopez about the training she received while

20   working as the Senior Executive Aide for Ms. Duncan?

21     A.    I don't think so.

22     Q.    When Ms. Lopez started in her role working in

23   your department, was there an actual official -- I'm

24   confused on this.  Was there an actual title that she

25   was moving into in a temporary capacity?

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        *Toll Free 855-MYDEPOS*

1       A.   I think for a while, she stayed in her
2   existing capacity as executive aide.  I don't know
3   exactly.
4       Q.   Okay.  But was there a -- one of those -- a
5   specific title that she was actually filling in for that
6   period of time?
7       A.   The intent was for her to replicate the duties
8   of the existing positions that Bertha Mitchell had on
9   her team, which was the -- like, the Utility Technical
10  Administrative Coordinator, whatever.
11      Q.   Okay.  And had you prior -- had you worked
12  with Bertha Mitchell before?
13      A.   Yeah.
14      Q.   Okay.  And Bertha Mitchell, what department is
15  she in?
16      A.   She technically works in Bryan -- Bryan
17  Rodger's division, which is Operations and Maintenance
18  -- and Mobility.  So she reports to Bryan.  Bryan
19  reports to Vik.  Vik reports to Jean.  But I think
20  everyone has always said, including Bryan and Vik, that
21  Bertha works for Jean.
22      Q.   Okay.  Even though she's in a completely
23  different role and almost department?
24           MS. CARRION:  Objection.  Form.
25           THE WITNESS:  Yeah.  But still within her

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1      portfolio.

2              BY MR. BENTLEY:

3      Q.   Still in her portfolio?  Okay.

4      A.   Yeah.

5      Q.   Do you know if Bertha Mitchell ever served as

6  an executive aide for Ms. Duncan?

7      A.   I don't know.

8      Q.   When you're communicating with Ms. Duncan,

9  does she typically copy Bertha Mitchell on e-mails?

10     A.   A lot.

11     Q.   Okay.  Did you ever ask why?

12     A.   No.

13     Q.   Did it ever concern you that Bertha Mitchell

14  was being copied on the e-mails?

15     A.   No.

16          MR. BENTLEY:  Let me show you what's being

17     marked as Exhibit 10.

18          (EXHIBIT 10 MARKED FOR IDENTIFICATION)

19          BY MR. BENTLEY:

20     Q.   What is marked as Exhibit 10 is a copy of an

21  e-mail from Jean Duncan to Scarlett Lopez dated January

22  3, 2022.

23          Do you see that?

24     A.   Uh-huh.

25     Q.   And then do you see on this -- on the copy



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  line that you are copied on this e-mail?

2       A.    Yep.

3       Q.    Do you remember this e-mail?

4       A.    Yes.

5       Q.    Okay.  And let me just go through some things

6  on this e-mail.  The first one says, "Thank you for

7  meeting with Vik, Bertha, and me this morning to discuss

8  the Senior Executive Aide position and the need for the

9  Transportation Engineering Division to have

10  administrative support services.

11            "As of today, January 3, 2022, you will be

12  temporarily assigned to the Transportation Engineering

13  Division, reporting to Danni Jorgenson.  A job

14  description and the job duties were shared with you, and

15  I know Vik was planning to meet with you and Danni to

16  discuss further details of the temporary job

17  requirement."

18            What job description was provided to her, to

19  your knowledge?

20       A.    I'd assume it was the one -- the people that

21  supported Bertha on her team, so.

22       Q.    Do you have any independent recollection of

23  that as you sit here today?

24       A.    Nope.

25       Q.    Okay.  Did you -- it says, "I know Vik was



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

1 planning to meet you and Danni to discuss further

2 details of the temporary job requirements."

3         Did you end up doing that?

4     A.   I don't know.

5     Q.   Okay.  The next sentence says, "We also

6 discussed my need to make a change with the Senior

7 Executive Aide position.  I am actively seeking a

8 replacement for my Senior Executive Aide position."

9         Do you see that?

10    A.   I do.

11    Q.   Did you understand that Ms. Lopez -- at this

12 time when she received this e-mail, that she was not

13 going back into her position to be the executive aide

14 for Ms. Duncan?

15    A.   Yes.

16    Q.   Okay.  Did you have any conversations with Ms.

17 Lopez around that time that, hey, you're not going back

18 as a Senior Executive Aide to Ms. Duncan?

19    A.    No.  I think we just tried to create a really

20 welcoming environment, showing her that, you know, we

21 can be a great team for her to work with, and just focus

22 on, like, the forward movement and the positivity.

23    Q.   Okay.  But did -- let me ask another way.  Did

24 Ms. Lopez ever come to you and say, Ms. Jorgenson, I

25 don't understand what's going on?  Did she ever have

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1 that conversation?

2          MS. CARRION:  Objection.  Form.

3          THE WITNESS:  I don't think so.

4          BY MR. BENTLEY:

5     Q.    Did Ms. Lopez ever express to you that she was

6 confused by the January 3, 2022, e-mail?

7     A.    I don't remember if she did.

8     Q.    Okay.  And then it goes on and says, "We are

9 working to create a permanent position for these duties

10 in the Transportation Engineering Division and plan to

11 post that position opening in a couple of weeks.  I

12 encourage you to apply for that position or any other

13 that you're interested in here at the City of Tampa."

14     A.    Uh-huh.

15     Q.    Okay.  And this was consistent, right, with

16 your discussion in December of 2021?

17          MS. CARRION:  Objection.  Form.

18          BY MR. BENTLEY:

19     Q.    Is that correct?

20     A.    Which discussion?

21          MS. CARRION:  Objection.  Form.

22          BY MR. BENTLEY:

23     Q.    In December 2021, when you were having that

24 conversation, you knew -- with Vik, you knew that she

25 was moving out of Ms. -- as a Senior Executive Aide for



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1 Ms. Duncan, right?

2     A.   Yes.  Right.

3     Q.   And you knew she would need to apply for other

4 positions?

5     A.   Yeah.

6     Q.   Okay.  For a permanent position?

7     A.   Right.

8     Q.   Okay.  And the position that she was going to

9 be held with you at that time was going to be labeled as

10 temporary?

11    A.   Yeah.

12    Q.   Okay.  Now, after she started working with you

13 in January 3, 2022, when did you learn that she was

14 pregnant?

15    A.   I don't remember the date.

16    Q.   Okay.  If you could look at Exhibit --

17       MR. BENTLEY:  Do you have your other exhibits?

18       MS. GARCIA:  The stickers?

19       MR. BENTLEY:  No, no.  The other exhibits that

20   you relied on during the deposition.

21       Do you have the other -- thank you.

22       BY MR. BENTLEY:

23    Q.   Let's leave these in front of you just in case

24 we need to reference them.

25       All right.  If you could look at Exhibit 1 for



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900      www.MILESTONEREPORTING.com      Toll Free 855-MYDEPOS

1  me, please.

2       A.   Okay.

3       Q.   Exhibit 1 appears to be a text message between

4  you and Ms. Lopez; is that correct?

5       A.   Yep.

6       Q.   Okay. And it says, "Hi, Danni. I'm sorry for

7  the late message. I'm not feeling good at all and called

8  my OB/GYN. She advised that I come to the hospital.  I

9  didn't feel good today at work and made several trips to

10 the bathroom. It didn't stop when I got home. I'm not

11 sure I'll be in to work tomorrow." And this is dated

12 January 5, 2022. Is this on or about when you learned of

13 Ms. Lopez's pregnancy?

14      A.   Yes.  It would've been before this date.

15      Q.   Okay.  Do you know?

16      A.   I don't know.

17      Q.   So she started working with you on January

18 3rd.  Do you believe Ms. Lopez would've informed you of

19 her pregnancy before January 3, 2022?

20      A.   Maybe it was January 4th.  And I don't

21 remember the day, but she did tell me in-person that

22 when she went to go for her back appointment --

23      Q.   Okay.

24      A.   -- she had pain in her back, and they do a

25 pregnancy test as a routine thing.  She didn't think



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  anything of it.  But when they did it, she found out she

2  was pregnant.

3      Q.   Okay.  And after that -- I'm looking at

4  Exhibit 1.  And going through the next few days, I don't

5  see any reference to her back.

6          Do you know why?

7          MS. CARRION:  Objection.  Form.

8          THE WITNESS:  I don't know why.

9          BY MR. BENTLEY:

10     Q.   Okay.  And then on -- if you look at Bates

11 stamp 500991, on January 13th, it says, "Hi, Danni.  I

12 left the hospital late this morning and went to see my

13 OB/GYN in the afternoon.  I had about four hours of

14 relief and now back to feeling terrible again since

15 about 2:00 p.m.  I have a doctor's note to be out

16 tomorrow as well.  I'll send it to you next -- send it

17 next."

18         And then there's that doctor's note that you

19 were asked about, right?  Did you immediately forward

20 that doctor's note to anybody?

21     A.   I did.  I think I called Jean, since I still

22 wasn't officially her supervisor, and I said, I think I

23 send this to HR and to you.  And I'm pretty sure that's

24 what I did.

25     Q.   Okay.  And when you say pretty sure, do you

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900      www.MILESTONEREPORTING.com      Toll Free 855-MYDEPOS

1  have an independent recollection of how you sent that

2  note to Jean Duncan?

3        A.    I assume I would've e-mailed it.

4        Q.    Okay.

5        A.    I don't know.

6        Q.    And I'm a lawyer.  I'm sorry.  I heard the

7  word assumed.  So you don't have an independent

8  recollection as you sit here today?

9        A.    No.

10       Q.    Okay.

11       A.    I don't.  This was two and a half years ago.

12       Q.    Did Ms. Lopez ever ask you to keep her

13  pregnancy confidential?

14       A.    I don't think so, but I would've just assumed

15  that I shouldn't tell anyone.  I mean, I knew I had to

16  tell Jean and HR because she was having these medical

17  issues.  But I wouldn't have told, you know, just anyone

18  on the floor.

19       Q.    Why did you feel you had to tell Jean?

20       A.    Because Jean was her supervisor, and she was

21  having a lot of health issues.  And if I'm reporting

22  that Scarlett is out of office because of health issues,

23  I felt like she needed the whole picture.

24       Q.    When she started in the temporary position on

25  or about January 3, 2022, who was responsible for



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1  inputting her time in the system?

2      A.    Bertha did it.

3      Q.    Okay.

4      A.    And I would e-mail Bertha or call Bertha and

5  say, these are the days and hours she worked, and this

6  is what she's working on.

7      Q.    Okay.  And if she was absent due to sick

8  leave, how would Bertha know how to code that?

9      A.    I would tell her.  And then if Bertha had

10 questions, she would work with Human Resources to make

11 sure that she was doing it correctly.

12     Q.    Okay.  And on this note here that you have in

13 front of you, if you -- on Page 500991, do you see that?

14     A.    Uh-huh.

15     Q.    And it looks like the note is for the period

16 of January 13, 2022, to January 16, 2022.

17            Do you see that?

18     A.    Uh-huh.  I see it.

19     Q.    Okay.  Now, if you could look at Exhibit 3 for

20 me.

21     A.    Okay.

22     Q.    Okay.  If you look on the very bottom, on

23 February 4th, it looks like Bertha Mitchell is sending

24 you an e-mail at 9:15 a.m., and she's copying Jean

25 Duncan.



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    A.   Uh-huh.

2    Q.   And it says in the subject line, "Priority,

3  Scarlett Lopez's time and attendance.  Importance,

4  high." And on the second page, which is Bates stamp

5  501082, it says, "Good morning, Danni.  Please advise if

6  Scarlett was out of the office this entire pay period,

7  01-23-22 to 02-05-22.  If so, please advise that she --

8  if we should submit a sick leave request in Kronos

9  rather than annual leave. "Also, did she provide you

10 with substantiation for this request?  If so, please

11 provide me with a copy. Please see the snip of her sick

12 leave balance.  Thank you.  Bertha." Do you see that?

13   A.   Uh-huh.

14   Q.   Okay. And that's what you received. Now, if

15 you look up on that, the next e-mail, it says from -- it

16 says, "Hi, Danni. This note only excuses Scarlett 01-

17 16-22. I think we must request additional notes excusing

18 her from work until approval of her FMLA requests.  The

19 weeks' pay period in question are 01-18- 22 through 01-

20 22-22 and 01-23-22 through 02-05-22." Man, that's a lot

21 of numbers in a row.

22        Do you see that?

23   A.   Uh-huh.

24   Q.   Okay.  Now, did you provide her that note

25 then?  Where's Bertha Mitchell getting that note?



MILESTONE **|** REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**        www.MILESTONEREPORTING.com        **Toll Free 855-MYDEPOS**

1  A. I sent her the note, which I also shared with

2 Becca.

3  Q. Okay.  And so now, you said -- you were asked

4 questions by Ms. Carrion about Jean Duncan's thing on

5 February 4, 2022, and says, "This nurse note has no

6 letterhead or details.  We also don't retrofit FMLA

7 annual time.  Something seems amiss.  Jean."

8   Did you have any personal conversation with

9 Ms. Duncan, what she meant by this e-mail?

10   MS. CARRION:  Objection.  Form.

11   THE WITNESS:  No.

12   BY MR. BENTLEY:

13  Q. And I think you testified, was this the first

14 time you ever had to receive a doctor's note?

15  A. Yeah.

16  Q. Okay.  Did you understand that they needed a

17 time period from -- since she was absent for more days

18 than just the dates January 13th through January 16th?

19   MS. CARRION:  Objection.  Form.

20   THE WITNESS:  I mean, at this point, this was

21  still out of my wheelhouse.  I was really relying on

22  Human Resources and Bertha and Jean to guide me.

23   BY MR. BENTLEY:

24  Q. Did you think it was improper for them to ask

25 for another doctor's note?

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900  www.MILESTONEREPORTING.com  Toll Free 855-MYDEPOS

1       A.   Not if that's what's required.

2       Q.   Okay.  To make sure it covers the appropriate

3  time period?

4       A.   If they had some kind of requirements or

5  regulations that say what a note should incorporate,

6  then --

7       Q.   You were asked questions about whether or not

8  Ms. Duncan actually believed Ms. Lopez was pregnant?

9       A.   Yeah.

10      Q.   When did she first raise any doubt about the

11 fact that Ms. Lopez was pregnant?

12      A.   There were so many conversations with Jean in

13 her office, but there were a number of occasions where

14 Jean said, I doubt she's even pregnant.  Like, this note

15 doesn't even say anything.  It could be from anyone.

16      Q.   Could it have been from anyone?

17      A.   I don't know.

18      Q.   Was there a letterhead on that note?

19      A.   It doesn't look like there is.

20      Q.   Okay.  And for someone that might not --

21 doesn't handle notes, was that unusual to you?

22           MS. CARRION:  Objection.  Form.

23           THE WITNESS:  I'm not someone who has reviewed

24     in the past or would typically review these, so --

25           BY MR. BENTLEY:

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1      Q.    Okay.

2      A.    -- what comments they have would be different

3   than mine as -- on this.

4      Q.    Okay.  And so when Ms. Duncan made the comment

5   about whether or not she was pregnant, where were you?

6      A.    We were sitting in her office.

7      Q.    Okay.  Who else was in attendance?

8      A.    I don't know.

9      Q.    You don't have any recollection of anyone else

10  being in the office when Ms. Duncan questioned whether

11  or not Ms. Lopez was actually pregnant?

12         MS. CARRION:  Objection.  Form.

13         THE WITNESS:  I don't remember.

14         BY MR. BENTLEY:

15     Q.    Okay.  While you served as her -- de facto

16  supervisor, correct?

17     A.    (No verbal response.)

18     Q.    Is that yes?

19     A.    Yeah.

20     Q.    Okay.  Did you ever deny Ms. Lopez any

21  requests for leave?

22     A.    I don't think so.

23     Q.    Okay.  Did you ever deny any requests for her

24  to attend a doctor's appointment?

25     A.    No.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1      Q.   Okay.  Do you know of anyone from the City of

2  Tampa that ever denied Ms. Lopez any requests for leave?

3      A.   I don't -- I don't think so.  I don't know.

4      Q.   Okay.  Did you encourage Ms. Lopez to file

5  FMLA paperwork?

6      A.   I think since she had been sick so much, I

7  encouraged her to talk to Human Resources.

8      Q.   Okay.

9      A.   I don't know a lot about the FMLA process.

10 It's not in my wheelhouse.

11     Q.   Okay.  Did you try to facilitate that

12 discussion with her?

13     A.   No.

14     Q.   Okay.  Did you have to -- my point is, did you

15 have to go in or try to arrange a meeting for Ms. Lopez?

16          MS. NACCACHE:  Objection.  Form.

17          MS. CARRION:  Objection.  Form.

18          BY MR. BENTLEY:

19     Q.   Did you have to schedule the meeting for Ms.

20 Lopez to meet with HR to discuss her FMLA paperwork?

21     A.   I don't think I did, but I'm not sure.  If

22 someone had asked me to do it, then I would've done it,

23 but --

24     Q.   Okay.

25     A.   -- it seemed like something she would do on

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  her own.

2        Q.    Did Ms. Lopez submit to you the FMLA

3  paperwork?

4        A.    I don't know.

5        Q.    Okay.  Do you know whether -- okay.

6              So you have no recollection if she submitted

7  it to you, or she submitted it to some other department?

8        A.    I have no recollection.

9        Q.    Okay.  Do you know if, ultimately, Ms. Lopez

10 was approved her FMLA request?

11       A.    I don't recall.

12       Q.    Okay.  Do you know whether -- when she was

13 approved her FMLA request, whether that was for a

14 continuous period of time?

15             MS. CARRION:  Objection.  Form.

16             THE WITNESS:  I don't recall.

17             BY MR. BENTLEY:

18       Q.    Okay.  Let me show you -- if you turn to

19 Exhibit 4.  Exhibit 4 was an e-mail that you were asked

20 about from Kimberley Sullivan to you on March 3, 2022.

21       A.    Uh-huh.  Yep.

22       Q.    It says, "Good afternoon.  We received a

23 medical note clearing Scarlett to return to work

24 tomorrow.  I have let Jean Duncan know.  Please let us

25 know if you have any questions."



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1        What did that -- how did you interpret that e-

2    mail?

3        A.   That Scarlett would be coming back to work on

4    March 4th.

5        Q.   Okay.  And when she was -- prior to receiving

6    this e-mail, did you understand that Ms. Lopez was out

7    on FMLA leave?

8        A.   I did not know whether she was out on FMLA

9    leave or sick leave.  I just -- it was all very new.  I

10   had just become the manager, so I didn't have the

11   background or expertise to guide her through this

12   process.

13       Q.   Prior to January 2022, had you had to input

14   employees' time into Kronos?

15           MS. CARRION:  Objection.  Form.

16           THE WITNESS:  Prior to --

17            BY MR. BENTLEY:

18       Q.   Prior to you coming into this role in 2022,

19   were you ever responsible for inputting --

20       A.   Yes.

21       Q.   -- subordinates' time into Kronos?

22       A.   Yes.

23       Q.   Okay.  And would you -- for that

24   responsibility, would you have to code it a certain way?

25       A.   Yes.

MILESTONE **|** REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**        **www.MILESTONEREPORTING.com**        **Toll Free 855-MYDEPOS**

1    Q.   Okay.  And so while you -- when you were

2  responsible for that, did you ever have an employee out

3  on FMLA leave?

4    A.   No.

5    Q.   Okay.  And if they needed sick leave, how

6  would you code it in the system at that time?

7    A.   I think they go in and request it, and then I

8  would approve it.

9        MR. BENTLEY:  Okay.  Let me show you what's

10     being marked as Exhibit 11 to your deposition.

11        I'm so sorry, guys.  I'll give you my copy

12     after I'm done.

13        (EXHIBIT 11 MARKED FOR IDENTIFICATION)

14        BY MR. BENTLEY:

15    Q.   All right.  This is an e-mail from Mike Swain

16  to Employee Relations dated March 8, 2022.

17        Do you see this?

18    A.   Uh-huh.

19    Q.   I don't see your name on it, but I want to

20  know if you've ever seen this e-mail before?

21    A.   I don't think I have.

22    Q.   And it says, "ER team per approved request

23  8281, please move Scarlett Lopez into a temporary

24  position number 88146.  She will retain the same title

25  with no impact to pay.  Let me know if you have any

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1 questions."

2          And then the next response, "I have processed

3 this effective March 6, 2022."

4          Do you know if there was any frustration by

5 Ms. Duncan on the fact that it took approximately two

6 months to get approved for a temporary position?

7          MS. CARRION:   Objection.   Form.

8          THE WITNESS:   She was frustrated because she

9     wanted to replace the position immediately.   She

10    wanted someone in that role.

11          BY MR. BENTLEY:

12    Q.   She wanted an assistant?

13    A.   Yeah.

14    Q.   Okay.   And so this is on March 8th.   So let me

15 show you what you were asked by Ms. Carrion.   If you

16 look at Exhibit 5 for me, please.   Exhibit 5 is dated

17 March 15th, approximately seven days after this e-mail.

18          And it says, "Jean and Bertha, since I'm not

19 officially Scarlett's supervisor, please find FMLA

20 information.   Thanks, Danni."

21          Do you see that?

22    A.   Uh-huh.   Yes.

23    Q.   So you're sending that.   And then on the next

24 e-mail that you received from Jean Duncan to you, it

25 says, "Bertha" -- and it obviously copies -- and to



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

 1  Bertha.  I'm sorry.

 2          It says, "Bertha, please see about reassigning

 3  Scarlett in Kronos to Danni.  Now that she's in a temp

 4  position, that should not be a problem as it was before.

 5  Thanks."

 6          What did she mean by that?

 7      A.  I don't know.  I didn't ask her.

 8      Q.  Do you know after March 15th, whether or not

 9  you were starting to input Ms. Lopez's time into Kronos?

10      A.  I don't remember.

11      Q.  You don't remember if you put Ms. Lopez's time

12  in Kronos?

13      A.  I don't remember.

14      Q.  Okay.  Did you have any follow-up

15  conversations with Bertha regarding this e-mail that you

16  received on March 15th at 4:51 p.m.?

17      A.  About this e-mail?

18      Q.  Yes, ma'am.

19      A.  I don't think I did, but I'm not sure.

20      Q.  Okay.  When you received this e-mail on March

21  15, 2022, do you know if Ms. Duncan -- not Ms. Duncan,

22  Ms. Lopez had filed a grievance?

23      A.  I don't know.

24      Q.  What was your understanding of Ms. Lopez's

25  grievance?



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

1           MS. CARRION:  Objection.  Form.

2           THE WITNESS:  My understanding is that,

3      following receipt of the performance evaluation that

4      Jean did, Scarlett was unhappy with the results and

5      felt like they didn't fairly capture her level of

6      effort, and so she filed a grievance.

7           BY MR. BENTLEY:

8      Q.   Okay.  So it was based on the scoring that she

9 received in her performance evaluation?

10          MS. CARRION:  Objection.  Form.

11          THE WITNESS:  I believe so.

12          BY MR. BENTLEY:

13     Q.   Okay.

14     A.   I was not part of that.

15          MR. BENTLEY:  Let me show you what's marked as

16     Exhibit 12 to your deposition.

17          (EXHIBIT 12 MARKED FOR IDENTIFICATION)

18          MR. BENTLEY:  Sarah, I can get you copies

19     afterwards if you need them, or --

20          MS. NACCACHE:  That's okay.

21          MR. BENTLEY:  Yeah.  I'm so sorry.

22          MS. GARCIA:  What exhibit?

23          MS. CARRION:  What exhibit is this?  I'm sorry.

24          MR. BENTLEY:  12.

25          MS. CARRION:  12.  Okay.



MILESTONE **|** REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1              BY MR. BENTLEY:

2        Q.   Did you -- and you testified earlier that Ms.

3  Duncan provided you a copy of this grievance?

4        A.   Yes, she did.

5        Q.   Okay.

6        A.   She sent it to me.

7        Q.   And did you review the grievance?

8        A.   Yes, I read it.

9        Q.   Okay.  Did you have any conversations with Ms.

10 Lopez about the grievance?

11       A.   No.

12       Q.   Okay.  Why not?

13       A.   I don't know.  I just didn't.  It seemed like

14 something that happened before she was on my team, and

15 now it's like a fresh start.

16       Q.   Okay.  But prior to this, the grievance being

17 filed, you testified that you knew you needed to post

18 the position externally?

19       A.   I did.

20       Q.   Okay.  And I thought I heard you say, you knew

21 you needed to post it externally because Ms. Lopez was

22 not going to get the position?

23       A.   I did know that.

24       Q.   Okay.  And so what changed, then?  Because

25 earlier, I thought you said it was the grievance that



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1 caused her to change her mind.

2          MS. CARRION:  Objection.  Form.

3          THE WITNESS:  I think it -- I --

4          MR. BENTLEY:  Do you need to take a phone call?

5          THE WITNESS:  Sorry.

6          MR. BENTLEY:  No, it's okay.  If you need to

7     take a phone call, just let me know, okay?

8          THE WITNESS:  I have a job now, which is great.

9     But I don't have to do it today.

10          So I can't say exactly when things changed.  I

11     don't think it was, like, an overnight thing, but

12     the level of complaints about Scarlett changed when

13     she filed the grievance.  And at that point, it was,

14     she absolutely cannot stay here or work here

15     anymore.

16          BY MR. BENTLEY:

17     Q.   But you already knew that though, right?

18     A.   It wasn't -- I didn't know it was such a -- I

19 didn't know how -- I didn't know how it would shift.

20     Q.   Okay.

21     A.   I knew that -- I knew Jean well enough to know

22 that she's going to expect this.  And so having an

23 external applicant pool was just a safe move that's --

24 you know, Scarlett could have also been hired through

25 that.



MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1      Q.   Okay.  In fact, she was encouraged to apply

2   for all these positions, right?

3      A.   Yes.

4      Q.   Did you have any conversations with Ms. Lopez

5   encouraging her to apply for more positions than just

6   the two that we discussed -- or this one we discussed?

7      A.   Yeah.  I encouraged her to keep applying.

8      Q.   Do you know how many times she applied for

9   positions while working for the City of Tampa?

10     A.   I don't know.

11     Q.   Okay.  Let me rephrase that.

12          Do you know how many positions she applied for

13  from the months of January 3, 2022, to August 22, 2022?

14     A.   I don't know how many.

15     Q.   Would you ever -- did you ever recommend to

16  Ms. Lopez that she should apply for a particular vacancy

17  at the City of Tampa?

18     A.   I told her -- she had shared with me that she

19  had a really great experience in the role that she was

20  in before she became Jean's executive aide, and that she

21  had been talking to that group about going to work

22  there. And I said -- I was just really supportive, and I

23  was hopeful that that could work out.

24     Q.   Okay.  When you received the performance

25  evaluation, were you surprised by any of the scoring

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1 criteria?

2     A.   Yes.

3     Q.   Which ones were you surprised about?

4     A.   She had all fives before, and then to go to

5 all -- pretty much ones and twos is very shocking.  It's

6 like, you would have to do something egregious at the

7 City, sort of, to be like that.  Even some people who

8 just aren't performers are getting all fives.

9     Q.   How did you know she had all fives from the

10 year before?

11     A.   Because I was also sent that one, and I was

12 sent her grievance.  And in the grievance, it had the

13 old -- the old performance evaluation.

14     Q.   With Ms. Duncan making the decision to remove

15 Ms. Lopez from her position as a Senior Executive Aide,

16 did you believe that she was going to get a good

17 evaluation from Ms. Duncan for that time period?

18          MS. CARRION:  Objection.  Form.

19          THE WITNESS:  I don't have an opinion on that.

20          BY MR. BENTLEY:

21     Q.   Well, if she was being moved and she was

22 receiving all fives, would you expect her to be staying

23 in that role as a Senior Executive Aide?

24          MS. CARRION:  Objection.  Form.

25          THE WITNESS:  I don't think that performance



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

1      reviews at the City of Tampa accurately can help

2      predict someone's success or failure at the City.

3          BY MR. BENTLEY:

4      Q.   Why?

5      A.   Because I got all fives, and then I was fired.

6      Q.   Okay.  When you score people, do you give all

7   fives?

8      A.   Sometimes.  I try to implement a more

9   realistic scoring approach, so that we can have more

10  conversations about constructive feedback and helping

11  people to grow in their careers.  That was not received

12  well.

13     Q.   Okay.  And what does that mean, "a more

14  realistic approach"?

15     A.   Where we're actually talking about where

16  people's strengths and weaknesses are.  How can we help

17  align your strengths with some of the job functions,

18  even if you're not doing them now?

19          And if these are your weaknesses, like, do you

20  see some that maybe you would like to work on and

21  strengthen?  And how can I help you?  How can I bring

22  you resources to do that?

23     Q.   Okay.  And when you were doing that, when you

24  were giving that type of approach, would you give

25  individuals a score below three?

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    A.    Sometimes.  Not often.

2    Q.    Okay.  Why not often?

3    A.    Because it affects -- it's tied to pay

4  increase, merit-based increase.

5    Q.    Exactly, right?

6    A.    Right.  And so it's a tricky situation.  You

7  want people to be able to get their three percent pay

8  raise.

9    Q.    And so even if they're not performing well,

10  you still might -- as a supervisor, you still want them

11  to get that raise?

12    A.    Yeah.  But you don't have to give all fives to

13  get it.

14    Q.    Okay.  What's the score they have to get to

15  get the pay raise?  Do you know?

16    A.    It depends on what level you are, and how they

17  score it.  Like, supervisors are different, but I'd have

18  to look.

19    Q.    So do you believe that Ms. Duncan should have

20  just given the bare minimum where she can get the pay

21  raise?

22        MS. CARRION:  Objection.  Form.

23        THE WITNESS:  I wasn't in Jean's shoes.  I

24      didn't see how Scarlett performed, so I can't speak

25      to whether or not this is an appropriate review.

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900       www.MILESTONEREPORTING.com       Toll Free 855-MYDEPOS

1          BY MR. BENTLEY:

2      Q.   Okay.  And same question.

3           Did you have any conversations with Jean about

4  the specific comments that she made in Exhibit 12?

5      A.   I hadn't -- I -- the first conversation --

6           MS. NACCACHE:  Objection to form.

7           Go ahead.  Sorry.

8           THE WITNESS:  Do you want to ask your question

9      again?

10          BY MR. BENTLEY:

11     Q.   Yeah.  I'm just saying, did you have any

12  conversations with Ms. Duncan regarding the specific

13  comments she put in Ms. Lopez's performance evaluation

14  that's marked as Exhibit 12?

15     A.   After Scarlett submitted her grievance, I

16  think that was probably the first time we had

17  conversations about it.

18     Q.   Tell me about that conversation.

19     A.   Jean was --

20          MS. CARRION:  Object to form.

21          THE WITNESS:  -- incredulous, I guess.  Like,

22     how could she do this to me?  Who does she think she

23     is? She's lucky that I'm even letting her stay.  I

24     could have fired her when I wanted to.

25          BY MR. BENTLEY:

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1     Q.   What does that mean?

2     A.   What?

3     Q.   You said, she's lucky that you let her stay.

4     A.   She's -- she meant she was lucky that she let

5 her transfer into this temporary position.

6     Q.   Okay.  Did she indicate she did that for Ms.

7 Lopez to find a landing spot within the City?

8          MS. CARRION:  Objection.  Form.

9          THE WITNESS:  I think that -- I think that was

10     the initial intent.  I think initially she was going

11     to allow it.

12          BY MR. BENTLEY:

13     Q.   Did Ms. Duncan ever express to you that she

14 did not believe an unclassified employee had the right

15 to file a grievance?

16     A.   I don't know.  I don't know that she said that

17 to me.

18     Q.   Okay.  Did she ever inform you during -- while

19 you were sitting there, did she ever discuss with you

20 that she was surprised because Ms. Lopez was an at-will

21 employee?

22     A.   I don't know.  She -- I knew she felt like

23 since she was an at-will employee, that she could

24 terminate her without a reason, without cause.

25     Q.   Okay.  Earlier, you were asked about the

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  grievance procedure, and you were asked a question about

2  the fact that Ms. Duncan was one of the first reviewers

3  of this grievance?

4          MS. CARRION:  Objection.  Form.

5          BY MR. BENTLEY:

6      Q.    Did you believe that was inappropriate?

7      A.    Inappropriate?

8      Q.    Yeah.

9      A.    What do you mean?

10     Q.    Well, maybe I misinterpreted your testimony,

11  and I apologize if I did. I thought when you were having

12  a conversation with Ms. Carrion about the grievance

13  procedure, that you did not believe that someone that's

14  being grieved against should be the one handling the

15  grievance?

16     A.    I don't think I said that.

17     Q.    Okay.  Then I totally misunderstood you, and I

18  apologize for that, Ms. Jorgenson.

19     A.    No.  If -- if there's a grievance against

20  someone, the person who's being accused should be -- I

21  mean, I don't know the procedures.  It should follow

22  whatever the procedures are that the City has

23  established. But it makes sense to me that if someone

24  has a grievance against someone, that they get brought

25  into the conversation with the goal of hopefully finding

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1 some kind of resolution.

2     Q.   Okay.  And if Ms. Lopez had issues with her

3 performance evaluation based on what Jean Duncan put

4 down on here, she should look into it, correct?

5          MS. CARRION:  Objection.  Form.

6          THE WITNESS:  Jean should?

7           BY MR. BENTLEY:

8     Q.   Jean should look at it?

9          MS. CARRION:  Objection.  Form.

10          THE WITNESS:  Yeah.

11           BY MR. BENTLEY:

12     Q.   And see if any changes need to be made?

13     A.   I think there's an opportunity for both sides

14 to state their case.

15     Q.   Okay.  And, ultimately, you learned that the

16 grievance came back, and Kimberley Sullivan came out and

17 said that you needed to perform an evaluation for a

18 certain period of time?

19          MS. CARRION:  Objection.  Form.

20          THE WITNESS:  That was the result?

21           BY MR. BENTLEY:

22     Q.   That was the result, correct?

23          Did you have any conversation with Jean about

24 that result?

25          MS. CARRION:  Objection.  Form.  There wasn't



**MILESTONE** | **REPORTING  COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          *Toll Free 855-MYDEPOS*

1    an answer to your question.

2        MR. BENTLEY:  Oh, she -- again, that was --

3    sorry.  It felt like the last time.

4        BY MR. BENTLEY:

5    Q.   Can you repeat that, your answer?

6        MS. CARRION:  She was thinking about it.

7        THE WITNESS:  I was repeating your question.

8        BY MR. BENTLEY:

9    Q.   Okay.

10   A.   "Who's on First?"

11       Can you say your question again?

12   Q.   Certainly.

13       Once you learned that the grievance came back,

14   that you had to complete a portion of her evaluation,

15   did you have any conversation with Ms. Duncan about that

16   decision?

17   A.   Yes.

18   Q.   What did she say?

19   A.   I -- she had wanted me to complete the

20   evaluation similarly to how she had done hers. And I

21   said, well, I talked to Human Resources. This is how

22   they -- how they're guiding me, just because I don't

23   feel like I can give a proper assessment since Scarlett

24   had been out on FMLA.  And so I'm going to give her all

25   threes, and I have this statement. And Jean wasn't happy

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

1  about that, but it also wasn't --

2      Q.   Okay.

3      A.   -- necessarily contradictory.

4      Q.   Well, that conversation, it seemed like it

5  occurred after you spoke to HR on how you were going to

6  handle it?

7          MS. CARRION:  Objection.  Form.

8          THE WITNESS:  Yeah.  I talked to HR.

9          BY MR. BENTLEY:

10     Q.   Okay.  So prior to talking to HR, did you have

11 any conversations with Jean Duncan about the decision

12 that you now had to score from the month of January 2022

13 until April 19, 2022?

14     A.   No.  I think -- no.  I think someone -- I

15 don't remember looking first in the chronology.

16     Q.   And why did you go to HR and say that you

17 could not score Ms. Lopez?

18         MS. CARRION:  Objection.  Form.

19         THE WITNESS:  I spoke with Human Resources

20     about the evaluation because I had only worked with

21     Scarlett for a couple of months at that point.  Most

22     of the time, she had been out sick, out on FMLA, she

23     -- pregnancy and a loss.  Like, it just -- it wasn't

24     enough of a sample to capture accurately her

25     performance.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1           BY MR. BENTLEY:

2       Q.   From that limited time that she was there, how

3  would you rate her employment?

4           MS. CARRION:  Objection.  Form.

5           THE WITNESS:  If I had to rate it honestly,

6       without doing the all threes, I think it depends.  I

7       mean, I'd have to really look and read -- like, I

8       had a different approach.

9           But if you read -- you know what "outstanding"

10      means, "excellent."  "Fully meets expectations."  I

11      think she probably, in all areas, was fully meeting

12      expectations or was excellent.

13          BY MR. BENTLEY:

14      Q.   Okay.  Why didn't you express that to Human

15  Resources when you were having the conversation on

16  giving a neutral performance evaluation?

17          MS. CARRION:  Objection.  Form.

18          THE WITNESS:  I did.  I said I have -- I've had

19      a positive experience working with Scarlett, but

20      it's only been a month, or however long it was.  It

21      wasn't long enough, and I don't feel comfortable

22      completing this document.

23          BY MR. BENTLEY:

24      Q.   Did you ever complain to Jean Duncan about Ms.

25  Lopez's work performance before you had to fill out this



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1  performance evaluation?

2      A.   I told Jean that I think, especially as we

3  were talking in the context of doing a national search,

4  if we were to do a national search, I feel like I

5  probably would find a stronger candidate. So that's one

6  reason we did that. And then -- I mean, Scarlett was

7  doing her best given the really tough season that she

8  was in. But, of course, like, she was withdrawn. She was

9  sad. She wasn't feeling well physically. She had a lot

10 on her plate.

11     Q.   Okay.

12     A.   But I also believe in giving people grace.

13     Q.   So why did you believe she was a stronger

14 candidate -- well, you could find a stronger candidate?

15     A.   Why did I believe?  Because if you do a

16 national search, how -- like, for any position, if you

17 do a national search, you're probably going to find

18 someone better.

19     Q.   Okay.  And shouldn't we always find the most

20 qualified candidate for a position?

21     A.   We should.

22     Q.   Okay.  But you were not -- but now, I heard

23 you were upset by the fact that we made an external

24 search?

25     A.   Well, with an external search, as it stood in



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

1  the beginning, there was still a chance that Scarlett

2  could have been the best candidate.

3      Q.   Okay.

4      A.   When Jean told the panel, you are not to hire

5  Scarlett, that took Scarlett off the table.

6      Q.   Okay.  When did Jean tell -- I know you talked

7  about it, but when did Jean tell the panel not to hire

8  Scarlett?

9          MS. CARRION:  Objection.  Form.

10         THE WITNESS:  I don't remember the day.  But

11     she told Michael.  She told me.

12         BY MR. BENTLEY:

13     Q.   Well, you already knew she wasn't going to

14  hire Scarlett in this role because you knew that on

15  January 3rd, when you already knew it was going to be

16  made external?

17         MS. NACCACHE:  Objection to form.

18         THE WITNESS:  I asked for it to be external

19     because we wanted the flexibility.

20         BY MR. BENTLEY:

21     Q.   Okay.  And you knew if we went external, you'd

22  likely find a stronger candidate?

23         MS. CARRION:  Objection to form.

24         THE WITNESS:  I thought there was a

25     possibility.

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

1          BY MR. BENTLEY:

2      Q.    Okay.

3      A.    But I didn't --

4      Q.    So then I --

5      A.    -- Scarlett could have been hired at that

6  point.

7      Q.    Okay.  And then I heard that she was obviously

8  -- what other concerns, if any, did you ever raise to

9  Jean Duncan regarding Ms. Lopez's performance?

10     A.    None.

11     Q.    None.  Did you ever tell her that she was

12  disengaged?

13     A.    Yeah.  I told her sometimes she seemed

14  disengaged.  But I also believe in giving feedback

15  directly to people.  And so I would talk to Scarlett and

16  say like, hey, you know, can you try to be more

17  proactive about walking around the floor and, like,

18  getting to know the people?  And so I saw her doing

19  that.

20     Q.    Okay.

21     A.    So when asked to change things or do things,

22  she would do them.

23     Q.    Okay.  How was her attitude in the workplace?

24     A.    Positive but quiet.

25     Q.    Did she ever not complete assignments for you?

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1     A.    I don't know.

2     Q.    Did you have to remind her about certain

3 assignments?

4     A.    Probably.  I mean, we were all really busy.

5     Q.    Did you ever inform Ms. Duncan that you had to

6 remind her about not completing certain assignments?

7     A.    I don't know.

8     Q.    Did you ever inform Ms. Mitchell that Ms.

9 Lopez was not completing certain assignments?

10     A.    I don't know.

11     Q.    Did you ever inform Ms. Mitchell of Ms.

12 Lopez's attitude when she started working with you?

13     A.    No, I don't think so.

14     Q.    Okay.  Did you ever inform Ms. Mitchell about

15 Ms. Lopez's demeanor while working with you?

16     A.    I don't think so.

17     Q.    Okay.  So going to these conversations then,

18 it's my understanding that you wanted to -- I'm sorry,

19 just rephrase.  It's my understanding that you wanted to

20 withdraw yourself from the panel?

21     A.    Yes.

22     Q.    Okay.  And when was that decision made?

23     A.    Before the position advertised.

24     Q.    Okay.  When was the position advertised?

25     A.    I don't know.



MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

1          MS. CARRION:  Object to form.

2          MR. BENTLEY:  What's the objection?

3          MS. CARRION:  Asked and answered.

4          And, Counsel, if I can get a restroom break?

5          MR. BENTLEY:  Yeah.  Do it -- that's a good

6     plan.

7          MS. CARRION:  Okay.

8          THE REPORTER:  One moment, please.

9          We are off record.

10           (OFF THE RECORD)

11              PROCEEDINGS CONTINUED IN VOL. II

12

13

14

15

16

17

18

19

20

21

22

23

24

25



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS