| Dept. File No. | **NON-BARGAINING UNIT GRIEVANCE FORM** | Grievance File No. |
|---|---|---|

GENERAL INSTRUCTIONS: Grieving employees and supervisors responsible for responding to a non-bargaining unit grievance should refer to Section 8.27 of the City of Tampa Personnel Manual for instructions and time limits. Supervisors should respond in memorandum format to the employee with a copy to Employee Relations and the Departmental File.

Employee Name: Scarlett Lopez
Employee Number: 71894
Department and Division Name: Infrastructure & Mobility
Position Title/Grade: Senior Executive Aide /AU5
Grievance Occurred (Date and Time): April 11, 2022
Discussed with (if applicable - Supervisor and Date):

**LIST ALL FACTS CONCERNING THE GRIEVANCE**

\* See attached

**REQUESTED REMEDY**

My request is for my evaluation review to be completely redone and re.graded by my supervisor Jean Duncan.

Employee's Signature and Date: 4/20/2022 Scarlett Lopez

Exhibit 12
Jorgenson
Date 5/23/24

HR 97 (11/94)    White - Employee Relations; Yellow - Department; Pink - Employee

500703



I.D. # 71374
Pay Cycle _____
RE. Total Pts. 27
Personnel Assist. Paul Cassettina

# CITY OF TAMPA
## ADMINISTRATIVE SUPPORT EMPLOYEES
## PERFORMANCE EVALUATION

Employee Name (Last, First, MI): **Lopez, Scarlett**

Class Title: **Senior Executive Aide**

Department/Division: **Infrastructure and Mobility**

Date Employed This Position: **04-19-20**

Type Evaluation:  ☒ Annual   ☐ Probationary   ☐ Other

Number Months Supervised: **12**

Period Covered by Evaluation: From **04-19-21** To **04-19-22**

Rater: **Jean W. Duncan, P.E.**
(Please Print Clearly)

INSTRUCTIONS: Inside are a number of performance categories. After reviewing the documentation, check the rating that best fits the employee's performance. You must enter comments describing the factual basis of the ratings. Additional documentation may be attached if necessary.

EVAL-A (4/04)

The following information is provided to raters to assist in the process of determining the proper rating for each category in the performance evaluation. You should select the rating that best describes the employee's overall level of performance.

**1. KEYBOARD/DATA ENTRY SKILLS:** How well does the employee prepare required material such as correspondence, reports, and technical documents? Consider the time required, neatness, accuracy, and formatting.

- [ ] **Outstanding: (5)** Prepares even the most complex and technical materials quickly and in the most appropriate format, without errors, etc. Requires minimal instructions. Is highly skilled in the use of equipment/software.
- [ ] **Excellent: (4)** Prepares materials, including technical documents, faster than average and in the proper format. Does not require detailed instructions. Skilled in the use of equipment/software.
- [x] **Fully Meets Expectations: (3)** Prepares materials with reasonable accuracy and speed. Requires normal instructions. Moderately proficient in the use of equipment/software.
- [ ] **Below Expectations: (2)** Some difficulties with speed, accuracy or formatting ability. Usually requires detailed instructions, especially for other than basic or routine assignments. Not fully capable in terms of using equipment/software.
- [ ] **Poor: (1)** Work consistently below standards in terms of speed, accuracy and use of proper format. Has difficulty correctly understanding even routine instructions. Has only an elementary operational ability relative to equipment/software.

Comments: After being provided instructions, Scarlett has produced memos accurately. Documents require minor corrections.

**2. RECORDING DATA/INFORMATION:** How effective is the employee in recording, transcribing, and processing data and information? Shorthand skills, if required, should be considered in terms of the ability to reconstruct an accurate transcript.

- [ ] **Outstanding: (5)** Never makes errors in recording information including the most complex subjects and situations (messages, notes, etc.) Able to transcribe notes or minutes quickly and reconstruct a detailed and accurate transcript of meetings, conferences, etc.
- [ ] **Excellent: (4)** Rarely makes even a minor error in recording information, even on complex matters. Transcribes notes or minutes accurately and reconstructs accurate and detailed accounts of meetings, conferences, etc.
- [ ] **Fully Meets Expectations: (3)** Makes an occasional error in recording information but usually not serious. May have some difficulty getting complete information on complex matters. Prepares reasonably accurate transcripts and accounts of meetings, conferences, etc.
- [x] **Below Expectations: (2)** Makes frequent errors, some serious, in recording information either by incorrectly recording or leaving information out. Has serious difficulty with complex information. Transcripts are usually somewhat sketchy and may require thorough review and revision in order to be acceptable as permanent records.
- [ ] **Poor: (1)** Unreliable in recording information. Leaves out important data and prone to record information incorrectly or incompletely. Unable to handle complex information. Produces transcripts that are inadequate and unacceptable. Cannot be effectively utilized in this capacity.

Comments: Scarlett was requested to record City Coucil Motions and supporting material for each Infrastructure and Mobility Department. To date, this assignment has not been completed.

**3. FOLLOWING INSTRUCTIONS:** What is the employee's ability to correctly follow written and verbal instructions regarding work to be done?

- [ ] **Outstanding: (5)** Understands instructions quickly and correctly, including the implications for flexibility, to the extent that if problems are encountered is able to immediately adjust in the appropriate manner. Does not ever require interpretation or re-explanation unless there is a flaw in the instructions.
- [ ] **Excellent: (4)** Understands instructions quickly and correctly. May require limited assistance if problems are encountered but is then able to quickly proceed. Rarely requires interpretation or re-explanation except when there is a problem with the instructions themselves.
- [ ] **Fully Meets Expectations: (3)** Usually understands instructions, requiring further explanation only for more difficult matters. Sometimes may not read written instructions clearly the first time. Tendency to want to discuss instructions, more for reassurance than from inability to understand.
- [x] **Below Expectations: (2)** Needs careful explanation of complex instructions, sometimes misunderstands even basic routine directions. Some limitations in reading ability or ability to correctly comprehend written materials. Usually requires discussion of instructions prior to starting.
- [ ] **Poor: (1)** Requires considerable explanation of instructions and frequently checks with supervisor during the course of the work. Frequently misunderstands even basic routine directions. Serious reading ability and comprehension limitations to the extent that communicating instructions in writing is always a problem.

Comments: Scarlett was provided several high profile executive items to track. The Administrator was not provided regular updates nor the final findings and recommendations regarding these service requests.

**4. REASONING AND PROBLEM SOLVING:** What is the employee's level of ability in pursuing a logical line of inquiry and reaching logical conclusions? How effective are the solutions?

- [ ] **Outstanding: (5)** Exceptional ability to think through problems and reach sound decisions in virtually all situations. Foresees implications and consequences of various courses of action with exceptional accuracy. Decisions made are consistently proven to be both effective and efficient.
- [ ] **Excellent: (4)** Demonstrates above average ability to understand problems and determine appropriate courses of action. Accurately anticipates most consequences. Usually reaches conclusions and decisions that prove to be sound.
- [ ] **Fully Meets Expectations: (3)** Displays generally sound reasoning ability. May at times have difficulty with more complex problems and may sometimes fail to accurately anticipate consequences. Usually reaches decisions that are acceptable although they may also not be as comprehensive as is desired.
- [x] **Below Expectations: (2)** Somewhat limited in problem solving ability, especially with regard to anticipating somewhat obvious consequences. Has difficulty with moderately complex problems. Sometimes reaches conclusions that are at odds with the facts. Decisions must usually be reviewed by supervisor and sometimes substantially revised.
- [ ] **Poor: (1)** Has weak analytical skills, does not have the ability to organize information and make sound decisions beyond the most basic matters. Judgement is regarded as unreliable and employee is allowed virtually no authority in this regard.

Comments: On most assignments, Scarlett has not taken initiative to engage with others regarding the status and or next steps. Instead, the Administrator reached out to others for information, since the information was not provided by the Senior Executive Aide.

**5. PROOFREADING:** How effective is the employee at proofing their own, and if required, the work of others? This includes identifying and correcting typographical errors as well as grammar, format and content.

- [ ] **Outstanding: (5)** Always catches and corrects even the smallest and most specialized errors, including those of others when their work comes to employee's attention. Ability includes typographical, spelling, grammar, punctuation and format. Never submits final copies that require change for this reason.
- [ ] **Excellent: (4)** Very rarely submits a final copy that requires correction and even then it is usually for minor reasons. As a rule identifies and corrects such errors.
- [x] **Fully Meets Expectations: (3)** Occasionally submits final products that contain errors in spelling, punctuation, grammar or format. Is usually reliable in identifying and correcting same but work must usually be proofed before final acceptance.
- [ ] **Below Expectations: (2)** Somewhat inefficient in identifying errors that require correction. Unable to identify certain problems such as unusual spellings, specialized formats or uncommon punctuation. Work must usually be carefully proofed by originator.
- [ ] **Poor: (1)** Unreliable in checking for errors and related problems. Unable to identify even some common errors and demonstrates minimal interest in checking work before submission. Work requires careful checking and may frequently have to be checked several times in succession before an acceptable product results.

Comments: Scarlett proofs documents well. There are no notable issues for this category, as minimal documents/emails were produced.

**6. INTERPERSONAL SKILLS:** Ability to get along with co-workers and the general public and the ability to establish and maintain effective working relationships.

- [ ] **Outstanding: (5)** Extremely successful in working with others. Avoids friction and helps resolve conflict when it occurs, even between others. Helpful and courteous to all, superior public relations skills.
- [ ] **Excellent: (4)** Very effective in working with others and considering their needs and feelings. Friendly and courteous, good public relations ability. Avoids friction and acts to resolve conflict when problems arise.
- [ ] **Fully Meets Expectations: (3)** Generally successful in working with others, seen as cooperative, meets normal expectations for courtesy and tact. Usually acts in time to prevent conflicts from becoming serious.
- [ ] **Below Expectations: (2)** Has limited success in working with others. Sometimes seen as uncooperative, has difficulty relating to certain people. May allow conflict to evolve into a serious incident on some occasions.
- [x] **Poor: (1)** Shows little interest or ability in getting along with others. Viewed as a loner, may be deliberately rude or provocative on some occasions. Exhibits strong dislikes toward certain individuals or types of people. May be repeatedly involved in serious confrontations with others.

Comments: Scarlett has not been very interactive with the Administrator this evaluation period. She seemed disinterested and distracted in her job. The Administrator relied on the Infrastructure and Mobility Customer Experience Supervisor often during this evaluation period as a result.

**7. COMMUNICATION SKILLS:** How effective is the employee in verbal and written communications? Consider this at the level of complexity appropriate for the position.

- [ ] **Outstanding: (5)** Exceptional ability to present even the most complex information clearly, whether verbally or in writing. Understands verbal information and instructions accurately and without difficulty. Able to adapt to different audiences and individuals easily.
- [ ] **Excellent: (4)** Strong ability to present complex information clearly and effectively to the intended audience, whether verbally or in writing. Written materials may occasionally require minor revision. Usually understands instructions without need for additional clarification.
- [ ] **Fully Meets Expectations: (3)** Good ability to communicate most information clearly to the intended audience, both verbally and in writing. Less effective with more complex material. Written communications may require some review and revision. Understands instructions correctly with only a moderate need for additional explanation.
- [x] **Below Expectations: (2)** Limited ability to communicate information clearly to the intended audience, whether verbally or in writing. Generally effective with basic information. Written materials usually require revision. May require considerable explanation of instructions.
- [ ] **Poor: (1)** Serious inability to communicate effectively, even in regard to basic information. Written material usually unacceptable. Has difficulty correctly understanding instructions even with considerable explanation.

Comments: Scarlett has been withdrawn most of this evaluation period. She rarely engaged with the Administrator to discuss work items. When working from home, Scarlett did not contact the Administrator to discuss important work assignments.

**8. ATTITUDE TOWARD THE JOB:** Includes interest in the work, desire to produce quality work, and willingness to put in extra effort.

- [ ] **Outstanding: (5)** Consistently exceeds expectations; always seeks out additional challenging work. Extremely efficient in use of time and strives constantly to meet the very highest quality standards.
- [ ] **Excellent: (4)** Frequently exceeds expectations; very willing to do extra work when time is available. Very efficient in use of time and strives for quality production.
- [ ] **Fully Meets Expectations: (3)** Routinely meets and sometimes exceeds expectations; accepts extra work when assigned. Generally efficient in use of time and acknowledges the importance of high standards but does not always achieve.
- [ ] **Below Expectations: (2)** Has difficulty meeting expectations consistently; usually unable to accept extra work because of this. Somewhat inefficient in use of time and may not recognize high standards as particularly important.
- [x] **Poor: (1)** Unable to meet normal expectations; impractical to consider for extra work assignments given present circumstances. Inefficient in use of time and is not concerned with quality standards.

Comments: During this evaluation period, Scarlett often remained in her office and rarely provided the Administrator with updates independently. Again, the Administrator was required to rely on the Infrastructure and Mobility Customer Experience Supervisor for needs.

**9. ATTITUDE TOWARD SUPERVISION:** Ability to accept supervision including positive response to constructive criticism.

- [ ] **Outstanding: (5)** Highly enthusiastic regarding job and department. Actively supports department and city policies. Makes the best of any work assignment. Reacts positively to supervision and constructive criticism. Works to improve the image of the department.
- [ ] **Excellent: (4)** Enthusiastic toward job and department. Supportive of policies. Does not complain, responds well to supervision and constructive criticism. Concerned with the image of the department.
- [ ] **Fully Meets Expectations: (3)** Generally satisfied with the job. Rarely complains or reacts negatively to supervision or constructive criticism. Shows some modest concern with image of department.
- [x] **Below Expectations: (2)** Somewhat disinterested in the job, may feel it is somewhat below his/her dignity. Somewhat of a complainer, openly dislikes certain assignments. May react negatively to constructive criticism.
- [ ] **Poor: (1)** Has a negative attitude toward the job, not supportive of department or city policies. Known as a complainer, strongly dislikes certain assignments or aspects of the work. Has negative attitude toward supervision and reacts strongly to constructive criticism.

Comments: Scarlett has been distracted by her personal cell phone. She was counseled several times regarding the distraction and how it gave the appearance that she was disinterested in her job. Scarlett continued to use her personal cell phone throughout this evaluation period.

**10. CONDUCT:** Conformance to accepted standards of behavior and dress, conduct off the job that bears directly on job performance.

[X] **Outstanding: (5)** Always reports for work in fully appropriate dress for the work to be done including required work and safety equipment. Always well groomed, personal hygiene fully satisfactory. Presents an excellent impression both on and off the job.

[ ] **Excellent: (4)** Reports for work in appropriate dress including work and safety equipment. Grooming and personal hygiene good. Presents a good impression on and off the job.

[ ] **Fully Meets Expectations: (3)** Occasionally may report for work in less than completely appropriate dress or without a piece of equipment. Hygiene generally acceptable. Presents a satisfactory image on and off the job.

[ ] **Below Expectations: (2)** Regularly reports for work inappropriately dressed and/or without required equipment. Hygiene needs improvement and might be disruptive at times. Does not present an especially positive image of a city employee.

[ ] **Poor: (1)** Usually reports to work improperly dressed or without equipment. Hygiene seriously deficient and frequently offensive to others. Presents a negative image as a city employee.

Comments: Scarlett reports to work dressed appropriately. She is always well groomed.

---

**11. DISCIPLINARY HISTORY:** What has been this employee's experience with regard to disciplinary actions? Note that disciplinary actions only within the evaluation period are to be considered. Prior history should be considered only where it clarifies events during the evaluation period.

[ ] **Outstanding: (5)** Absolutely reliable and dependable even in the complete absence of supervision. Has no disciplinary history including even the mildest form of verbal counseling. Requires minimal supervision. Has received written or verbal commendations for exemplary conduct.

[ ] **Excellent: (4)** Highly reliable and dependable in the absence of supervision. Has no disciplinary history including verbal warnings. May have been commended for good conduct.

[ ] **Fully Meets Expectations: (3)** Generally reliable in the absence of supervision, requires normal supervision. May have received no more than one verbal warning which resulted in immediate correction of the problem.

[X] **Below Expectations: (2)** Has received two or more verbal warnings which have resulted in less than the desired improvement. Often requires close supervision and may be somewhat unreliable in the absence of supervision.

[ ] **Poor: (1)** Has committed major infractions resulting in suspension or demotion without producing the desired improvement. Requires close supervision and is known to be unreliable in the absence of same.

Comments: Scarlett has received several verbal warnings regarding the use of her cell phone and the appropriateness of engaging with the Administrator. There have been no improvements.

---

**12. USE OF LEAVE:** How appropriate has the employee's use of leave been? Consider total use of sick leave, patterns of sick leave suggesting abuse, special restrictions that have been placed on sick leave use, advance scheduling of annual leave, etc.

[ ] **Outstanding: (5)** Is always on time for work, never late or absent on short notice with the rare exception of the most serious emergency circumstances. Is available for work on an emergency basis whenever necessary. Leave is always planned in advance and employee is always willing to revise leave requests in response to organizational needs.

[ ] **Excellent: (4)** Rarely late as much as a minute or two and does not call in sick on short notice except under unusual emergency circumstances. Rarely leaves work early and does so only for true emergencies. Usually available for extra work when necessary. Leave is well planned and employee is usually willing to make adjustments when required.

[ ] **Fully Meets Expectations: (3)** May have been slightly tardy twice, up to ten minutes each time. Sometimes gives short notice on illness or personal emergencies, may occasionally leave work early for similar reasons. Planned leave is handled appropriately although is somewhat reluctant to make adjustments once requests are submitted. Occasionally, absences slow down productivity of unit.

[X] **Below Expectations: (2)** Somewhat excessive tardiness, may have been counseled or given a written warning on this. High incidence of absences on short notice. Excessive use of sick leave, may be on show cause, absences have adversely affected unit productivity.

[ ] **Poor: (1)** Frequent lateness and absences cause scheduling and production problems. Has been disciplined without any significant improvement. Leave balances exhausted, is on show cause for sick leave, frequently must use "X" time.

Comments: _____

Recommended for Step Increase? ☒ No ☐ N/A ☐ Yes   Effective Date: 04-19-22

Total Points: 27   # Categories Rated: 12   Average Rating: 2.25

See ATU Agreement, Article 21.

_Jean W. Duncan_ (Rater's Signature)   Infrastructure and Mobility Administrator   04-08-22
                                        Title                                       Date

**EMPLOYEE'S ACKNOWLEDGMENT:** I understand that it is my right, if I wish to do so, to enter my comments on this form or to submit a written statement regarding this evaluation within two (2) working days after discussion with my immediate supervisor. I have read this evaluation of my work and have discussed it with my supervisor.

☐ I agree with this evaluation   ☒ I disagree with this evaluation

Employee's Comments: * See comments attached

Employee's Signature _____ Date _____

Reviewer's Comments: I anticipate that Scarlett will utilize this evaluation and apply it in a positive manner with her next review period.

_Jean W. Duncan_ (Reviewer's Signature)   04-08-22
                                          Date

☒ I concur with this evaluation
☐ I do not concur with this evaluation

Department Director's Comments: _____

Department Director's Signature _____ Date _____

☐ I concur with this evaluation
☐ I do not concur with this evaluation

April 19th, 2022

Concerning the performance evaluation presented to me on April 11th, 2022, from my supervisor Jean Duncan, Infrastructure & Mobility Administrator

Having received and reviewed this Evaluation that is supposed to cover the period of April 19, 2021, through April 19, 2022, I have the following comments and observations:

Firstly, this evaluation review was not completed by my supervisor Jean Duncan. It was completed by my supervisor's friend Bertha Mitchell, Customer Experience Supervisor whom I do not report to, work alongside nor does she know what my workload entails on a daily basis, as she works in another building/location and ultimately should not be completing my evaluation what-so-ever. Also, I was reassigned to and under the supervision of Danni Jorgenson starting January 3, 2022. Jean Duncan did not request or receive any feedback from Danni on my job performance since I was reassigned. The evaluation period that Jean evaluates should be from April 19, 2022, through January 2, 2022. Danni Jorgenson should evaluate my performance for the remainder of the evaluation period from January 3, 2022, until now.

My work relationship with my supervisor, Jean Duncan has been great from the start of my employment and assignment to her on April 19th, 2021. In fact, Jean's friend, Bertha Mitchell sought me out specifically to inquire if I would be interested in working with Jean as her Aide due to my impeccable reputation and incredible work ethic at the City of Tampa.

This performance review which was completed by Bertha Mitchell and not my supervisor Jean Duncan, seems in all aspects as a cover-up for unlawful action or intention. It also is just a mere document to support what my supervisor plans to do. This "papering of my file" is what managers oftentimes do when planning to take unlawful action. If this were to be a legitimate negative performance review, it would provide concrete examples of ways in which my performance falls short of unambiguous expectations. The reviews are not constructive in nature, they are not specifically defining anything for me, they are not showing measurable areas where there are performance issues, nor providing concrete guidance in terms of what I can do to improve in those areas. The review itself and my supervisors conduct in issuing the review, should be tailored toward the goal of correcting performance failings that exist – not simply and falsely reprimanding me for no apparent reason.

This illegitimate and negative performance review has taken on much different characteristics than the ones I've just stated, not only in terms of the nature of the review itself but also in terms of the circumstances surrounding the review.

SEE ATTACHMENT 1.

I feel as though the negative nature of this review is completely unexpected. I disagree with the performance criticisms as they are false, and I have provided documentation of such. I do not understand or know where they came from being that I have never received a negative comment from Jean regarding my work performance during this evaluation period. The review does not appear to be geared towards correcting these alleged performance failings and does not give me clear methods to improve, it simply emphasizes criticisms. In receiving this unjustifiably harsh and negatively heinous review, it is important that I note what has occurred before the review was received. FMLA medical leave, the fact that I disclosed not one but two pretty disabling conditions, one being my painful back

condition and the other being a pregnancy related condition which made it extremely difficult to be at work and in which have all medical documents available and also requested and received approved workplace accommodation for one of them, in which makes this review look to be motivated by unlawful, discriminatory and retaliatory animus.

SEE ATTACHMENT 1.

I was also not given ample time to prepare for this review being that if I would've known it to be a negative and poor review, I would have prepared my facts and documents which take some time to do. Since I did not see this coming as it was unexpectedly negative, I was given very little time to respond and gather documentation. Reviews are meant to be legitimate evaluations of an employee's performance. This review was not conducted with transparency, which raises a red flag as to what the actual motivation behind it is and bears the question whether the motivation is of an illegitimate discriminatory and unlawful nature. This review focuses on ill-defined, vague, and subjective criticisms of myself rather than measurable performance objectives. This also appears to be "personality based" failings, pointing out how I fall short on my demeanor, interactions, and communication style. When I was given these vague and subjective criticisms through this review, my supervisor (not Bertha Mitchell) should be able to supply concrete examples of even subjectively poor performance.

This evaluation review vehemently differs in terms of rating and comments from my previous evaluation review given to me by my supervisor Jean Duncan. In which I know she did do herself because I was in office and present when she typed it up. It also strongly differs from any evaluation review I have received in the past within my employment at the City of Tampa. I have done nothing to warrant this adverse change. This review is more of slander, defamation of character and a great attempt at tarnishing my reputation at the City of Tampa. I say this review comes as a surprise because Jean never even remotely let me know in any way shape or form that she was dissatisfied with my performance. Jean never counseled me on anything during this evaluation period either. Jean has expressed several times that she does not understand why managers would wait until evaluation time to let an employee know how horribly they have been doing for an entire year. This causes me great confusion as that is exactly what was done here on my evaluation. This negative review also seems to be in retaliation due to my absences that were covered under FMLA and work from home accommodations due to a serious back condition, and how Bertha Mitchell was asked to step in while I was either working from home or on sick leave.

500711

Next are my comments to each category in which I have provided documentation to them

1. Eval 2020 rated #5  Eval 2021 rated #3
   Nothing changed as far as my technical skills and how I format various types of documents. I have actually acquired more knowledge since my previous evaluation. If no notable changes, rating should be the same as my previous evaluation. This needs to change from rating #3 to rating #5.

2. Eval 2020 rated #5. Eval 2021 rated #2
   Previous evaluation I was given a 5 rating on this category and had already been working with Jean for a year. Now on this evaluation it states that I was given an assignment that has to date not been completed. This assignment is an ongoing type of assignment with a start date of "as soon as you start the job" and no end date. It is vague and confusing to say that "to this date the assignment has not been completed". Documents show council and SIRE tracking. Rating needs changing

3. Eval 2020 rated #5  Eval 2021 rated #2
   Documentation provided to show tracking items and updates to manager Jean Duncan. Rating needs changing

4. Eval 2020 rated #5  Eval 2021 rated #2
   It is stated that I have not taken initiative to engage with others regarding status and next steps. I am unsure about what this means since it is a vague statement. I have provided documents to show otherwise

5. Eval 2020 rated #5. Eval 2021 rated #3
   Nothing changed from my previous evaluation period. Rating should be the same as my previous evaluation. This needs to change from rating #3 to rating #5.

6. Eval 2020 rated #5. Eval 2021 rated #1
   Subjective personal opinion on my personality. Assumption. Documents are provided to show interactions throughout evaluation period. Including helping Bertha Mitchell in 40th street location. Rating needs changing

7. Eval 2020 rated #5  Eval 2021 rated #2
   Subjective personal opinion. Jean and I engaged daily on work items via email, texts, and phone. Documents provided to show engagement. Jean also would send me documents to either re-write, proof-read, adjust / insert int letterheads etc. Rating needs changing

8. Eval 2020 rated #5. Eval 2021 rated #1
   Offices of Jean and I were conjoined by a door that mostly stayed open the entire day unless she was in a private meeting. If she needed to see me, she would walk right into my office; if I ever needed to see her, I would do the same. Relying on Bertha Mitchell for needs is a vague statement. Documents provided

9. Eval 2020 rated #5. Eval 2021 rated #2
   Jean has never once counseled me on the use of my personal cell phone. Jean only contacted me on my personal cell phone rather than my city issued cell phone whether it was for work or personal things. I never had a problem with Jean only contacting me on my personal cell. I also communicated on my personal cell to the other Aides on the 8th floor and even some of the council aides (these were mainly communications on my work cell, which is identical to my personal cell, black iPhone 11) regarding work related issues very often. I would often, if not always, walk around with both black iPhone 11's (work and personal) and would even take them

500712

both to the bathroom with me or when running a personal errand for Jean (like grabbing her tea at the nearby coffee shop or driving to DD, searching for her Smartwater, etc) as to not miss a call or text on my city cell or not miss a call or text from Jean on my personal cell phone. Jean received, during this evaluation period several compliments from my peers and co-workers, such as Phyllis Ho-Zuhars (Senior Executive de to the Chief of Staff) whom Jean and I worked very closely with and developed a strong relationship, and outside of COT, United Way Director ise James on being co chair of the United Way campaign last year 2021

10 Eval 2020 rated #5  Eval 2021 rated #5

Thank you for stating that I dressed appropriately for work

11. Eval 2020 rated #5  Eval 2021 rated #2

My supervisor Jean Duncan has never given me a verbal warning on the use of my cell phone or on the appropriateness of engaging with her. As stated in category 9, Jean and I would communicate often through my personal cell phone regarding work and personal (example, my medical related items. I am actually not sure what is meant by this comment since it is very vague.

12 Eval 2020 rated #5  Eval 2021 #2

My upervisor Jean Duncan did not leave a comment on why she rated me a #2 and how it differed from my previous evaluation in which she rated me a #5. I continued to often work through lunch, after hours and even the weekend with no comp time or over time recorded I have provided documents showing that the only times I have used leave time during this evaluation period and under Jean's supervision before my reassignment was on 9-7-21 when I used my floating holiday and when I took sick leave 11-15-21 through 11-19-21 and 11-22-21 through 11-24-21 (8 days). Any other sick leave or annual leave time that I have taken has been used under FMLA and should not be considered or taken into account during this evaluation period. But I have also provided all documentation on my FMLA leave.

ATTACHMENT 1.

Some background on the circumstances surrounding my reassignment: In October 2021, I started to have debilitating back pain. On October 13th, 2021, after a few days of back pain and work from home Jean text me advising that I see a specialist instead of going to the wellness center for pain medication like I told her I had planned to do. I took her advice and had an appointment for the next day. I received a note to stay home, but still worked from home. On October 21st, 2021, I went back to get an MRI done, all while keeping Jean updated through text messages and pictures. Documents provided. The doctor put me out but noted that I may work from home if possible, for 4 weeks. I sent this to Jean and spoke with her on the phone. During this time between November and the end of December, I kept in communication with Jean about work related items and my personal health through text messages that I have provided and also emails. On November 22, 2021, Jean reached out to see how I was doing. I advised that I had forgotten to contact her about a follow up appointment and said I would work from home since my back was still no good. She had no problems with my working from home thus far. She advised that it was not appropriate for me to 'just decide' to work from home and that this was more of an HR decision. She suggested I use sick leave until I could come back in office. I reminded Jean that my doctor's note recommended 4 weeks of work from home until follow up but would use sick leave if that is what she suggested. Jean then replied: "Scarlett   you went home early on October 18th when your back pain started. You were out the rest of the week, with the note from the nurse sent in on October 21st, which does not mention follow up. (The note did mention follow up appointment for 4 weeks, Jean just did not look at it. Documentation provided.) Allowance for working at home needs to be approved by the City and not a doctor or nurse. You have been out since October 18 (out physically and not in the building but still working while at home) so you should use sick leave until you are well. Since a nurse/doctor wrote a note recommending working at home, please provide a note from your follow up that you are able to return. Thank you and get well" That same day, November 22, 2021, I received my follow up appointment and immediately sent it to Jean via text that morning so that she could see it. She did not respond, so I sent her another message asking if she had received it at 1pm that day. She replied: "Yes. So I guess you will be out sick on Monday and Tuesday of next week?" I replied: Yes. That's the first available appointment they had." On the day of my follow up appointment that I already discussed and showed proof of, I text Jean because I had received a message from the Parking Division about a new access card to the parking garage. I asked Jean if she had received it. She stated that she did not receive it and asked if I was coming in today. I reminded her that my follow up appointment was that day in the afternoon, but I would need the new access card if the doctor approved my return to work for the next day. My doctor put me out with option to work from home for one month starting December 1st, 2021. I texted Jean explaining and also sent her a picture of the note from the doctor. She advised that she was busy and would talk to me tomorrow. We did speak and she advised that I get with HR and as long as they approved the accommodation for the month that she would be ok with it as well. HR approved the accommodation which is documented. My return was to be on January 3, 2022. During this time of the month of work from home, I worked and communicated with Jean daily. In the rare cases that we did not communicate directly, more than one day would not go by without direct communication or her seeing me working via emails sent.

On Thursday December 30, 2021 I received an email from Director Vik Bhide letting me know that I was being reassigned to temporarily help the Transportation department and to meet in his office on

500714

Monday morning January 3, 2022. I had not gotten a single clue that this was happening. I was blind sided to say the least being that this notice did not come from my supervisor Jean Duncan, nor was she even copied on the email. I met with Vik on Monday morning and Bertha Mitchell was in attendance as well. Jean was not and I did not have the assumption that she would be there either. Jean did finally come to the meeting about 30 minutes into it. Vik explained that I would be temporarily reassigned to assist Transportation and this position was to be called "Transportation Administrative Support" and showed me on a big screen what the job duties looked like and when I asked to make sure this was just a temporary move, he assured me with a strong yes. I did not have an issue at all with assisting in the Transportation department temporarily. Vik said my pay would not change nor would my schedule. When Vik and Bertha left the room Jean said to me that she was going to be looking for someone new in my place. This then led me to believe that the move was not temporary. I told Jean that I knew I had been away from the office for some time, but I didn't know anything about this or why it was happening. Jean said, "no this has nothing to do with your illness, just that she thought "New Year, fresh start". This comment was very insensitive to say being we were discussing my job and livelihood here rather than some insignificant moment in time. That was the only answer I received as to my "reassignment"

I have since then, been working under Danni Jorgenson's supervision. I have received very positive feedback from Danni and others in the department in my short time working in the department and anxiously waiting for the talked about position to come about. During all this time since I was reassigned into a non-existent position and although I have received the good feedback from Danni I have been in a constant state of anxiety and stress. To top it all off on April 11th, 2022, I have now received an improper and slanderous evaluation review. When I received my evaluation and read all of the comments, I asked for a meeting with HR to go over it since a disagreed with the review and felt that this is just an attempt at harassing and belittling my job performance.

On Wednesday April 13th, 2022, at around 9am I spoke to Rebecca Carr about requesting a meeting to go over the evaluation. On the same day April 13th, 2022, I received a missed call from Jean Duncan's new Aide in which I returned the call and the new Aide asked me if I had received the evaluation. I informed her that I did receive it and I was working on a response and also waiting to speak to HR regarding the evaluation. She said that she would inform Jean. A few hours later I received a meeting notice called "Position Transaction" that I was to attend a meeting including myself, HR specialist Rebecca Carr and Danni Jorgenson. This meeting never took place. It was then brought to my attention that a separate meeting including Jean Duncan, Danni Jorgenson, HR specialist Rebecca Carr and Bertha Mitchell, took place before my meeting was supposed to take place. In this meeting Danni later informed me, that my "position" was discussed. The position discussed was "Utility Administrative Support Technician". This was not the position that was discussed at the meeting I had on January 3rd, 2022, with Vik, Jean and Bertha. This position is also to be posted citywide for anyone to apply to, and if I were to be hired for it, my salary would decrease severely. Again, not what was discussed at the meeting I had on January 3rd, 2022.

At this point what is being shown is that I am being bullied, harassed, and being retaliated against for working from home due to my back injury and also for being out on FMLA leave which then caused for Bertha Mitchell (to whom Jean asks for responsibilities to be delegated to in my absence) to have to fulfill some of my job duties. This talk of positions is almost being dangled in my face like a carrot. This is not what a "reassignment" is being that I have to apply for a position that I am supposedly being reassigned to. One does not apply to a position that they are being reassigned to. It does not make any

500715

sense. Jean has already "reassigned" me or as I see it moved me out of the way so that she may hire someone else, hired someone to take my place, and now once again without being given a choice told that this other position is what is being talked about and that I would have to apply for it as well, all without a reason or explanation. Yet no moves have been made to a permanent reassignment since this was first talked about on January 3rd, 2022. For Jean Duncan and Bertha Mitchell to continue their bullying and harassment with a seriously negative and improper evaluation to be put in my file in an attempt to disgracefully tarnish my name is beyond my understanding and continues to cause me anxiety and stress. I am requesting for this evaluation to be completely redone by Jean Duncan and to include facts and truths.

*Scarlett Lopez S.L.*

500716