**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

SCARLETT LOPEZ,

     Plaintiff,

v.                             Case No. 8:23-cv-2548-KKM-LSG

CITY OF TAMPA,

     Defendant.

_____

## ORDER

Scarlett Lopez sues her former employer, the City of Tampa, and alleges that the City violated the Americans with Disabilities Act, the Pregnancy Discrimination Act, the Family and Medical Leave Act, and the Florida Civil Rights Act. Compl. (Doc. 2). The City moves for summary judgment. Mot. for Summary J. (MSJ) (Doc. 42). For the below reasons, I grant in part and deny in part the City's motion.

## I.    BACKGROUND

In October 2018, Lopez started as a City employee. Joint Statement of Undisputed Facts (Doc. 41) (JSUF) ¶ 1. At the suggestion of Bertha Mitchell, Lopez later applied to serve as the Senior Executive Aide for Jean Duncan, the

Administrator of Infrastructure and Mobility. *Id.* ¶¶ 3–5. Duncan offered the job to Lopez and did not consider anyone else for the position. *Id.* ¶¶ 5–6.

Lopez started as Duncan's Senior Executive Aide on April 19, 2020. *Id.* ¶ 7. After Lopez received the job, Mitchell trained her both remotely and in person. *Id.* ¶ 8. A few months into her tenure, Lopez started working full-time in the office. *Id.* ¶ 9. In February 2021, Duncan presented Lopez with her annual performance evaluation. *Id.* ¶ 10. Lopez received an "outstanding" evaluation in all twelve scoring criteria. *Id.* Because of the COVID-19 pandemic, Duncan testified that she did not work together in-person with Lopez very often, and therefore her evaluation was a "combination" of her review of Lopez's work and her hopes for Lopez's work moving forward. Duncan Dep. I (Doc. 52) at 113:7–114:6. Lopez testified that she received "compliments and positive feedback" from both Mitchell and Duncan. Lopez Dep. (Doc. 47) at 100:14–103:16.

In March 2021, Lopez began a romantic relationship. JSUF ¶ 11. Duncan testified that this resulted in Lopez becoming "disinterested in her job," as she "was on her personal cell phone constantly" and not completing her work tasks. Duncan Dep. I at 142:15–143:15; *see also* Jorgenson Dep. I (Doc. 53) at 130:1–19. Duncan continued to send Lopez to train with Mitchell and asked Mitchell to supervise

Lopez because Duncan did not trust Lopez to perform. Duncan Dep I. at 151:10–25; Mitchell Dep. (Doc. 55) at 84:10–13, 106:2–12.

In September 2021, Duncan reached out to Mike Swain, Employment Services Manager, about moving Lopez to a different position because Duncan was unhappy with Lopez's work. Swain Dec. (Doc. 46) ¶¶ 7, 9; Duncan Dep. II (Doc. 52-1) at 66:1–11. Swain informed Duncan about the applicable Civil Service Rules. Swain Dec. ¶ 10. With this information, Duncan responded that she "would explore her options." *Id.*

The next month, Duncan learned that Lopez was experiencing severe back pain. JSUF ¶ 12. Duncan encouraged Lopez to seek treatment, and, after receiving an MRI, Lopez informed Duncan that she suffered from "severe radiculopathy," or a pinched nerve. *Id.* ¶¶ 12–13; (Doc. 57-8) at 1. Lopez's doctor recommended four weeks of working from home, and Duncan approved this request. JSUF ¶ 13. In November 2021, Lopez again visited the doctor, who recommended another month of working from home. *Id.* ¶ 14; (Doc. 57-10) at 1. Duncan, along with the City's HR Department, authorized Lopez to work remotely from November 30 to December 31, 2021. JSUF ¶ 18; (Doc. 57-14) at 1–2; (Doc. 57-17) at 1–2.

Duncan also continued to look for a new position for Lopez. Duncan believed Lopez could provide the Transportation Engineering Division with assistance and sought to add a position to that Division. Duncan Dep. II at 73:20–74:2; 79:3–7; Swain Dec. ¶ 12. To comply with the Civil Service Rules, this position would be temporary, and Lopez would eventually have to apply to fill it permanently. Swain Dec. ¶ 13.

On December 30, Vik Bhide, Mobility Department Director, emailed Lopez to inform her about her reassignment. JSUF ¶ 19; (Doc. 47-8) at 1; (Doc. 57-20) at 1. At a January 3, 2022 meeting, Duncan told Lopez that the change was not due to Lopez's illness. Lopez Dep. at 130:18–25. Instead, Duncan wanted a "fresh start." *Id.* at 130:25; Duncan Dep. III (Doc. 52-2) at 5:20–24. In an email, Duncan informed Lopez that she was actively seeking a replacement for her Senior Executive Aide position. (Doc. 47-8) at 2. Duncan encouraged Lopez to apply for a permanent position in the Transportation Engineering Division or another position at the City of Tampa. (Doc. 47-8) at 2; JSUF ¶ 22. According to Jorgenson, Duncan decided to relocate Lopez because Duncan "felt like she wasn't getting the level of service she needed from [Lopez]," who had been working from home due to "really bad back problems." Jorgenson Dep. I at 27:12–17. Duncan, Jorgenson said, "needed someone

4

physically there," so Lopez was not "a match for" her. *Id.* at 28:24–29:2. Jorgenson also recalls Duncan saying that Lopez's boyfriend was "the cause of the problems," and "when he entered the picture," Lopez became "a less devoted employee." *Id.* at 28:20–24.

In early January 2022, Lopez informed Jorgenson, her new manager, that Lopez was pregnant. JSUF ¶ 23. A few days later, Lopez informed Jorgenson that she was not feeling well and, as a result, her doctor requested that she go to the hospital. *Id.*; (Doc. 57-24) at 1. Lopez suffered from "Hyperemesis Gravidarum," a severe form of morning sickness. Lopez Aff. (Doc. 58) ¶ 36; Compl. ¶ 72. As a result, Lopez could not work on at least seven days during January and Jorgenson approved her requests for leave. JSUF ¶ 23.

Later in January, Lopez requested pregnancy-related FMLA medical leave, which the City granted. (Doc. 57-26) at 1–2; (Doc. 57-27) at 1–4; (Doc. 47-16); JSUF ¶ 25. Upon returning to work in March, Lopez learned that Duncan planned to hire Sheila DelCastillo as her replacement. JSUF ¶¶ 27–28. On March 24, 2022, Lopez experienced a miscarriage, which resulted in her hospitalization. *Id.* ¶ 30; (Doc. 57-40) at 1. But five days later, Lopez returned to work, and she did not request any additional leave. JSUF ¶ 30; Carr Dec. (Doc. 43) ¶ 18.

5

After returning, Lopez received her performance evaluation covering the period from April 19, 2021, to April 19, 2022. JSUF ¶ 32. In preparing the evaluation, Duncan asked Mitchell to assist in substantiating Duncan's conclusion that "[t]here was a pattern of disengagement, disinterest, and distraction on the part of Ms. Lopez." Duncan Dep. III at 33:24–34:15. After reviewing numerous emails, Mitchell produced a timeline regarding Lopez's work performance and provided it to Duncan. Mitchell Dep. at 194:16–195:5; *see* (Doc. 55-12) at 1–2 (timeline). Mitchell sent Lopez's leave usage to Duncan. (Doc. 57-46) at 1–2. This revealed that Lopez used 292 hours of FMLA-protected leave, eighty hours of sick leave, and four hours of exempt leave. *Id.* at 1.

Duncan ended up scoring Lopez with 27 overall points, resulting in a "Below Expectations" average rating of 2.25. JSUF ¶ 32; *see* Perf. Eval. (Doc. 52-18) (performance evaluation). With respect to "use of leave," Duncan chose the option that provided: "[s]omewhat excessive tardiness, may have been counseled or given a written warning on this. High incidence of absences on short notice. Excessive use of sick leave, may be on show cause, absences adversely affected unit productivity." Perf. Eval. at 5. Duncan also did not recommend Lopez for a pay increase. *See id.* at 6.

Lopez later filed a complaint alleging that her temporary assignment constituted "harassment, bullying, and retaliation for working from home due to her health conditions and FMLA-related leave." JSUF ¶ 33. Rebecca Carr, an Employee Relations Specialist, submitted a memorandum concluding that the only reason for the reassignment was Lopez's performance. *Id.* ¶ 36; *see* (Doc. 57-67) at 1–2; *see also* Carr Dep. II (Doc. 51-1) at 39:19–48:18.

Lopez also filed a non-bargaining unit grievance, in which she requested that Duncan produce a new performance evaluation. JSUF ¶ 34; (Doc. 47-11). Lopez complained that the evaluation covered a period when Jorgensen, not Duncan, supervised her. *Id.* Lopez also claimed that the review "look[ed] to be motivated by unlawful, discriminatory, and retaliatory animus" given that it came after her FMLA leave and after she disclosed her two "disabling conditions." (Doc. 47-11) at 2–3. According to Jorgenson, after Duncan learned of this grievance, Duncan was "angry" and "appalled" and requested the termination of Lopez. Jorgenson Dep. I at 82:1–3; Jorgenson Dep. II (Doc. 53-1) at 5:1–24. Duncan directed Jorgenson not to hire Lopez for a permanent position. Jorgenson Dep. I at 85:7–25.

After a hearing, Duncan denied Lopez's grievance. JSUF ¶ 35; (Doc. 57-66) at 1. Lopez appealed this denial and Kimberly Sullivan, the Employee Relations

Manager, granted Lopez's grievance in part and ordered Jorgenson to complete an evaluation from January 3, 2022, to April 19, 2022. JSUF ¶¶ 37–38. Jorgenson gave Lopez a "Fully Meets Expectations" grade in all twelve scoring categories. JSUF ¶ 39. In her review, Jorgenson explained that "[b]ecause of Lopez's extended absence during the review period," Jorgenson did not "feel as though" she could "adequately complete a performance evaluation." (Doc. 47-14) at 8. Therefore, on the instruction of Human Resources, Jorgenson gave Lopez a neutral evaluation and "indicated that [Lopez] fully meets expectations for each category." *Id.*

Simultaneous to her grievance process, Lopez applied to work full-time in the position of Utility Administrative Support Technician (UAST position), which was the position she temporarily filled. JSUF ¶ 40. Due to pressure from Duncan, Jorgenson testified that she decided, even before Lopez filed the grievance, to recommend that the City open the post to outside applicants and to create an impartial panel to make the hiring decision. Jorgenson Dep. I at 139:2–140:3, 169:16–19; Jorgenson Dep. II at 8:7–22, 11:4–22.

Even with this being the case, after Lopez filed the grievance, Duncan took steps to ensure that the position was posted publicly, asking HR to advertise the position "outside of the City of Tampa." (Doc. 57-72) at 1. Also, according to

Jorgenson, Michael Capotrio, the head of the interview panel, told her that Duncan directed him not to hire Lopez. Jorgenson Dep. I at 88:1–9. This instruction came, Jorgenson says, during conversations in which Duncan told Capotrio to speed up the interview process. *Id.* at 88:5–9, 110:15–111:5. Jorgenson also testified that Bhide, early in the process as interviews were ready to start, called the other two panelists with the same instruction. *Id.* at 89:8–13. Capotrio strenuously denies receiving this instruction, as do the other two panel members. Capotrio Dep. (Doc. 50) at 74:23–75:9; Greco Dec. (Doc. 44) ¶ 8; Lundgren Dec. (Doc. 45) ¶ 10. Bhide also does not recall telling Jorgenson that he would call the other panel members. Bhide Dep. (Doc. 49) at 165:13–19.

The panel interviewed eleven finalists, including Lopez, and each panelist then independently scored each applicant. Capotrio Dep. at 68:16–18, 70:5–71:14; (Doc. 50-4) (rating sheet). Lopez ranked fifth after the interviews and the panel ultimately hired the top ranked candidate. JSUF ¶ 46; (Doc. 50-4). Because the City filled her position, Lopez was terminated. JSUF ¶¶ 47–48.

About the same time, Lopez applied for a Payroll Technician position with the City. JSUF ¶ 49. Multiple employees vouched for Lopez. Lee Dep. (Doc. 54) at 54:3–24. After telephonic interviews, Lee Huffstutler, Chief Accountant for the

City, narrowed the candidate pool to five, including Lopez. JSUF ¶¶ 50–51; (Doc. 56-1). But after reviewing Lopez's personnel file and evaluation, Dennis Rogero, the City's Chief Financial Officer, made the final decision to hire another candidate. JSUF ¶¶ 52–55; Rogero Dep. (Doc. 56) at 92:1–10; (Doc. 47-18). According to Jorgenson, after learning that Lopez sought another job at the City, Duncan said that she would prevent Lopez from receiving it. Jorgenson Dep. I at 99:7–14; Jorgenson Dep. II at 31:10–25, 46:23–47:2. Rogero, though, testified that he never had a conversation with Duncan or Mitchell regarding Lopez's application. Rogero Dep. at 90:10–24.

Over the next couple of years, Lopez unsuccessfully applied for six positions with the City. Carr Dec. ¶¶ 31–38. Lopez also initiated this action, raising discrimination and retaliation claims. Compl. The City moves for summary judgment. MSJ.

## II.    LEGAL STANDARD

Summary judgment is appropriate if no genuine dispute of material fact exists, and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). A fact is material if it might affect the outcome of the suit under governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The movant always bears the initial burden of informing the district court of the basis for its motion and identifying those parts of the record that demonstrate an absence of a genuine issue of material fact. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). When that burden is met, the burden shifts to the nonmovant to present evidentiary materials (e.g., affidavits, depositions, exhibits, etc.) demonstrating that there is a genuine issue of material fact, which precludes summary judgment. *Id.* A moving party is entitled to summary judgment if the nonmoving party "fail[s] to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

I review the record evidence as identified by the parties and draw all legitimate inferences in the nonmoving party's favor. *See Sconiers v. Lockhart*, 946 F.3d 1256, 1262 (11th Cir. 2020); *Reese v. Hebert*, 527 F.3d 1253, 1268 (11th Cir. 2008). Here, to the extent that the record is disputed or capable of multiple inferences, I draw them in favor of the non-movant.

## III.   ANALYSIS

The City moves for summary judgment as to all of Lopez's claims. *See* MSJ. I start with Lopez's discrimination claims and then turn to her retaliation claims.

11

### A. Discrimination Claims

Lopez raises discrimination claims under the Americans with Disabilities Act
(ADA) (Count I), Pregnancy Discrimination Act (PDA) (Count II), and the
Florida Civil Rights Act (FCRA) (Counts IV through VI). *See* Compl. When a
plaintiff lacks direct evidence of discrimination, a plaintiff may employ the
*McDonnell Douglas*[1] burden-shifting framework through circumstantial evidence of
discrimination. *Ossmann v. Meredith Corp.*, 82 F.4th 1007, 1014 (11th Cir. 2023);
*Akridge v. Alfa Ins. Cos.*, 93 F.4th 1181, 1191 (11th Cir. 2024) (ADA); *Owens v.
Governor's Off. of Student Achievement*, 52 F.4th 1327, 1337 (11th Cir. 2022) (PDA);
*Surtain v. Hamlin Terrace Found.*, 789 F.3d 1239, 1245 n.6 (11th Cir. 2015) (per
curiam) (FCRA). Under this framework, a plaintiff must establish a prima facie case.
*Akridge*, 93 F.4th at 1191. If the plaintiff succeeds, then "the burden of production
shifts to the employer to articulate a legitimate, non-discriminatory reason for its
decision." *Id.* If the employer meets its burden, the "burden then shifts back to the
employee to present sufficient evidence creating a genuine issue of material fact that
the employer's reason is pretext." *Id.* As an alternative to *McDonnell Douglas*, a
plaintiff may provide "a convincing mosaic of circumstantial evidence that would

---

[1] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

allow a jury to infer intentional discrimination by the decisionmaker." *Smith v. Lockheed–Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011) (footnote omitted) (quoting *Silverman v. Bd. of Educ.*, 637 F.3d 729, 734 (7th Cir. 2011)). "This approach to analyzing the evidence treats an employment discrimination suit in same way [a court] would treat any other case—jumping directly to the ultimate question of liability and deciding whether the moving party is entitled to judgment at that stage of the case." *Tynes v. Fla. Dep't of Juv. Just.*, 88 F.4th 939, 947 (11th Cir. 2023).

### 1. The City is Entitled to Summary Judgment on Lopez's ADA Discrimination Claim

The ADA prohibits discriminating "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). To establish a prima facie case under the ADA, a plaintiff must show: "(1) she has a disability; (2) she is a qualified individual under the ADA; and (3) the employer discriminated against her 'on the basis of disability.' " *Akridge*, 93 F.4th at 1191 (quoting 42 U.S.C. § 12112(a)). For the third prong, a plaintiff must prove that "an adverse employment action would not have occurred but for the plaintiff's disability." *Id.* at 1192. This

causation burden is also a precondition under the "convincing mosaic" model. *Id.* at 1197.

Lopez alleges that the City discriminated against her—by reassigning, demoting, and terminating her—because of two protected disabilities: Radiculopathy and Hyperemesis Gravidarum. Compl. ¶¶ 135, 138.

With respect to Lopez's demotion and reassignment, the City argues that it is entitled to summary judgment because Lopez cannot prove that her alleged disabilities caused these adverse employment actions. MSJ at 24–26. I agree.[2] Lopez cannot meet her burden because the uncontroverted record shows that Duncan wanted to reassign Lopez *before* she learned of Lopez's disabilities. Duncan testified that, in September of 2021, she wanted to make a change for her senior executive aide position and therefore she called Swain about creating a temporary position for Lopez. Duncan Dep. II at 66:1–67:19, 69:15–20, 70:24–71:5, 72:8–9, 84:25–85:2; Duncan Dep. III at 43:12–13. Swain recalls this September conversation, during which Duncan "expressed dissatisfaction with Lopez and believed that she would be

---

[2] The City also argues that: (1) Lopez cannot establish that her back injury is a disability; (2) Duncan had legitimate, non-discriminatory reasons for replacing Lopez; and (3) Lopez cannot show that the City's proffered reasons are pretext for unlawful discrimination. MSJ at 21–24, 26–28. Because I conclude that Lopez cannot meet the causation element of a prima facie case, I assume that her back injury qualifies as a disability and need not consider the other arguments.

better suited in a different position." Swain Dec. ¶¶ 7, 9. Swain also remembers Duncan inquiring "whether she could hire a new aide." *Id.* ¶ 9. Then, in November, Duncan and Swain discussed creating a temporary position for Lopez, which would allow Duncan to hire a new Senior Executive Aide. *Id.* ¶ 13. Duncan put this plan into motion over the next two months. *Id.* ¶¶ 14–15. According to Duncan, the "[c]ity bureaucracy" delayed implementation of her plan. Duncan Dep. II at 78:10–20.

When Duncan called Swain in September 2021, nothing in the record supports an inference that Duncan knew of Lopez's back pain. *See* JSUF ¶ 12 ("In October, Duncan was informed that Lopez was experiencing severe back pain."). Indeed, Lopez alleges that her "extreme" back pain began on October 9, 2021. Compl. ¶ 47. And Lopez does not present evidence that Duncan knew of Lopez's pregnancy-related disability before January 2022. *See* JSUF ¶ 23. Therefore, Lopez cannot meet her burden of establishing that these disabilities were but-for causes of Duncan's decision to replace Lopez and transfer her to a temporary position. It is of no moment that Duncan's decision was not finalized until after she learned of Lopez's back pain. An employer's "proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality." *Clark*

15

*Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001) (per curiam); *cf. Drago v. Jenne*,

453 F.3d 1301, 1308 (11th Cir. 2006) ("We hold that, in a retaliation case, when an

employer contemplates an adverse employment action before an employee engages

in protected activity, temporal proximity between the protected activity and the

subsequent adverse employment action does not suffice to show causation.").

Lopez argues that causation is sufficiently a jury question based on the

"temporal proximity between [Lopez] returning from her work-from-home

accommodation on the same day she was moved to a temporary assignment,"

"Duncan's discriminatory comments to Jorgenson about [Lopez]," and "numerous

inconsistent statements" from Duncan concerning who she spoke to about her plans

to reassign Lopez. Resp. (Doc. 57) at 21–22. The above cases make clear, though,

that this evidence is not enough to create a genuine dispute about causation in the

light of the evidence about Duncan's intentions in September, before all of these

other events unfolded. Although Lopez notes the City's failure to "produce any

documentation regarding the calls between Duncan and Swain, including notes,

emails, or call logs," Resp. at 23; *see also id.* at 24, she does not provide any evidence

that calls into question the existence of these conversations. Lopez also relies on

Duncan's alleged failure to comply with the Civil Service Rules and other City

procedures. *Id.* at 22–25. But even assuming that Lopez is correct in her critiques of Duncan's conduct, none of this evidence speaks to whether Lopez's disabilities caused her reassignment.

In sum, Lopez cannot show that the City—transferring Lopez to a temporary position—discriminated against Lopez "on the basis of" her disabilities. Therefore, the City is entitled to summary judgment in this regard.

Lopez also cannot demonstrate that her termination, which followed her failure to receive the permanent UAST position, is a product of disability discrimination. Lopez fails to substantiate her claim that the City hired another candidate for the permanent UAST position on the basis of Lopez's alleged disabilities. Although there is contested evidence suggesting that Duncan and Bhide attempted to intervene in the hiring process by reaching out to Capotrio and the other panel members, *see* Jorgenson Dep. I at 88:1–9, 89:8–13, 111:6–112:11,[3]

---

[3] The City argues that Jorgenson's testimony on this point is hearsay, because it relays what Capotrio allegedly told Jorgenson about his conversation with Duncan. MSJ at 31–32. At summary judgment, a court "may consider only that evidence which can be reduced to an admissible form." *Rowell v. BellSouth Corp.,* 433 F.3d 794, 800 (11th Cir. 2005). The Eleventh Circuit had concluded that an employee's statements are admissible under Federal Rule of Evidence 801(d)(2)(D) when the employee participates, "at least to some extent," in the adverse employment action. *Kidd v. Mando Am. Corp.,* 731 F.3d 1196, 1208 (11th Cir. 2013). Because Capotrio led the interview process and Duncan and Bhide allegedly influenced the hiring process, the record reflects the requisite amount of involvement and thus Jorgenson's testimony is admissible. *See Rowell,* 433 F.3d at 800 ("Courts have admitted statements of managers under Rule

Lopez fails to identify evidence suggesting that Duncan and Bhide did so because of Lopez's alleged disabilities. Therefore, the City is entitled to summary judgment on Lopez's ADA discrimination claim based on her termination.

### 2. The City is Entitled to Summary Judgment on Lopez's PDA Discrimination Claim

As amended by the PDA, Title VII prohibits an employer from discharging or "otherwise . . . discriminat[ing] against any individual with respect to [her] compensation, terms, conditions, or privileges of employment," "because of or on the basis of pregnancy, childbirth, or related medical conditions." 42 U.S.C. §§ 2000e(k), 2000e-2(a)(1). To establish a prima facie case under *McDonnell Douglas*, a plaintiff must prove "(1) that she belongs to a protected class, (2) that she was subjected to an adverse employment action, (3) that she was qualified to perform the job in question, and (4) that her employer treated 'similarly situated' employees outside her class more favorably." *Lewis v. City of Union City*, 918 F.3d 1213, 1220–21 (11th Cir. 2019) (en banc).

Lopez alleges that the City's termination decision "was driven by unlawful pregnancy and pregnancy-related disability discrimination and retaliation against"

---

801(d)(2)(D) where there is some evidence that the statements reflected some kind of participation in the employment decision.").

her. Compl. ¶ 146. The City argues that it is entitled to summary judgment on this claim because Duncan made the decision to replace Lopez before she learned of Lopez's pregnancy, and that, when Lopez applied for other positions with the City, she was not pregnant. *See* MSJ at 28–29. Lopez does not offer much of a response, other than to suggest that Duncan discriminated against her based on her pregnancy and pregnancy-related condition when Duncan authored a "false and contrived performance review." Resp. at 20 n.18.

The City is entitled to summary judgment. Lopez provides no evidence that Duncan knew of Lopez's pregnancy when she reassigned her and replaced her with a new Senior Executive Aide. *See* (Doc. 47-8) at 2 (Duncan informing Lopez of her reassignment on January 3, 2022); JSUF ¶ 23 ("On or about January 5, 2022, Lopez informed her new manager, Danni Jorgenson, that she was pregnant."); Lopez Dep. at 139:15–20 (Lopez testifying that she does not remember whether she informed anyone at the City before January 5, 2022). Further, by the time Lopez applied and interviewed for the permanent UAST position, she was no longer pregnant or otherwise experiencing related medical conditions. *See* JSUF ¶¶ 30, 45.

Given the above timeline, Lopez cannot meet her burden. With respect to Lopez's demotion, the City cannot be held liable without actual knowledge of

Lopez's pregnancy and the related medical condition. *Cf. Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1186 (11th Cir. 2005) ("[A] decision-maker who lacks actual knowledge of an employee's disability cannot fire the employee 'because of' that disability."). And when the City terminated Lopez, she no longer belonged to a protected class. It follows that Lopez cannot establish a prima facie case of discrimination. *See Lewis*, 918 F.3d at 1222 ("At the *prima facie* stage the plaintiff must show a potential 'winner'—*i.e.*, enough to give rise to a valid inference that her employer engaged in unlawful intentional 'discrimination.' "). For the same reason, Lopez fails to present a "convincing mosaic" of circumstantial evidence that would allow a jury to conclude that the City terminated her "because of" her pregnancy or the related medical condition. *Tynes,* 88 F.4th at 946.

Rather than offer a response to the above, Lopez argues that Duncan's performance review constitutes actionable discrimination that deprived her of a raise. Resp. at 20 n.18. But Lopez did not plead this theory of discrimination. Lopez alleged only that her "termination" resulted from pregnancy and pregnancy-related disability discrimination. Compl. ¶¶ 145–47 (identifying the adverse employment action as her "termination" for count II arising under the PDA). Because a "plaintiff may not amend her complaint through argument in a brief opposing summary

judgment," *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) (per curiam), this theory is unavailable to Lopez.

The City is entitled to summary judgment on Lopez's PDA discrimination claim.

### 3. The City is Entitled to Summary Judgment on Lopez's FCRA Discrimination Claims

FCRA prohibits an employer from "discharg[ing]" or "fail[ing] or refus[ing] to hire any individual," or "discriminat[ing] against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex, pregnancy, [or] handicap." § 760.10(1)(a), Fla. Stat. Lopez alleges that the City violated the FCRA by temporarily reassigning her, demoting her, hiring her replacement, and terminating her because of her sex, pregnancy, and pregnancy-related disability. Compl. ¶¶ 160–77.

The City is entitled to summary judgment on these counts. As covered above, uncontroverted record evidence demonstrates that Duncan decided to replace Lopez before learning of Lopez's pregnancy or Lopez's pregnancy-related disability. *See supra* at 19–20. Also, Lopez fails to present evidence that she did not receive the permanent UAST position because of her pregnancy or pregnancy-related disability. *See id.* Therefore, the City is entitled to summary judgment on these counts.

### B. Lopez's Retaliation Claims

Lopez brings retaliation claims under the ADA (Count I), PDA (Count II), Family and Medical Leave Act (FMLA) (Count III) and FCRA (Count VII). Like with the discrimination claims, a court may evaluate a plaintiff's retaliation claim under the *McDonnell Douglas* framework when a plaintiff proceeds based on circumstantial evidence. *Ring v. Boca Ciega Yacht Club Inc.*, 4 F.4th 1149, 1163 (11th Cir. 2021); *Matamoros v. Broward Sheriff's Off.*, 2 F.4th 1329, 1336 (11th Cir. 2021); *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1293 (11th Cir. 2006). An employee may also rely on a "convincing mosaic" of circumstantial evidence. *Berry v. Crestwood Healthcare LP*, 84 F.4th 1300, 1310 (11th Cir. 2023). Either way, the question is "whether the evidence permits a reasonable factfinder to find that the employer retaliated against the employee." *Id.* at 1311.

#### 1. The City is Entitled to Summary Judgment in Part on Lopez's ADA Retaliation Claim

To prove an ADA retaliation claim, a plaintiff must show that (1) she "engaged in conduct protected by the ADA; (2) she "was subjected to an adverse employment action at the time, or after the protected conduct took place"; and (3) her employer "took an adverse employment action against [her] because of [her] protected conduct." *Collado v. United Parcel Serv., Co.*, 419 F.3d 1143, 1158 (11th

Cir. 2005) (quotation omitted); *see Batson v. Salvation Army*, 897 F.3d 1320, 1328

(11th Cir. 2018) (listing prima facie elements for *McDonnell Douglas* purposes).

Lopez alleges that she engaged in statutorily protected expression by filing a

complaint, grievance, and requested periodic updates concerning the grievance.

Compl. ¶ 139.[4] As a result, Lopez alleges, she was demoted, terminated, and failed

to receive the Payroll Technician position. Compl. ¶ 140. In response, the City

moves for summary judgment on the basis that Lopez's demotion occurred before

she engaged in protected activity and that the City had legitimate, non-retaliatory

reasons for their hiring decisions. MSJ at 30–33.

A reasonable jury could not find that Lopez's demotion is the product of the

retaliation. The demotion came three months before Lopez filed her grievance and

complaint. *See* JSUF ¶¶ 20–23, 33–34. Therefore, no "causal connection exists

between" Lopez filing the complaint and grievance and Lopez receiving a demotion.

*Batson*, 897 F.3d at 1328.[5]

---

[4] Lopez attempts to include other alleged statutorily protected activities—such as her request for
an accommodation—in her summary judgment briefing. *See* Resp. at 28. This is impermissible.
*See Gilmour*, 382 F.3d at 1315. Lopez's attempt to include new adverse employment actions—such
as the City's failure to give her a 4% raise—is similarly impermissible. *See* Resp. at 28–29.

[5] The same is true of Duncan's performance review and the removal of her parking privileges, both
of which also came before Lopez filed her grievance and complaint. *See* Compl. ¶¶ 78–79, 85–96.

A reasonable jury could, though, conclude that Lopez failed to receive the permanent UAST position, and was thus terminated, because she engaged in statutorily protected conduct. Taking the evidence in the light most favorable to Lopez, after receiving notice of the grievance, Duncan approached Jorgenson and said that Lopez "has got to go." Jorgenson Dep. I at 85:16–25. Duncan then ensured that the permanent UAST position attracted as many applicants as possible. Although the City may post a position internally, which means it is "restricted to the City staff," *id.* at 84:20–85:2, Duncan took steps to ensure that it was posted externally, which means that non-employees can apply. A few weeks after Lopez filed the grievance, Duncan, "anxious to close the books on the temporary position situation" due to the "recent change of Executive Senior aides," directed Human Resources to advertise the permanent UAST position "outside of the City of Tampa to ensure that we have a great pool of candidates." (Doc. 57-72) at 1. As a result, the City attracted nearly 200 applicants. Jorgenson Dep. I at 108:20–21. Lopez was the only City employee in the final five. *See* Resp. at 17; (Doc. 44-1) at 1. Finally, Jorgenson testified that she was told that Duncan and Bhide contacted the three panel members interviewing applicants for the permanent position and instructed

them to hire someone other than Lopez. Jorgenson Dep. I at 88:1–9, 89:8–13, 110:15–112:25.

Crediting this evidence, a reasonable jury could conclude that Duncan acted to open the applicant pool in response to Lopez's grievance, which resulted in Lopez, the highest rated City employee, *see* (Doc. 44-1) at 1, losing out on the position to an outside applicant. A reasonable jury could also find that Duncan and Bhide instructed the panel to hire someone other than Lopez for the position. This means that a reasonable jury could conclude that the City is liable for ADA retaliation with respect to Lopez's failure to receive the permanent UAST position and her subsequent termination. To be sure, a reasonable jury could conclude that the decision to open the hiring pool was not the product of a retaliatory motive. A reasonable jury could also credit the City's "legitimate, non-discriminatory reason[s]" for hiring another candidate. *Gogel v. Kia Motors Mfg. of Georgia, Inc.*, 967 F.3d 1121, 1135 (11th Cir. 2020) (en banc); *see* MSJ at 31; Lundgren Dec. ¶ 12 (stating that Stebbins was "the highest ranked candidate," which "ultimately led to her being offered the position"); Greco Dep. ¶ 12 (same). But in the light of the record evidence of Duncan's desire to terminate Lopez and the alleged attempt to influence the hiring panel, a reasonable jury could also reject these proffered reasons and

25

conclude that they are "merely a pretext to mask [retaliatory] actions." *Gogel*, 967
F.3d at 1135 (quoting *Bryant v. Jones*, 575 F.3d 1281, 1308 (11th Cir. 2009)). As a
result, summary judgment is improper.

Other than arguing that legitimate, non-discriminatory reasons existed to hire
the best applicant, *see* MSJ at 31–32, the City responds by arguing that it decided to
externally post the position before Lopez filed her grievance, *see* Reply (Doc. 59) at
11–12. The record, though, does not settle this question. The City cites Jorgenson's
deposition, in which she testifies that she recommended an external posting in
January 2022, before Lopez filed her grievance. Jorgenson Dep. I at 139:2–140:3,
169:16–19. Jorgenson also testified to conversations she had about the eventual
interview process that were held before Lopez filed her grievance on April 20, 2022.
Jorgenson Dep. II at 8:5–22, 11:4–25.

At the same time, Jorgenson testified that any final decision about an external
posting "probably [fell] to Human Resources and need[ed] concurrence from the
director." Jorgenson Dep. I at 86:16–21. Also, Bhide testified that the decision is
made either by the director or the department or the relevant manager. Bhide Dep.
at 157:22–158:15. Bhide said that it is "possible [he] could have made" the decision
to post the position externally. *Id.* at 158:18–19. In the light of Jorgenson's testimony

about the final decisionmaker, along with Duncan's email and the fact that Duncan was Bhide's superior, Bhide Dep. at 29:19–20; (Doc. 57-72) at 1, a reasonable jury could conclude that Duncan participated in the final decision to post the job externally.

For the above reasons, a reasonable jury considering all the evidence could find "that the employer retaliated against the employee." *Berry*, 84 F.4th at 1311. As a result, the City is not entitled to summary judgment with respect to the retaliation claim based on Lopez's termination.

In her complaint, Lopez also cites the City's decision not to hire her for the position of Payroll Technician as another example of retaliation. Compl. ¶ 140. The City argues that Lopez fails to supply any evidence that Duncan, Bhide, and Mitchell "had conversations with anyone within payroll about hiring Lopez." MSJ at 32. To support this proposition, the City points to the testimony of Rogero, the decisionmaker, who testified that he never had a conversation with Duncan or Mitchell regarding Lopez's application. Rogero Dep. at 90:10–24. Rogero was also unaware that Lopez filed a grievance. *Id.* at 101:9–20.

But a reasonable jury could infer retaliation on this theory from the record. According to Jorgenson's testimony, Duncan intervened and prevented Lopez's hire.

27

Duncan, Jorgenson testified, said that she would "see to it" that Lopez "will not work
at the City." Jorgenson Dep. I at 99:7–14. Jorgenson also testified to conversations
in which Mitchell and Duncan said that they "made sure that [the Payroll
Technician] position will not happen for [Lopez]." Jorgenson Dep. II at 31:10–25;
*see id.* at 46:23–47:2 ("I believe that Jean did not want Scarlett to work at the City.
And she indicated to me—Jean indicated to me that—when I said she had an
opportunity in Payroll, Jean said, not anymore, I saw to that.").

Given the conflicting evidence about Duncan's involvement in the City's
decision to hire another candidate for the Payroll Technician position, the City is
not entitled to summary judgment. A reasonable jury could credit Jorgenson's
testimony and find that Duncan, because of Lopez's protected conduct, intervened
to prevent Lopez from receiving the job. Alternatively, a reasonable jury could credit
Rogero's testimony and conclude that the City's decision was not the product of
retaliation. At bottom, this is a jury question, and the City is not entitled to summary
judgment.[6]

---

[6] In her response to the City's motion, Lopez cites four additional jobs with the City for which she
unsuccessfully applied. Resp. at 29–30. Because Lopez did not plead these adverse employment
actions, she cannot raise them now. *Gilmour*, 382 F.3d at 1315. In any case, Lopez does not provide
evidence in support of these claims, and the City has submitted evidence refuting them. *See* Carr
Dec. ¶¶ 33–38.

### 2. The City is Not Entitled to Summary Judgment on Lopez's PDA Retaliation Claim

Title VII, of which the PDA is a part, prohibits an employer from discriminating against an employee because she "has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3(a). Lopez alleges that the City's termination decision was driven by retaliation against her for her opposition to the City's pregnancy and pregnancy-related discrimination. Compl. ¶ 147. Because Title VII and ADA retaliation claims are assessed under the same framework, *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1287 (11th Cir. 1997), it follows that, for the reasons above, *see supra* at 24–27, the City is not entitled to summary judgment on Lopez's PDA retaliation claim arising from Lopez's termination.

### 3. The City is Entitled to Summary Judgment in Part on Lopez's FMLA Retaliation Claim

The FMLA "grants an eligible employee the right to take up to 12 workweeks of unpaid leave annually for any one or more of several reasons." *Hurlbert*, 439 F.3d at 1293 (quoting 29 U.S.C. § 2612(a)(1)(D)). "The FMLA prohibits employers from interfering with, restraining, retaliating against, or denying 'the exercise of or the attempt to exercise' any rights guaranteed under the Act." *Matamoros*, 2 F.4th at

1337 (quoting 29 U.S.C. § 2615(a)). Thus, an employer may not retaliate against an employee for taking FMLA leave. *See Jones v. Gulf Coast Health Care of Delaware, LLC*, 854 F.3d 1261, 1270 (11th Cir. 2017).

"To establish a prima facie case of retaliation, the plaintiff must show that: (1) he engaged in statutorily protected activity; (2) he experienced an adverse employment action; and (3) there is a causal connection between the protected activity and the adverse action." *Hurlbert*, 439 F.3d at 1297. The FMLA employs a "but-for causation" standard. *Lapham v. Walgreen Co.*, 88 F.4th 879, 893 (11th Cir. 2023).

Although not separately addressed by the parties, it appears that Lopez first claims that the City violated the FMLA by terminating her for opposing their "discriminatory practices." Compl. ¶ 155; *see* 29 U.S.C. § 2615(a)(2) ("It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter."). To the extent this is a separate claim, it may proceed to trial for the reasons stated above. *See supra* at 24–27.

30

The main thrust of Lopez's FMLA claim, though, is her allegation that the City retaliated against her on account of her use of FMLA leave. Compl. ¶ 153.[7] Although Lopez's claims are not a model of clarity, it appears she claims that this retaliation includes her demotion, her negative performance review, her termination, and her failure to receive the job of Payroll Technician with the City. *See id.* ¶¶ 153, 158. A reasonable jury could find that her use of FMLA leave was a but-for cause of Lopez's negative performance review and that this performance review was a but-for cause of Lopez's failure to receive the Payroll Technician job, but could not find that Lopez's use of FMLA leave was a but-for cause of the other adverse employment actions.

First, Lopez was demoted before she took FMLA leave,[8] meaning Lopez cannot prove a causal connection.[9] Lopez also fails to explain how her use of FMLA

---

[7] In the motion for summary judgment, the City argues that Lopez cannot prevail on an FMLA interference claim. MSJ at 33–34. I read Lopez's complaint to include only FMLA retaliation claims. *See* Compl. ¶¶ 148–159. In any case, even if Lopez is raising such a claim as related to her back injury, it is meritless for the reasons the City identifies. *See* MSJ at 33–34.

[8] To the extent Lopez's December 2021 request for accommodation qualifies as FMLA-protected activity, *see* Compl. ¶ 158, this claim would still fail given the evidence that Duncan wanted to replace Lopez in September 2021, *see supra* at 14–15.

[9] Lopez also alleges that the City's decision to "remov[e] her parking pass privileges" constituted an adverse employment action. Compl. ¶ 153. Lopez's parking pass, though, was "assigned to the

31

leave is a but-for cause of the City's decision to hire another candidate for the permanent UAST position.

With respect to the negative performance review, though, Lopez presents evidence that Duncan reviewed Lopez's leave chart, which included her FMLA leave, right around the time that Duncan signed Lopez's review. *See* Perf. Eval.; (Doc. 57-46).[10] Lopez also presents evidence that, because of her negative performance review, she did not receive a pay increase. *See* Perf. Eval. at 6. This renders the negative performance review an adverse employment action. *See Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1261 (11th Cir. 2001) ("An employment action is considered 'adverse' only if it results in some tangible, negative effect on the plaintiff's employment."). Viewing the evidence in the light most favorable to her, a reasonable jury could find in favor of Lopez on her FMLA retaliation claim based on the performance review.

The City responds that Duncan did not consider Lopez's FMLA leave in writing the review, citing two portions of Duncan's deposition for support. MSJ at

---

holder of [her] position," JSUF ¶ 29, and thus her loss of a parking pass followed from her demotion.

[10] The record also includes evidence that Duncan knew about Lopez's FMLA leave before receiving this leave chart. *See, e.g.*, (Docs. 57-32, 57-36). Indeed, in one email, Duncan commented that "[s]omething seems amiss" regarding Lopez's FMLA request. (Doc. 57-32) at 1.

35. In the first part, Duncan testified that, after discussions with HR, the decision was made to split Lopez's review between Duncan and Jorgenson. Duncan Dep. III at 24:14–18. But HR appears to have made this decision after Lopez filed her grievance and after Duncan evaluated and handed down the performance review. *See* JSUF ¶¶ 36–37. In the second cite, Duncan details some of her considerations when she evaluated Lopez's use of sick leave. Duncan Dep. III at 49:9–50:20. Although Duncan does not testify that she considered Lopez's FMLA leave, this testimony does not conclusively preclude a reasonable jury from inferring that Lopez's protected activity was a but-for cause of the adverse employment action.

The City next argues that Lopez's claim fails because the City ultimately granted, in part, Lopez's grievance and ordered Jorgenson to evaluate Lopez's performance from January 3, 2022, to April 19, 2022, which included the time that Lopez used FMLA leave. MSJ at 35; *see* (Doc. 47-13). It is not clear why the City's grievance decision means that Lopez's FMLA claim fails as a matter of law. Duncan's review resulted in Lopez not receiving a pay increase, and it does not appear that Lopez was eligible for a pay increase when Jorgenson re-evaluated her. *See* (Doc. 47-14) at 8 (checking "N/A" for "Recommend for Step Increase?"). The

resolution of Lopez's grievance process thus does not prevent a reasonable jury from finding for Lopez on this theory of Lopez's retaliation claim.[11]

Finally, the City argues that Lopez cannot show "how a score of 'Below Expectations' in one of the 12 categories prevented her from receiving a pay increase." MSJ at 35. Fairly read, Lopez argues that her scores in multiple categories affected her ability to receive a raise and that these scores were affected by her FMLA leave. *See* Resp. at 11–12. When taken together, a reasonable jury could find that these negative scores resulted in Lopez not receiving a pay increase. *See* (Doc. 57-49) at 5–9 (detailing merit increase process).

For these reasons, a reasonable jury could find that Duncan, by authoring the negative performance review and not recommending Lopez for a pay increase, retaliated against Lopez for engaging in activity protected by the FMLA. As a result, the City is not entitled to summary judgment. *See Berry*, 84 F.4th at 1311 ("[T]he question for the court at summary judgment . . . is only whether the evidence permits a reasonable factfinder to find that the employer retaliated against the employee.").

---

[11] In her complaint, Lopez alleges that the denial of her grievance is another act of FMLA retaliation. Compl. ¶ 153. But as noted, the City ultimately granted Lopez's grievance in part. And Lopez does not explain how the denial in part of the grievance, on its own, constitutes an adverse employment action.

34

Lopez's final alleged act of retaliation is the City's decision to hire someone else for the position of Payroll Technician. *See* Resp. at 29; Compl. ¶¶ 127–32; 158. Rogero, the City's Chief Financial Officer and final decisionmaker, testified that he hired Angelica Calderon instead of Lopez for two main reasons. Rogero Dep. at 83:1–2, 92:5–10. First, Calderon's experience was "clearly" "better than the other candidates." *Id.* at 92:7–9; *see id.* at 123:22–124:2 (Rogero agreeing that Calderon is "more qualified than Ms. Lopez for the position"). Second, he "looked at [Lopez's] performance evaluation." *Id.* at 92:9–10, 94:18–22. Both the "comments and [the] low scoring" convinced Rogero that Lopez was not the right candidate for the position. *Id.* at 92:24–93:10. Rogero testified that, although his decision was not "solely based on" the performance review, the performance review did "play a role" in his hiring decision. *Id.* at 97:20–98:13; *see also* (Doc. 47-18) at 1 (an email from Lee Huffstutler, the Chief Accountant for the City, to Lopez informing Lopez that "it may not happen due to [her] recent performance evaluation").

Rogero also testified that he considered a ranking of the candidates that Huffstutler prepared. Rogero Dep. at 97:24–98:9. Importantly, from Rogero's recollection, Huffstutler had ranked Calderon above Lopez before he reviewed Lopez's performance evaluation. *Id.* at 120:19–122:9; *see* (Doc. 56-1) at 1. And

Rogero testified that he usually chooses Huffstutler's top recommendation. Rogero

Dep. at 122:14–20. Only Caledron and Jill Elder, who was ranked behind Calderon,

received in-person interviews with Huffstutler. *See* JSUF ¶ 54.

Based on this evidence, a reasonable jury could conclude that Lopez's negative

performance evaluation (which, as concluded above, a reasonable jury could find was

the product of FMLA retaliation) was a but-for cause of Lopez's failure to receive

the job. This remains the case even considering Rogero's testimony about the other

reasons for his decision. Although Rogero testified that his decision was not "solely

based on" Lopez's negative performance evaluation, Rogero Dep. at 97:20–23, "there

can be multiple but-for causes of an adverse employment action," *Akridge*, 93 F.4th

at 1200. And the City does not point to evidence entitling it to summary judgment

based on causation. Accordingly, the City has not demonstrated entitlement to

summary judgment.

### 4. The City is Entitled to Summary Judgment in Part on Lopez's FCRA Retaliation Claims

Under the FCRA, "[i]t is an unlawful employment practice for an employer

. . . to discriminate against any person because that person has opposed any practice

which is an unlawful employment practice under this section." § 760.10(7), Fla. Stat.

Lopez alleges that she engaged in statutorily protected expression by filing a

complaint, grievance, and requested periodic updates concerning the grievance.
Compl. ¶ 180. Lopez alleges that the City retaliated against her by demoting her
and terminating her, and not hiring her for the Payroll Technician position after she
complained of her poor performance evaluation, filed a grievance, and requested
updates concerning that grievance. *Id.* ¶¶ 180–82.[12] For the reasons above, *see supra*
at 23–28, the City's motion is denied with respect to Lopez's claim that the City
retaliated against her by not hiring her for the permanent UAST position and thus
terminating her and Lopez's claim that the City retaliated against her by not hiring
her for the Payroll Technician position, but it is otherwise granted.

## IV.    CONCLUSION

Accordingly, it is **ORDERED** that the Motion for Summary Judgment (Doc.
42) is **GRANTED** in part and **DENIED** in part. The City is entitled to summary
judgment on all of Lopez's discrimination claims and some of Lopez's retaliation
claims. Lopez's ADA, PDA, and FCRA retaliation claims with respect to the City's
termination decision, which followed from the City's decision to hire someone else
for the permanent UAST position, may proceed to trial. So may Lopez's ADA and

---

[12] Lopez's retaliation claim with respect to the performance review and the removal of her parking
privileges fails for the reasons above. *See supra* at 23 n.5.

37

FCRA retaliation claims regarding the City's decision to hire someone else for the

Payroll Technician position. Lopez's FMLA retaliation claim based on her grievance

and the City's termination decision may proceed to trial. So may Lopez's FMLA

retaliation claims based on her use of FMLA leave and the negative performance

review and failure to receive the Payroll Technician position.

  **ORDERED** in Tampa, Florida, on June 20, 2025.


Kathryn Kimball Mizelle
United States District Judge